Case No. 23-10534

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

In the Matter of: Highland Capital Management, L.P.,

      Debtor.

---

Highland Capital Management Fund Advisors, L.P., now known as NexPoint
Asset Management, L.P.; NexPoint Advisors, L.P.,

      Appellants,

v.

Highland Capital Management, L.P.,

      Appellee.

---

## APPELLANTS' RECORD EXCERPTS

---

Direct Appeal from the United States Bankruptcy Court for
the Northern District of Texas, the Honorable Stacey G.C. Jernigan

Davor Rukavina, Esq.
**MUNSCH HARDT KOPF & HARR, P.C.**
500 North Akard St., Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR NEXPOINT ASSET
MANAGEMENT, L.P. and
NEXPOINT ADVISORS, L.P.**

# TABLE OF CONTENTS

| TAB | DESCRIPTION | NUMBER |
|:---:|:---|:---:|
| 1 | Docket Sheet (District Court) | ROA.1-5 |
| 2 | Notice of Appeal (Bankruptcy Court) | ROA.10-12 |
| 3 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan [DE# 3503] | ROA.13-31 |
| 4 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief | ROA.752-912 |
| 5 | Transcript of October 26, 2022 Hearing | ROA.1074-1173 |
| 6 | Fifth Circuit Original Opinion (21-10449) Dated August 19, 2022 | ROA.936-965 |
| 7 | Fifth Circuit Opinion on Rehearing (21-10449) Dated September 7, 2022 | ROA.1011-1040 |
| 8 | Unpublished Order (23-90013) Granting Permission for Direct Appeal | ROA.1207 |
| | **OPTIONAL CONTENT** | |
| 9 | Redline of Fifth Circuit Original Opinion Against Opinion on Rehearing in 21-10449 | n/a |

RESPECTFULLY SUBMITTED this 15th day of August, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ Davor Rukavina

    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    500 N. Akard St., Ste. 3800
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ASSET
MANAGEMENT, L.P. and
NEXPOINT ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 15th day of August, 2023, a true and a correct copy of the foregoing document was served on the counsel of record listed below via electronic service.

Zachery Z. Annable, Esq.
Email: zannable@haywardfirm.com
Hayward, P.L.L.C.
10501 N. Central Expressway, Ste. 106
Dallas, TX 75231-0000

Jeffrey N. Pomerantz
Email: jpomerantz@pszjlaw.com
Pachulski Stang Ziehl & Jones, L.L.P.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.

4892-6077-6055v.1 019717.00001

TAB 1

BKAPP,TOLIVER

# U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00573-E

Highland Capital Management Fund Advisors LP et al v. Highland Capital Management LP

Assigned to: Judge Ada Brown

Case in other court:  BK Court, 19-34054-sgj11

                USCA5, 23-10534

Cause: 28:0158 Notice of Appeal re Bankruptcy Matter (BA

Date Filed: 03/15/2023
Jury Demand: None
Nature of Suit: 422 Bankruptcy: Appeal 28 USC 158
Jurisdiction: Federal Question

**Debtor**

**Highland Capital Management LP**

**Appellant**

| | | |
|---|---|---|
| **Highland Capital Management Fund Advisors LP** | represented by | **Davor Rukavina**<br>Munsch Hardt Kopf & Harr PC<br>500 N Akard St<br>3800 Ross Tower<br>Dallas, TX 75201<br>214-855-7587<br>Email: drukavina@munsch.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Julian Preston Vasek**<br>Munsch Hardt Kopf & Harr PC<br>500 N. Akard St<br>Suite 3800<br>Dallas, TX 75201<br>214-855-7500<br>Fax: 214-855-7584<br>Email: jvasek@munsch.com<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |

**Appellant**

| | | |
|---|---|---|
| **NexPoint Advisors LP** | represented by | **Davor Rukavina**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |
| | | **Julian Preston Vasek**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br>*Bar Status: Admitted/In Good Standing* |

V.

**<u>Appellee</u>**

**Highland Capital Management LP**                    represented by    **Jeffrey N Pomerantz**
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
310-227-6910
Fax: 310-201-0760
Email: jpomerantz@pszjlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Gregory V Demo**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
212-561-7700
Fax: 212-561-7777
Email: gdemo@pszjlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Hayley R Winograd**
Pachulski Stand Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
212-561-7700
Fax: 212-561-7777
*PRO HAC VICE*
*Bar Status: Not Admitted*

**Ira D Kharasch**
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
310-277-6910
*Bar Status: Not Admitted*

**John A Morris**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
Suite 34th Floor
New York, NY 10017
212-561-7760
Fax: 212-561-7777
Email: jmorris@pszjlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Zachery Z Annable**
Hayward PLLC
10501 N Central Expressway, Suite 106
Dallas, TX 75231
972-755-7108
Fax: 972-755-7110
Email: zannable@haywardfirm.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bankruptcy Judge**

**Stacey G Jernigan**                        represented by   **Stacey G Jernigan**
US Bankruptcy Court
Chambers of Judge Stacey G C Jernigan
1100 Commerce St
Room 1254
Dallas, TX 75242-1496
214-753-2040
Email: sgj_settings@txnb.uscourts.gov
PRO SE

V.

**Notice Only**

**Case Admin Sup**                           represented by   **Case Admin Sup**
Email: txnb_appeals@txnb.uscourts.gov
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2023 | 1 (p.6) | Pursuant to Fed. R. Bankr. P. 8003(d), the bankruptcy clerk has transmitted the notice of appeal filed in bankruptcy case number 19-34054 and the notice of appeal has now been docketed in the district court in case 3:23-cv-573. (The filing fee has been paid in the Bankruptcy Court.) Pursuant to Fed. R. Bankr. P. 8009, before the record on appeal can be assembled and filed in the district court, designations of items to be included in the record on appeal and statements of issues must be filed in the bankruptcy case. If a sealed document is designated, the designating party must file a motion in the district court case for the document to be accepted under seal. See also District Court Local Bankruptcy Rule 8012.1. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.6) Notice of appeal and supporting documents) (Whitaker - TXNB, Sheniqua) (Entered: 03/15/2023) |
| 03/15/2023 | | New Case Notes: A filing fee has been paid. (acm) (Entered: 03/16/2023) |
| 04/14/2023 | 2 | |

| | | ELECTRONIC ORDER: ELECTRONIC ORDER: It has come to the Court's attention that Appellee's Counsel Jeffrey N. Pomerantz, Gregory V. Demo, Hayley R. Winograd, Ira D. Kharasch, and John A. Morris, are not admitted to practice in the United States District Court for the Northern District of Texas. Therefore, within 20 days from the date of this order, counsel for Appellee must either become admitted to practice in this District (See LR 83.7), or move the Court to be admitted Pro Hac Vice (See LR 83.9(b)). Failure to do so may result in sanctions being imposed for failure to comply with an order of the Court. (Ordered by Judge Ada Brown on 4/14/2023) (chmb) (Entered: 04/14/2023) |
|---|---|---|
| 04/20/2023 | 3 (p.126) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Gregory V. Demo with Pachulski Stang Ziehl & Jones LLP (Filing fee $100; Receipt number ATXNDC-13682933) filed by Highland Capital Management LP (Attachments: # 1 (p.6) Certificate of Good Standing, # 2 Proposed Order) (Hayward, Melissa) (Entered: 04/20/2023) |
| 04/20/2023 | 4 (p.134) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Hayley R. Winograd with Pachulski Stang Ziehl & Jones LLP (Filing fee $100; Receipt number ATXNDC-13682941) filed by Highland Capital Management LP (Attachments: # 1 (p.6) Certificate of Good Standing, # 2 Proposed Order) (Hayward, Melissa) (Entered: 04/20/2023) |
| 04/20/2023 | 5 (p.140) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney John A. Morris with Pachulski Stang Ziehl & Jones LLP (Filing fee $100; Receipt number ATXNDC-13682948) filed by Highland Capital Management LP (Attachments: # 1 (p.6) Certificate of Good Standing, # 2 Proposed Order) (Hayward, Melissa) (Entered: 04/20/2023) |
| 04/21/2023 | 6 | ELECTRONIC ORDER granting 3 (p.126) Application for Admission Pro Hac Vice of Gregory V. Demo. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Ada Brown on 4/21/2023) (chmb) (Entered: 04/21/2023) |
| 04/21/2023 | 7 | ELECTRONIC ORDER granting 4 (p.134) Application for Admission Pro Hac Vice of Hayley R. Winograd. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Ada Brown on 4/21/2023) (chmb) (Entered: 04/21/2023) |
| 04/21/2023 | 8 | ELECTRONIC ORDER granting 5 (p.140) Application for Admission Pro Hac Vice of John A. Morris. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Ada Brown on 4/21/2023) (chmb) (Entered: 04/21/2023) |
| 04/24/2023 | 9 (p.148) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Jeffrey N. Pomerantz with Pachulski Stang Ziehl & Jones LLP (Filing fee $100; Receipt number ATXNDC-13689450) filed by Highland Capital Management LP (Attachments: # 1 (p.6) Proposed Order)Attorney Zachery Z Annable added to party Highland Capital Management LP(pty:e) (Annable, Zachery) (Entered: 04/24/2023) |
| 04/25/2023 | 10 | ELECTRONIC ORDER granting 9 (p.148) Application for Admission Pro Hac Vice of Jeffrey N. Pomerantz. Important Reminder: Unless excused for cause, an attorney |

| | | who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Ada Brown on 4/25/2023) (chmb) (Entered: 04/25/2023) |
|---|---|---|
| 05/02/2023 | 11 (p.157) | Notice Transmitting COMPLETE BK Record on Appeal re 1 (p.6) Notice Transmitting BK Appeal or Withdrawal of Reference. (Attachments: # 1 (p.6) Mini Record Vol. 1, # 2 Appellant Record Vol. 2, # 3 (p.126) Appellant Record Vol. 3, # 4 (p.134) Appellant Record Vol. 4) (Blanco - TXNB, Juan) (Entered: 05/02/2023) |
| 05/23/2023 | 12 (p.1174) | Unopposed MOTION for Extension of Time to File Appellants' Brief filed by Highland Capital Management Fund Advisors LP, NexPoint Advisors LP (Attachments: # 1 (p.6) Exhibit A, # 2 Exhibit B, # 3 (p.126) Proposed Order) (Vasek, Julian) (Entered: 05/23/2023) |
| 05/24/2023 | 13 | ELECTRONIC ORDER granting 12 (p.1174) Unopposed Motion for Extension of Time to File. Before the Court is the Unopposed Motion to Extend Brief Deadline, filed by appellants NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. ("Appellants"). Having considered the relief requested in the Motion and the agreement of the parties, it is hereby ORDERED that the motion is GRANTED, and Appellants' deadline to file their brief is extended to June 15, 2023. (Ordered by Judge Ada Brown on 5/24/2023) (chmb) (Entered: 05/24/2023) |
| 06/05/2023 | 14 | ELECTRONIC ORDER: The Court ORDERS the Parties in this proceeding to take notice that Judge Ada Brown shall adopt revised policies and procedures on July 1, 2023. The revised policies and procedures are posted on the Courts page on the Northern District of Texas Website. RevisedJSR-Brown.pdf (uscourts.gov). If the Parties have any motion or response deadlines between now and July 1, 2023, which are affected by new briefing requirements, the Parties may proceed under the current policies and procedures. The Parties may further seek leave of Court for any filings due in July 2023 to comply with the Courts revised briefing requirements. (Ordered by Judge Ada Brown on 6/5/2023) (chmb) (Entered: 06/05/2023) |
| 06/12/2023 | 15 (p.1205) | NOTICE of *Direct Appeal to the Fifth Circuit* filed by Highland Capital Management Fund Advisors LP, NexPoint Advisors LP (Attachments: # 1 (p.6) Fifth Circuit Order Granting Direct Appeal) (Vasek, Julian) (Entered: 06/12/2023) |
| 06/12/2023 | 16 (p.1208) | MOTION to Abate District Court Appeal in Light of Direct Appeal to the Fifth Circuit filed by Highland Capital Management Fund Advisors LP, NexPoint Advisors LP (Attachments: # 1 (p.6) Exhibit A - Fifth Circuit Order Granting Direct Appeal, # 2 Proposed Order) (Vasek, Julian) (Entered: 06/12/2023) |

# TAB 2

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

## <u>JOINT NOTICE OF APPEAL</u>

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "<u>Appellants</u>"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "<u>Bankruptcy Case</u>") of Highland Capital Management, L.P. (the "<u>Debtor</u>"),

and, pursuant to 28 U.S.C. § 158(a), hereby appeal to the United States District Court for the

Northern District of Texas that certain *Memorandum Opinion and Order on Reorganized Debtor's*

*Motion to Conform Plan [DE #3503]* entered by the Bankruptcy Court on February 27, 2023 at

docket no. 3671 in the Bankruptcy Case (the "<u>Order</u>").[1]

A copy of the Order is attached hereto as Exhibit "A."

---

[1] The Order is also entered at docket number 3672, apparently once as an order and once as a memorandum opinion. To the extent necessary, the Appellants also appeal by this notice the same Order as entered at docket number 3672 in addition to as entered at docket number 3671.

23-10534.10

The names of the parties to the Order, and the contact information for their attorneys, is as follows:

1. <u>Appellants:</u>

      Highland Capital Management Fund Advisors, L.P.
      NexPoint Advisors, L.P.

      <u>Attorneys:</u>

            Davor Rukavina
            Julian P. Vasek
            MUNSCH HARDT KOPF & HARR, P.C.
            3800 Ross Tower
            500 N. Akard Street
            Dallas, Texas  75201-6659
            Telephone: (214) 855-7587
            Facsimile: (214) 855-7584
            Email: [drukavina@munsch.com](mailto:drukavina@munsch.com)

2. <u>Appellee:</u>

      Highland Capital Management, L.P.

      <u>Attorneys:</u>

            Jeffrey N. Pomerantz
            Ira D. Kharasch
            John A. Morris
            Gregory V. Demo
            Hayley R. Winograd
            PACHULSKI STANG ZIEHL & JONES LLP
            10100 Santa Monica Blvd., 13th Floor
            Los Angeles, CA 90067
            Telephone: (310) 277-6910
            Facsimile: (310) 201-0760
            Email: jpomerantz@pszjlaw.com
                  ikharasch@pszjlaw.com
                  jmorris@pszjlaw.com
                  gdemo@pszjlaw.com
                  hwinograd@pszjlaw.com

23-10534.11

RESPECTFULLY SUBMITTED this 13th day of March, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina

  Davor Rukavina, Esq.
  Texas Bar No. 24030781
  3800 Ross Tower
  500 N. Akard Street
  Dallas, Texas 75201-6659
  Telephone: (214) 855-7500
  Facsimile: (214) 855-7584
  Email: drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 13th day of March, 2023, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Appellee.

By: /s/ Davor Rukavina

  Davor Rukavina, Esq.

# TAB 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 27, 2023**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §  Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## MEMORANDUM OPINION AND ORDER ON REORGANIZED DEBTOR'S MOTION TO CONFORM PLAN [DE # 3503]

### I.  INTRODUCTION

This Memorandum Opinion and Order addresses a *Motion to Conform Plan* [DE # 3503] ("*Motion*") filed by Highland Capital Management, L.P. ("Highland" or the "Reorganized Debtor").[1]  The *Motion* was filed in response to a ruling of the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") in connection with an appeal of the confirmation order on

---

[1] The court will sometimes use the term "Debtor" when referring to Highland during the post-petition/pre-confirmation time period.

1



EXHIBIT "A"
23-10534.13

Highland's Chapter 11 plan ("Plan"). As further explained herein, the Fifth Circuit affirmed the confirmation order in all respects except the following:  it determined that certain ***exculpations*** in the Plan, as to certain parties, were impermissible pursuant to section 524(e) of the Bankruptcy Code and should be stricken as to those parties.  More specifically, the Fifth Circuit held that the only parties properly entitled to Plan exculpations were:  the Debtor, the Official Committee of Unsecured Creditors (the "UCC") and its members, and the "Independent Directors"[2] (collectively, the "Properly Exculpated Parties").  The Fifth Circuit then remanded "to the Bankruptcy Court for further proceedings in accordance with the opinion of this Court."[3]

Accordingly, the Reorganized Debtor filed the *Motion*, proposing that the bankruptcy court approve a scaled down defined term for "Exculpated Parties" in the Plan.  This, says the Reorganized Debtor, is all that the Fifth Circuit's mandate required—i.e., a narrowing of the defined universe of persons who received exculpations under the Plan.

Three sets of parties objected to the *Motion*: (a) Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. (the "Funds") [DE # 3539]; (b) the Dugaboy Investment Trust ("Dugaboy")[4] [DE # 3540]; and (c) NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. (the "Advisors") [DE # 3551].[5]  These objectors argue that the Fifth Circuit's ruling requires more surgery on the Plan than simply narrowing the defined term for "Exculpated Parties."  The Reorganized Debtor disagreed in a Reply [DE # 3566], and the court thereafter held a hearing to allow oral argument. The court gave an oral ruling from the bench at the hearing, stating that the Reorganized Debtor's

---

[2] The Independent Directors—consisting of James P. Seery, Jr., John Dubel, and Retired Bankruptcy Judge Russell Nelms—were appointed by the bankruptcy court and were comparable to "quasi-trustees."
[3] *NexPoint v. Highland Capital Management*, Case No. 21-10449 at DE # 213 (5th Cir. Sep. 12, 2022).
[4] Dugaboy is a family trust of James Dondero ("Mr. Dondero"), the co-founder and former CEO of the Debtor.
[5] It has been conceded at prior hearings that the Advisors are controlled by Mr. Dondero. The court assumes that is still the case.

23-10534.14

proposal of simply changing the defined term in the Plan for "Exculpated Parties" would seem to properly address the Fifth Circuit's ruling and mandate, but the parties asked the court to draft a formal written Order providing its reasoning, for the parties' benefit and in case there were appeals of the court's ruling on the *Motion*. This constitutes the court's written ruling.

## II.     RELEVANT BACKGROUND

On October 16, 2019, Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On February 22, 2021, the bankruptcy court entered a Confirmation Order [DE # 1943] confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (as subsequently modified, the "Plan"). The Confirmation Order was appealed by the Funds, the Advisors, Dugaboy, the Get Good Trust (the latter of which is another family trust of Mr. Dondero), and Mr. Dondero in his individual capacity ("Appellants") [DE ## 1957, 1966, 1970, 1972]. Appellants' appeal was certified for direct appeal to the Fifth Circuit.

On August 19, 2022, the Fifth Circuit issued an opinion (the "Initial Fifth Circuit Opinion")[6] and a judgment ("Judgment") affirming in substantial part the Confirmation Order, stating that it reversed "only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e)," and would "strike those few parties from the plan's exculpation, and affirm on all remaining grounds."[7] The Fifth Circuit remanded to the bankruptcy court "for further proceedings in accordance with the opinion of this Court."[8]

---

[6] *NexPoint v. Highland Capital Management*, 2022 WL 3571094, Case No. 21-10449, slip opinion previously available at DE # 194 (5th Cir. Aug. 19, 2022). The Initial Fifth Circuit Opinion was attached to the Funds' objection to the *Motion* as an Exhibit A [DE # 3539].
[7] *Id.* at p. 2.
[8] *Id.*

On September 2, 2022, the Funds filed a short (four-and-one-half pages) motion for
rehearing at the Fifth Circuit (the "Motion for Rehearing").[9]  This was on the Friday before Labor
Day.  The Funds requested "that the Court narrowly amend the [Initial Fifth Circuit] Opinion in
order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck
from the protections of the injunction and gatekeeper provisions of the plan (in other words, that
such parties cannot constitute 'Protected Parties')."  As later explained, the Plan contained distinct
"Exculpation," "Injunctions," and "Gatekeeper" provisions.  On September 7, 2022 (the Tuesday
after Labor Day), the Fifth Circuit granted the Motion for Rehearing and, without entertaining
responses or oral argument, withdrew the Initial Fifth Circuit Opinion and entered a substituted
opinion (the "Final Fifth Circuit Opinion").[10] The Final Fifth Circuit Opinion *replaced only one
sentence* that had been in the Initial Fifth Circuit Opinion:

> *"The injunction and gatekeeper provisions are, on the other hand, perfectly lawful"* [11]
> with the following sentence:

> *"We now turn to the Plan's injunction and gatekeeper provisions."* [12]

However, in the Final Fifth Circuit Opinion, same as the Initial Fifth Circuit Opinion, the
Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only
insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those
few parties from the plan's exculpation, and affirm on all remaining grounds."[13] To be clear, no

---

[9] DE # 3539, Exhibit C thereto.
[10] *NexPoint v. Highland Capital Management*, 48 F.4th 419, Case No. 21-10449, slip opinion at DE # 210 (5th Cir.
Sep. 7, 2022). The Final Fifth Circuit Opinion was attached to the Funds' objection to the *Motion* as an Exhibit C
[DE # 3539]. Most subsequent references to the Final Fifth Circuit Opinion will cite to the published version of it in
the West Reporter Service, appearing at 48 F.4th 419.
[11] *See* slip opinion, at p. 27 [DE # 3539, Exhibit A thereto].
[12] *See* Final Fifth Circuit Opinion, slip opinion at p. 28 [DE # 3539, Exhibit C thereto]. 48 F.4th at 438.
[13] 48 F.4th at 424.

4

findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the Initial Fifth Circuit Opinion were disturbed.

The Fifth Circuit's docket reflects that it issued its Judgment and a mandate on September 12, 2022, remanding "to the Bankruptcy Court for further proceedings in accordance with the opinion of this Court."[14]

On October 7, 2022, the Fifth Circuit denied a motion by certain Appellants for a stay of the mandate.[15]

Thereafter, on January 10 and 23, 2023, petitions for *writ of certiorari* to the United States Supreme Court were filed by the Reorganized Debtor and certain Appellants.[16]  There being no stay of the Final Fifth Circuit Opinion or the mandate, this court now issues this ruling on the *Motion*.

## III.   JURISDICTION

The bankruptcy court has jurisdiction to rule on the *Motion* pursuant to the mandate of the Fifth Circuit issued on September 12, 2022.  Furthermore, the underlying statutory authority that is applicable is 11 U.S.C. §§ 105(a) and 1142.

## IV.   THE PLAN PROVISIONS THAT ARE CONCEIVABLY AT ISSUE

To put the relief sought in the *Motion* and the objections thereto into proper context, a review of three sets of Plan provisions is appropriate.  First, the ***exculpation provisions***.  Second, the ***injunction provisions***.  Third, the ***gatekeeping provisions***.  These all had distinct functions;

---

[14] *NexPoint v. Highland Capital Management*, Case No. 21-10449 at DE # 213 (5th Cir. Sep. 12, 2022).
[15] *Id.* at DE # 222 (5th Cir. Oct. 7, 2022).
[16] *Id.* at DE ## 227 & 228 (5th Cir. Jan. 10 & 23, 2023).

23-10534.17

they were not in any way redundant. Sometimes they have been collectively referred to as the

"*Protection Provisions*."

**Exculpations**.  The Plan addressed Exculpation at Article IX.C thereof. The "Exculpation"

provision, in pertinent part, stated as follows:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, *no Exculpated Party will have or incur*, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and *liability for conduct occurring on or after the Petition Date* in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); provided, however, *the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct* or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability. (Emphasis added.)

The Plan had a defined term for "Exculpated Parties," at Article I.B.62 that read as follows:

> "**Exculpated Parties**" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its

23-10534.18

subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Simply stated, the Exculpation Provisions shielded a specified list of parties from any **negligence liability** for **post-petition conduct** in connection with the Highland Chapter 11 cases. The provisions effectuated **an absolution of liability** for the Exculpated Parties—but, again, only for mere negligent conduct occurring on or after the Petition Date and in connection with the case. It is also notable that the Exculpation Provisions deal only with pre-Effective Date Parties (i.e., not any parties created by the terms of the Plan, such as the Litigation Trustee or Claimant Trustee).

    **Injunctions.** The Plan addresses Injunctions at Article IX.F, in the first three paragraphs thereof. The "Injunctions" provision, in pertinent part, stated as follows:

> Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, *from taking any actions to interfere with the implementation or consummation of the Plan*.

> Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting *the Debtor or the property of the Debtor*, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order *against the Debtor or the property of the Debtor*, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind *against the Debtor or the property of the Debtor*, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the *Debtor or against property or interests in property of the Debtor*, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) *acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.*

7

The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, ***but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property***. (Emphasis added.)

The Plan had a defined term for "Enjoined Parties," at Article I.B.56 that read as follows:

"**Enjoined Parties**" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons[17] of each of the foregoing.

Simply stated, the injunctions were ***not*** a release, or absolution of liability, or exculpation *per se*, but were, rather, an equitable device aimed at: (a) enforcing the discharge of the Debtor; (b) protecting the Debtor's property dealt with by the Plan; and (c) preventing interference with implementation of the Plan. It was directed to claimants, equity interest holders, those who had participated in the Chapter 11 Case (including Mr. Dondero) and parties related to them. In sum—similar to so many Chapter 11 plans that this court sees—this provision was "belts and suspenders" to the Plan discharge and was essentially a ***policing mechanism to deter actions in violations of the discharge or otherwise inconsistent with the Plan***.

**Gatekeeper Provisions**. The Plan set forth gatekeeper provisions in the fourth paragraph of Article IX.F, although the gatekeeper provision did not use this title. This provision was very

---

[17] "Related Entity" and "Related Persons" were defined terms under the Plan, but the definitions will not be set forth herein, because they are not deemed relevant to the court's analysis.

much part and parcel to the Injunctions (which explains why it is located in the same section of the Plan).  The provision stated:

> Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party *that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing* without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; provided, however, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  *The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action*.  (Emphasis added.)

The Plan had a defined term for "Protected Parties" as follows:

> "**Protected Parties**" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv)     the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy

9

Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

Notably, the list of "Protected Parties" was not identical to the list of "Exculpated Parties." Namely, the "Protected Parties" list included several parties that were not even in existence prior to confirmation—such as the Claimant Trustee, Claimant Trust Oversight Board, and Litigation Trustee. In any event, simply put, the Gatekeeper Provision was somewhat of a tool to deal with any future, potential lawsuits that might be deemed to run afoul of the Injunctions. It did not effectuate a release or an absolution of any liability. Rather, as the "gatekeeper" nickname implies, it simply provided that a plaintiff would have to **ask** the gatekeeper before bringing a claim. No one would be allowed to bring a claim against a defined universe of "Protected Parties" without first asking the bankruptcy court. The bankruptcy court would have to determine, after notice, that such claim or cause of action represents a colorable claim against a Protected Party and specifically authorize such plaintiff to bring such claim against any such Protected Party. If the bankruptcy court were to deny permission, then, presumably, such denial could be appealed.

The Confirmation Order addressed Exculpation, the Injunctions, and the Gatekeeper Provisions at length at pages 48-59.

## V.    THE RELIEF SOUGHT IN THE MOTION TO CONFORM PLAN

As noted earlier, in the *Motion*, the Reorganized Debtor proposes that only one change is needed to make the Plan compliant with the Fifth Circuit's ruling: narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent Directors, (iii) the Committee, and (iv) members of the Committee (in their official capacities).

10

The Reorganized Debtor states that this one simple revision of this defined term "directly addresses all instances of exculpation deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and no other changes" are required to conform the Plan and Confirmation Order to the Final Fifth Circuit Opinion.[18]

<u>The Funds' Opposition</u>. The Funds support the revision of the defined term "Exculpated Parties," as proposed by the Reorganized Debtor, but they argue that the defined term "Protected Parties" must likewise be revised to "fully implement[ ] the mandate of the Fifth Circuit . . . ." [19] The Funds point to their Motion for Rehearing filed at the Fifth Circuit, wherein they expressed concern that "the Court's statement that the injunction and gatekeeper provisions are 'perfectly lawful,' might be argued to mean that the injunction and gatekeeper provisions – without any tailoring – are allowed to stand."[20] The Funds specifically asked the Fifth Circuit panel to revise its opinion to clarify and "to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the Plan (in other words, that such parties cannot constitute 'Protected Parties'), such that the injunction and gatekeeper provisions extend only to Highland Capital, the Committee and its members, and the Independent Directors."[21] The Funds' argue that the fact that the panel granted the Motion for Rehearing and removed the "perfectly lawful" sentence (replacing it with the sentence noted above) and otherwise left the language unchanged means that the panel agreed with the Funds' interpretation of the Initial Fifth Circuit Opinion that "the parties protected by the injunction and

---

[18] DE # 3503, ¶ 11.
[19] DE # 3539, ¶ 3.
[20] DE # 3539, ¶ 5.
[21] DE # 3539, Exhibit B thereto, at ¶ 3.

gatekeeper provisions (the Protected Parties) must similarly be limited to the Properly Exculpated

Parties – Highland, the Committee and its members, and the Independent Directors."[22]

Accordingly, the Funds request that, in addition to narrowing the defined term "Exculpated

Parties," the bankruptcy court order a similar narrowing of the defined term "Protected Parties" to

read:

> "Protected Parties" means, collectively, (i) the Debtor, (ii) the Independent
> Directors, (iii) the Committee, and (iv) members of the Committee (in their official
> capacities).[23]

Dugaboy's Opposition.  Dugaboy filed a short Joinder simply adopting the arguments of

the Funds.[24]

The Advisors' Opposition.  The Advisors filed an Objection adopting the Funds' Response

but requesting two additional revisions to the Plan.[25]  First, the Advisors proposed fully deleting

the provision in the Injunctions section (Plan, Art. IX.F., third para.) that "purports to enjoin claims

against successors of the Debtor who are not entitled to limited qualified immunity under" the

Final Fifth Circuit Opinion.[26]  Second, the Advisors proposed "carv[ing] out from the gatekeeping

provision of the injunction those suits that are expressly allowed by 28 U.S.C. § 959(a)," by

"amend[ing] the fourth paragraph of Article IX.F of the Plan by excepting from the gatekeeping

provisions actions that relate to the Independent Directors or Debtor 'carrying on business

connected with [their] property' as provided in § 959(a)." With respect to the "carve out" request,

the Advisors point to footnote 18 of the Final Fifth Circuit Opinion, which states, "[W]e also leave

---

[22] DE # 3539, ¶ 14.
[23] DE # 3539, ¶ 19.
[24] DE # 3540.
[25] DE # 3551.
[26] *Id.* at ¶ 6.

12

the applicability of *Barton*'s[27] limited statutory exception to the bankruptcy and district courts in the first instance."[28]

Highland's Reply.   Highland replied to all of this by arguing that the Motion for Rehearing—and what the Funds asked for therein—is hugely significant.  The Funds specifically requested, in their Motion for Rehearing, that the Fifth Circuit panel (a) limit the definition of "Protected Parties" in the same way that it did with respect to the parties entitled to exculpation, and (b) "tailor" the injunction and gatekeeper provisions, in order to confirm that the Fifth Circuit meant to narrow the parties covered by the injunctions and gatekeeper provisions of the Plan.  The Fifth Circuit did none of those things when it granted the Motion for Rehearing; it simply deleted the sentence stating that the gatekeeper provisions and injunction are "perfectly lawful" and otherwise left its initial affirmance of the gatekeeper provisions and injunctions intact. Highland argues that "the Fifth Circuit . . . clarified that the Injunction was 'sound' but not 'perfectly lawful'" and that nothing in the Final Fifth Circuit Opinion supports the position that the Fifth Circuit intended to limit the Protected Parties that are protected by the Gatekeeper Provision from "harassing and frivolous litigation." Highland further argues that, since the Gatekeeper Provision is not a release, it does not implicate § 524(e), but is necessary to prevent harassment.

## VI.    RULING ON MOTION TO CONFORM PLAN

The court grants the request of the Reorganized Debtor, holding that the only thing that needs to be done in response to the Final Fifth Circuit Opinion and mandate is to change the defined term for "Exculpated Parties," at Art. I.B.62 of the Plan as follows:

---

[27] This is, of course, a reference to *Barton v. Barbour*, 104 U.S. 126 (1881).
[28] 48 F.4th at 439 n.18 (citing 28 U.S.C. § 959(a) "(allowing suit, without leave of the appointing court, if the challenged acts relate to the trustee or debtor in possession 'carrying on business connected with [their] property'")).

"'Exculpated Parties' means, collectively, (i) the Debtor, (ii) the Independent Directors, (iii) the Committee, and (iv) the members of the Committee (in their official capacities)."

In so holding, this court has scoured the Final Fifth Circuit Opinion to be clear what language survived and to discern what the Court did or did not find problematic with the Plan Protections. In that regard, this court notes the following:

On Page 429, the Fifth Circuit states:

We then turn to the merits, conclude the Plan exculpates certain non-debtors beyond the bankruptcy court's authority, and affirm in all other respects.[29]

On Page 432, the Court states:

We do, however, agree with Appellants that the bankruptcy court exceeded its statutory authority under § 524(e) by exculpating certain non-debtors, and so we reverse and vacate the Plan only to that extent.[30]

On Page 435, the Fifth Circuit states, before launching into a discussion of the various type of Plan Protections:

The bankruptcy court deemed the provisions legal, necessary under the circumstances, and in the best interest of all parties. We agree, but only in part. Though the injunction and gatekeeping provisions are sound, the exculpation of certain non-debtors exceeds the bankruptcy court's authority. We reverse and vacate that limited portion of the Plan. . . . In a Chapter 11 bankruptcy proceeding, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Contrary to the bankruptcy court's holding, the exculpation here partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors. *See Pacific Lumber,* 584 F.3d at 251–53. We must reverse and strike the few unlawful parts of the Plan's exculpation provision.[31]

---

[29] 48 F.4th at 429.
[30] *Id.* at 432.
[31] *Id.* at 435.

14

On pages 437-438, in wrapping up its discussion of the Exculpation Provisions, the Fifth

Circuit states:

> In sum, our precedent and § 524(e) require any exculpation in a Chapter 11
> reorganization plan be limited to the debtor, the creditors' committee and its
> members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the
> trustees within the scope of their duties, *see Baron*, 914 F.3d at 993. And so,
> excepting the Independent Directors and the Committee members, the exculpation
> of non-debtors here was unlawful. Accordingly, the other non-debtor exculpations
> must be struck from the Plan. *See Pacific Lumber*, 584 F.3d at 253.
>
> As it stands, the Plan's exculpation provision extends to Highland Capital
> and its employees and CEO; Strand; the Reorganized Debtor and HCMLP GP LLC;
> the Independent Directors; the Committee and its members; the Claimant Trust, its
> trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its
> trustee; professionals retained by the Highland Capital and the Committee in this
> case; and all ''Related Persons.'' Consistent with § 524(e), we strike all exculpated
> parties from the Plan except Highland Capital, the Committee and its members, and
> the Independent Directors.[32]

On page 438, immediately after the previously quoted language, the next section of the

Final Fifth Circuit Opinion has a subheading "Injunction & Gatekeeper Provisions,"

and then states:

> ***We now turn to the Plan's injunction and gatekeeper provisions.***
> Appellants object to the bankruptcy court's injunction as vague and the gatekeeper
> provision as overbroad. We are unpersuaded.[33]

Note that the bolded sentence above is the only new sentence in the Final Fifth Circuit

Opinion, and it replaced a previous sentence that read: "The injunction and gatekeeper provisions

are on the other hand, perfectly lawful."

---

[32] *Id.* at 437-38.
[33] *Id.* at 438 (emphasis added).

Finally, in the penultimate paragraph of the entire Final Fifth Circuit Opinion, the Fifth Circuit states:

> In sum, the Plan violates § 524(e), but only insofar as it exculpates and enjoins certain non-debtors. The exculpatory order is therefore vacated as to all parties except Highland Capital, the Committee and its members, and the Independent Directors for conduct within the scope of their duties. We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.

On balance, this court does not know how it could be clearer, that the Fifth Circuit was holding that the exculpations of certain parties violated section 524(e), but the other Plan Protections were "sound."[34]

Of course, this still begs the question: what might the Fifth Circuit have meant in replacing the sentence ***"The injunction and gatekeeper provisions are on the other hand, perfectly lawful"*** with the sentence "***We now turn to the Plan's injunction and gatekeeper provisions"***?[35]

It is certainly awkward for this court to attempt to be a mind-reader regarding editorial or wordsmithing decisions undertaken by the Fifth Circuit. All this court can be sure of is that the Fifth Circuit declined the Funds' request, in their Motion for Rehearing, to strike or modify the defined term "Protected Parties" (that pertains to the Gatekeeper Provision) so that it would be coterminous with the defined term "Exculpated Parties." The Fifth Circuit did not modify the Gatekeeper Provision or its applicable definition of "Protected Parties" in any way, let alone in the manner that the Funds requested. And the Fifth Circuit did not include anything in its Final Fifth Circuit Opinion to indicate that the panel agreed with the Funds' analysis.

---

[34] *Id.* at 435.
[35] *Id.* at 438.

16

Moreover, limiting the definition of "Protected Parties" to be coterminous with the defined term "Exculpated Parties" would mean that the Gatekeeper Provision would have no effect on any conduct that occurs after the Plan Effective Date. Why? ***Because the persons included in the defined term "Exculpated Parties"—as now limited by the Fifth Circuit's ruling to include only the Debtor, the UCC, the UCC members, and Independent Directors—are all gone now.*** They all ceased to exist on the Effective Date. Additionally, the Debtor would not even need a Gatekeeper Provision for pre-Effective Date conduct because the Debtor was discharged. The Gatekeeper Provision is largely forward-looking, to prevent interference with post-Effective-Date management as they consummate the Plan, wind down the assets, and administer the Claimant Trust and the Litigation Sub-Trust. As noted, the defined term for "Protected Parties" includes several parties that did not even exist pre-confirmation such as the Claimant Trustee, Claimant Trust Oversight Board, and Litigation Trustee. It is mostly a tool to deal with any future, potential lawsuits that might be deemed to run afoul of Plan implementation. The Gatekeeper Provision did not effectuate a release or an absolution of any liability. Rather, as the "gatekeeper" nickname implies, it simply provided that a plaintiff would have to ***ask*** the gatekeeper before bringing a claim against the defined universe of "Protected Parties." If such a request is made, the bankruptcy court will determine, after notice, whether such claim or cause of action represents a colorable claim against a Protected Party and specifically authorize such plaintiff to bring such claim against any such Protected Party. If the bankruptcy court denies permission, then, presumably, such denial could be appealed.

The bankruptcy court humbly suggests that the Fifth Circuit well understood all of this. Perhaps they deleted the one sentence out of concern that there might be something in the Injunction Provisions that ran afoul of the new, narrowed defined term for "Exculpated Parties"—

for example, the catchall clause at Article IX.F(v) of the Injunction Provision.  Specifically, that

catchall clause, appearing after the injunctions of all sorts of conduct *against the Debtor* or its

property, also enjoins parties from "(v) *acting or proceeding in any manner, in any place*

*whatsoever, that does not conform to or comply with the provisions of the Plan."*  Perhaps the

Fifth Circuit thought this injunctive language was a little vague or broad, but it had fixed any

problem with it, by making clear that no one was absolved from any liability except the Debtor,

the UCC, the UCC members, and the Independent Directors.  The Fifth Circuit had fixed any

problem with the cause by ruling that the defined term "Exculpated Parties" was too broad.

But perhaps the Fifth Circuit was simply making a stylistic edit—maybe they thought the

words "perfectly lawful" may have sounded a bit too rosy or glowing, with regard to gatekeeper

provisions generally, and they did not want to suggest that they had blessed them for every plan in

the future, no matter what the facts and circumstances were.  Perhaps the word "sound" seemed

more measured and case-specific than the words "perfectly lawful."

In any event, in light of the Fifth Circuit keeping intact, in its Final Fifth Circuit Opinion,

the language that the "the injunction and gatekeeping provisions are sound," this court sees no

need to tailor those provisions in any manner.  This tailoring request was made to the Fifth Circuit

in the Motion for Rehearing, and they declined.

Finally, with regard to the Advisors' request that this court delete the provision in the

Injunctions section (Plan, Art. IX.F., third para.) that "purports to enjoin claims against successors

of the Debtor who are not entitled to limited qualified immunity" pursuant to the Final Fifth Circuit

Opinion and "carve out from the gatekeeping provision . . . those suits that are expressly allowed

by 28 U.S.C. § 959(a)," the bankruptcy court declines this request.  This court does not read

footnote 18 of the Fifth Circuit's Final Opinion, which states, "[W]e also leave the applicability of

*Barton*'s[36] limited statutory exception to the bankruptcy and district courts in the first instance,"[37] as necessitating any modification to the Plan whatsoever.

## VII.    CONCLUSION

The court grants the *Motion* and orders that one change be made to the Plan to conform it to the mandate of the Fifth Circuit:  revise the definition of "Exculpated Parties" as proposed in the *Motion* and no more.

### # # # END OF MEMORANDUM OPINION AND ORDER # # #

---

[36] This is, of course, a reference to *Barton v. Barbour*, 104 U.S. 126 (1881).
[37] 48 F.4th at 439 n.18 (citing 28 U.S.C. § 959(a) "(allowing suit, without leave of the appointing court, if the challenged acts relate to the trustee or debtor in possession 'carrying on business connected with [their] property'")).

# TAB 4



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.   entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

000583


*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.  set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c.  set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d.  initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.  reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f.  reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g.  reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

000584

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.      reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.      reviewed: (i) the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

DOCS_SF:104487.21 36027/002

000585

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.    reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.    conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.    heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.    considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

4

000586

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.  **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case. Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021. The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board. The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders. The Claimant Trustee is responsible

000587

Appx. 00034756

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.     **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan.  As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.     **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

000588

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for and/or control numerous non-debtor entities in the complex Highland enterprise.

5. **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned: (a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general partner.

6. **The Highland Enterprise.** Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these assets are managed by the Debtor pursuant to shared services agreements with certain affiliated entities, including other affiliated registered investment advisors. In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

000589

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

       7.    **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

       8.    **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

8

000590

23-03416759

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer Committee</u>")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("<u>Acis</u>")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

9

000591

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c. **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d. **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9. **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

DOCS_SF:104487.21 36027/002

000592

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure**. Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

11

000593

Delaware to Dallas. Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12. **Post-Petition Corporate Governance Settlement with Committee.** After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5] As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand. As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

DOCS_SF:104487.21 36027/002

000594
23-10536463

13. **Appointment of Independent Directors.** As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case. They are: James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms. These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor). The three independent board members' resumes are in evidence. The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee. The Bankruptcy Court and the Committee each trusted the independent directors. They were the right solution at the right time. Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee. Each of the independent directors brought unique qualities to the table. Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business. Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context. And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries. By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

13

000595

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case. The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically. Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

14

000596

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7] The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders. As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order. The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved. They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court. As noted previously, they completely changed the trajectory of this case.

15. **Not Your Garden Variety Mediators.** And still another reason why this was not your garden variety case was the mediation effort. In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero. The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room. Those co-mediators were: Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

000597

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

000598

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a. *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b. *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c. A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d. *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e. *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17. **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18. **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

18

000600

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated. Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

DOCS_SF:104487.21 36027/002

000601

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19. **Background Regarding Dondero Objecting Parties.** To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero. In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence. Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing. The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20. **Other Confirmation Objections.** Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

DOCS_SF:104487.21 36027/002

000602

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a.  *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b.  *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c.  *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d.  *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e.  *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f.  *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21.  **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

DOCS_SF:104487.21 36027/002

000603

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

22

000604

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

23

000605

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications"). Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications. Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation). The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan. Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data. The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

DOCS_SF:104487.21 36027/002

000606

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

DOCS_SF:104487.21 36027/002

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30. **Bankruptcy Rule 3016(a).** In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31. **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).** As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32. **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33. **Classification of Secured Claims.** Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors. Class 3 (Other

26

000608

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.     **Classification of Priority Claims.**   Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.   Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.     **Classification of Unsecured Claims.**  Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.   Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).   The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.   Class 8 Creditors

DOCS_SF:104487.21 36027/002

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

000610

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

000611

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39. **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40. **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41. **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

DOCS_SF:104487.21 36027/002

000612

1390514781

42.  **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a.  **The Claimant Trust.**  The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b.  **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.  The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

DOCS_SF:104487.21 36027/002

000613

    c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

    43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

000614

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

DOCS_SF:104487.21 36027/002

000615

45. **Selection of Trustees.** The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee. As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record. The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee. Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks. Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally. Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date. The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae. Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

DOCS_SF:104487.21 36027/002

000616

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46. **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47. **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

DOCS_SF:104487.21 36027/002

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

000618

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.    **Plan Proposed in Good Faith and Not by Means Forbidden by Law (==11 U.S.C. § 1129(a)(3)).**  The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

DOCS_SF:104487.21 36027/002

b. The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c. Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d. While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e. On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f. On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g. The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h. Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i. Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

000620

49.     **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims. The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50.     **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto. For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider. The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy. Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51.     **No Rate Changes (11 U.S.C. § 1129(a)(6)).** The Plan does not provide for any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

DOCS_SF:104487.21 36027/002

000621

52.    **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).** The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. On October 15, 2020, the Debtor filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its advisors and which was attached as Exhibit C to the Disclosure Statement. On January 29, 2021, in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor provided an updated version of the Liquidation Analysis to the then-objectors of the Plan, including Mr. Dondero and the Dondero Related Entities. On February 1, 2021, the Debtor filed the Amended Liquidation Analysis/Financial Projections. The Amended Liquidation Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues, and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in market conditions and other factors; (3) expected revenues and expenses arising in connection with the Debtor's continued management of the CLOs pursuant to management agreements that the Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding two or three employees to assist in the management of the CLOs, the Debtor also increased modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

    a.    The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

    b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

    c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

000623

     d.     The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

     e.     The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

DOCS_SF:104487.21 36027/002

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**   Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).**   Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

000625

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

DOCS_SF:104487.21 36027/002

000626

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

      a.     <u>Class 8</u>. The Plan is fair and equitable with respect to Class 8 General Unsecured Claims. While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement. Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

      b.     <u>Class 10 and Class 11</u>. There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11. Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement. Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C). The Plan does not discriminate unfairly as to Equity Interests. As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan. Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

61. **Only One Plan (<mark>11 U.S.C. § 1129(c))</mark>.** The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62. **Principal Purpose (<mark>11 U.S.C. § 1129(d))</mark>.** Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63. **Satisfaction of Confirmation Requirements.** Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64. **Good Faith Solicitation (<mark>11 U.S.C. § 1125(e))</mark>.** The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65. **Discharge (<mark>11 U.S.C. § 1141(d)(3))</mark>.** The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code. Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

**000628**

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66. **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67. **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68. **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69. **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70. **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

DOCS_SF:104487.21 36027/002

000630

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties. Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties. The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties. The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases. The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

000631

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The Debtor Release also contains conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the "Release Conditions"). Until the an employee satisfies the Release Conditions or the Release Conditions otherwise terminate, any claims against such employee will be tolled so that if the Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a later date. The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's testimony, demonstrates that the Debtor is not aware of any claims against any of the Released Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released Parties' significant contributions to a highly complex and contentious restructuring. The Committee, whose members hold approximately $200 million in claims against the Estate, is highly sophisticated and is represented by highly sophisticated professionals, and has actively and vigorously negotiated the terms of the Debtor Release, which was the subject of significant controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October 27, 2020.

72. **Exculpation.** Section IX.C of the Plan provides for the exculpation of certain Exculpated Parties to the extent provided therein (the "Exculpation Provision"). As explained below, the Exculpation Provision is appropriate under the unique circumstances of this litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent. First, with respect to the Independent Directors, their agents, and their advisors, including any employees acting at

DOCS_SF:104487.21 36027/002

000632

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.     **Existing Exculpation of Independent Directors.** The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

DOCS_SF:104487.21 36027/002

000633

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors, including any employees acting at their direction, as well as the Chief Executive Officer and Chief Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order and the July 16 Order.

74.     **The Exculpation Provision Complies with Applicable Law.**  Separate and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy Court also finds and concludes that the Exculpation Provision is consistent with applicable law, including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.     First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain parties other than a creditors' committee and its members is that section 524(e) of the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all exculpations under the Bankruptcy Code and the court in such case specifically approved the exculpations of a creditors' committee and its members on the grounds that 11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties…. [I]f members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al, Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)).  *Pacific Lumber's* rationale for permitted exculpation of creditors' committees and their members (which was clearly policy-based and based on a creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members.  The Independent Directors, and by extension the Chief Executive Officer and Chief Restructuring Officer, were not

000634

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.     Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

DOCS_SF:104487.21 36027/002

75. **Injunction.** Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision"). The Injunction Provision is necessary to implement the provisions in the Plan. Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value. In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities. Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero, it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors. The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142. The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release." The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law. The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76. **Gatekeeper Provision**. Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision"). The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties. Thereafter, if the Bankruptcy Court determines that the action is

DOCS_SF:104487.21 36027/002

000636

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

DOCS_SF:104487.21 36027/002

000637

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

       78. **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79. **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision. Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017). Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

000639

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126 (1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir. 2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.),* 301 F.3d 296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge Techs., Inc.),* 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

000640

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

    a.    Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

    b.    Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

    c.    The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

DOCS_SF:104487.21 36027/002

000641

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.      The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.      Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.      Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

DOCS_SF:104487.21 36027/002

000642

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.      The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h.      Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.      For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.      **Confirmation of the Plan.** The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

000643

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

**B. Findings of Fact and Conclusions of Law**. The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014. All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order. To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

**C. Objections**. Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference. All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

**D. Plan Supplements and Plan Modifications.** The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

DOCS_SF:104487.21 36027/002

000644

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

E. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

F. **Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

DOCS_SF:104487.21 36027/002

000645

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

**G.      Effectiveness of All Actions.**  All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

**H.      Restructuring Transactions.**  The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

DOCS_SF:104487.21 36027/002

000646

23-04446-15

I. **Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J. **Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

DOCS_SF:104487.21 36027/002

000647

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K.** **Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

DOCS_SF:104487.21 36027/002

000648

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

        **L.**      **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

        **M.**      **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

000649

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

**N. Compromise of Controversies.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

**O. Objections to Claims**. The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

**P. Assumption of Contracts and Leases.** Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan. Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to any of the

68

000650

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q.      **Rejection of Contracts and Leases.**  Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan.  To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R.      **Assumption of Issuer Executory Contracts.**  On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

DOCS_SF:104487.21 36027/002

000651

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a cumulative amount of $525,000 (the "Cure Amount") as follows:

    a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

    b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.** Effective as of the Confirmation Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO Ltd., Rockwall CDO II Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

70

000652

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

      **T.** **Release of Debtor Claims against Issuer Released Parties.** Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

DOCS_SF:104487.21 36027/002

000653

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U. **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

000654

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

W. **Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

X. **Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

DOCS_SF:104487.21 36027/002

000655

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y. **Exculpation.** Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

000656

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.** **Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

000657

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

**AA. Injunction. Upon entry of this Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan. Except as expressly provided in the Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

DOCS_SF:104487.21 36027/002

000658

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

000659

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

BB.    **Duration of Injunction and Stays.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

CC.    **Continuance of January 9 Order and July 16 Order.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

DD.    **No Governmental Releases.** Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

DOCS_SF:104487.21 36027/002

000660

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

**EE.    Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

DOCS_SF:104487.21 36027/002

000661
2314903434930

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF. **Cancellation of Notes, Certificates and Instruments.**  Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

DOCS_SF:104487.21 36027/002

000662

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

      **GG. Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

      **HH. Post-Confirmation Modifications.** Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

      **II. Applicable Nonbankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

      **JJ. Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

DOCS_SF:104487.21 36027/002

**000663**

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

**KK.** **Notice of Effective Date.** As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c). Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

**LL.** **Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

**MM.** **Waiver of Stay.** For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

000664

NN.  **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.  **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.  **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.  **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

000665

applicable nonbankruptcy law. In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.  The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law. The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan. The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.  The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full. In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default. Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default. If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith. The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

DOCS_SF:104487.21 36027/002

000666

**RR.    Resolution of Objections of Scott Ellington and Isaac Leventon.**
Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

    a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

    b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

    c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

    d.    The Senior Employees' Objection is deemed withdrawn.

**SS.    No Release of Claims Against Senior Employee Claimants**.  For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

000667

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT.** **Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

DOCS_SF:104487.21 36027/002

000668

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

     **UU.**   **IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

DOCS_SF:104487.21 36027/002

000669

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.   The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

88

000670

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

**ZZ.** **Miscellaneous.** After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

DOCS_SF:104487.21 36027/002

000671

APP 004 840

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

### ###END OF ORDER###

000672

**Exhibit A**

**Fifth Amended Plan (as Modified)**

000673

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ...........................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law ....................1

    B.    Defined Terms ..............................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS.................16

    A.    Administrative Expense Claims...............................................16

    B.    Professional Fee Claims ..........................................................17

    C.    Priority Tax Claims.................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS .............................................................18

    A.    Summary.................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ..........................................................18

    C.    Elimination of Vacant Classes ................................................19

    D.    Impaired/Voting Classes .........................................................19

    E.    Unimpaired/Non-Voting Classes .............................................19

    F.    Impaired/Non-Voting Classes .................................................19

    G.    Cramdown...............................................................................19

    H.    Classification and Treatment of Claims and Equity Interests............19

    I.    Special Provision Governing Unimpaired Claims ..............................24

    J.    Subordinated Claims ...............................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................24

    A.    Summary.................................................................................24

    B.    The Claimant Trust .................................................................25

        1.    Creation and Governance of the Claimant Trust and Litigation Sub-Trust...........................................................25

        2.    Claimant Trust Oversight Committee.....................................26

000675

DLI-1541644

3.    Purpose of the Claimant Trust. ................................................27

4.    Purpose of the Litigation Sub-Trust. ......................................27

5.    Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.    Compensation and Duties of Trustees. ...................................29

7.    Cooperation of Debtor and Reorganized Debtor. ...................29

8.    United States Federal Income Tax Treatment of the Claimant Trust. .........................................................................................29

9.    Tax Reporting. .........................................................................30

10.   Claimant Trust Assets. .............................................................30

11.   Claimant Trust Expenses. ........................................................31

12.   Trust Distributions to Claimant Trust Beneficiaries. ..............31

13.   Cash Investments. ....................................................................31

14.   Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C.   The Reorganized Debtor ....................................................................32

1.    Corporate Existence ...............................................................32

2.    Cancellation of Equity Interests and Release. .........................32

3.    Issuance of New Partnership Interests ....................................32

4.    Management of the Reorganized Debtor .................................33

5.    Vesting of Assets in the Reorganized Debtor ..........................33

6.    Purpose of the Reorganized Debtor ........................................33

7.    Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets .................................33

D.   Company Action ................................................................................34

E.   Release of Liens, Claims and Equity Interests....................................35

F.   Cancellation of Notes, Certificates and Instruments...........................35

000676

**Page**

    G.     Cancellation of Existing Instruments Governing Security Interests ................. 35

    H.     Control Provisions ................................................................................. 35

    I.     Treatment of Vacant Classes ................................................................. 36

    J.     Plan Documents ..................................................................................... 36

    K.     Highland Capital Management, L.P. Retirement Plan and Trust ....................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES .................................................................................................... 37

    A.     Assumption, Assignment, or Rejection of Executory Contracts and
        Unexpired Leases ................................................................................. 37

    B.     Claims Based on Rejection of Executory Contracts or Unexpired
        Leases ................................................................................................... 38

    C.     Cure of Defaults for Assumed or Assigned Executory Contracts and
        Unexpired Leases ................................................................................. 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 39

    A.     Dates of Distributions ............................................................................ 39

    B.     Distribution Agent ................................................................................. 39

    C.     Cash Distributions ................................................................................. 40

    D.     Disputed Claims Reserve ....................................................................... 40

    E.     Distributions from the Disputed Claims Reserve ............................................ 40

    F.     Rounding of Payments ............................................................................ 40

    G.     *De Minimis* Distribution ....................................................................... 41

    H.     Distributions on Account of Allowed Claims ................................................ 41

    I.     General Distribution Procedures ............................................................... 41

    J.     Address for Delivery of Distributions ......................................................... 41

    K.     Undeliverable Distributions and Unclaimed Property ..................................... 41

    L.     Withholding Taxes ................................................................................. 42

000677

DOCS_NY:41564.646

**Page**

M. Setoffs ...................................................................................................42

N. Surrender of Cancelled Instruments or Securities .............................42

O. Lost, Stolen, Mutilated or Destroyed Securities ...............................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS...........................................43

A. Filing of Proofs of Claim ..................................................................43

B. Disputed Claims..................................................................................43

C. Procedures Regarding Disputed Claims or Disputed Equity Interests ..............43

D. Allowance of Claims and Equity Interests..........................................44

    1. Allowance of Claims...................................................................44

    2. Estimation ...................................................................................44

    3. Disallowance of Claims .............................................................44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ...................................45

A. Conditions Precedent to the Effective Date .......................................45

B. Waiver of Conditions..........................................................................46

C. Dissolution of the Committee .............................................................46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................47

A. General................................................................................................47

B. Discharge of Claims............................................................................47

C. Exculpation .........................................................................................47

D. Releases by the Debtor........................................................................48

E. Preservation of Rights of Action.........................................................49

    1. Maintenance of Causes of Action ..............................................49

    2. Preservation of All Causes of Action Not Expressly Settled or
       Released ......................................................................................49

000678

**Page**

    F.    Injunction ...................................................................................................50

    G.    Duration of Injunctions and Stays.............................................................51

    H.    Continuance of January 9 Order ...............................................................51

ARTICLE X. BINDING NATURE OF PLAN ........................................................51

ARTICLE XI. RETENTION OF JURISDICTION ..................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................54

    A.    Payment of Statutory Fees and Filing of Reports .................................54

    B.    Modification of Plan ................................................................................54

    C.    Revocation of Plan ..................................................................................54

    D.    Obligations Not Changed.........................................................................55

    E.    Entire Agreement ....................................................................................55

    F.    Closing of Chapter 11 Case ....................................................................55

    G.    Successors and Assigns............................................................................55

    H.    Reservation of Rights..............................................................................55

    I.    Further Assurances ..................................................................................56

    J.    Severability .............................................................................................56

    K.    Service of Documents ..............................................................................56

    L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
        the Bankruptcy Code................................................................................57

    M.    Governing Law ........................................................................................58

    N.    Tax Reporting and Compliance ...............................................................58

    O.    Exhibits and Schedules ...........................................................................58

    P.    Controlling Document ..............................................................................58

000679

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

      HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

      Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

      If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.**    <u>Rules of Interpretation, Computation of Time and Governing Law</u>

      For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

000681

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.



15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

000683

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

5

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

6

000685


42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

000686


Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

000687

62.    "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.    "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.    "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

000688

69.    "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.    "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.    "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.    "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.    "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.    "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.    "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.    "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.    "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.    "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.



81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.     "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

000690


and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.    "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.    "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.    "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.    "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.    "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.    "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

000691

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

000692


of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.



117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

000694

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.** **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

000695

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.     Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

000696

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**     **Summary**

     All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

     The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

000697

C. **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D. **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E. **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F. **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G. **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H. **Classification and Treatment of Claims and Equity Interests**

1. *Class 1 – Jefferies Secured Claim*

   - *Classification*: Class 1 consists of the Jefferies Secured Claim.

   - *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until



full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

20


000699

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. *Class 5 – Retained Employee Claims*

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6

000700

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. _Class 7 – Convenience Claims_

- _Classification_: Class 7 consists of the Convenience Claims.

- _Allowance and Treatment_: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- _Impairment and Voting_: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. _Class 8 – General Unsecured Claims_

- _Classification_: Class 8 consists of the General Unsecured Claims.

- _Treatment_: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

000701

9. *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

000702
DZ-00034871

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and shall retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.**     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.**     **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.**     **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

000703

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.     The Claimant Trust**[2]

1.     *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

000704

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

000705

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.      *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.      *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.      *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

000706

(i)     the payment of the Claimant Trust Expenses;

(ii)    the payment of other reasonable expenses of the Claimant Trust;

(iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)     the orderly monetization of the Claimant Trust Assets;

(vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

000707

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee.  Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

000708

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. _Tax Reporting._

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. _Claimant Trust Assets._

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

000709

11. *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

000710

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. **The Reorganized Debtor**

### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

000741
DAF-00514880

4.     _Management of the Reorganized Debtor_

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.     _Vesting of Assets in the Reorganized Debtor_

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.     _Purpose of the Reorganized Debtor_

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.     _Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets_

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

000712

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

## D.    **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

000713

### E.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.    Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

000714

## I.    **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.    **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

000715

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

000716
23-10514-885

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**     **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

000747

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.  Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.  Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

000718

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.**     **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.**     **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.**     **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

**F.**     **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

000719

## G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

000720

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.** **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.** **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.** **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

000721

## O.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

## A.    Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

## B.    Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

## C.    Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

000722
NHF00524891

## D.    **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

000723
23-10524.692

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.**     **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

000724

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B. <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C. <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

000725

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.     General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.     Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.     Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

000726

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     <u>**Releases by the Debtor**</u>

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "<u>Reduced Employee Claim</u>"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "<u>Independent Members</u>"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

000727

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E. **Preservation of Rights of Action**

### 1. *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2. *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

000728

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F. **Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

000729

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

G.    **Duration of Injunctions and Stays**

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

H.    **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


**ARTICLE X.
BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

000730
23-10553-899

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

000731

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

000732

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A. Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B. Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C. Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

000733

**D.**     **Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.**     **Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.**     **Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**G.**     **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.**     **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

000734

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.    **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.    **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

### **If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

000735

Dallas, Texas 75201
Attention: James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Attn: Jeffrey N. Pomerantz, Esq.
Ira D. Kharasch, Esq.
Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz, Esq.
Ira D. Kharasch, Esq.
Gregory V. Demo, Esq.

## L.   **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

57

000736
23-10541-1905

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**    **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**    **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**    **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**    **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

000737

DB-10534-006

Dated: January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.

Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

000739

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

2

000741
23-70544.0910

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

000742
23-70444 211

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

000743

# TAB 5

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    October 26, 2022
 5                                  )    1:30 p.m. Docket
           Reorganized Debtor.      )
 6                                  )    MOTION TO CONFORM PLAN FILED
                                    )    BY DEBTOR HIGHLAND CAPITAL
 7                                  )    MANAGEMENT, LP [3503]
     _____)
 8                      TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
10
     APPEARANCES:
11
     For the Reorganized           Jeffrey Nathan Pomerantz
12   Debtor:                       PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
13                                    11th Floor
                                   Los Angeles, CA  90067
14                                 (310) 277-6910

15   For the Funds:                A. Lee Hogewood III
                                   K&L GATES, LLP
16                                 4350 Lassiter at North Hills
                                     Avenue, Suite 300
17                                 Raleigh, NC  27609
                                   (919) 743-7306
18
     For the Funds:                Artoush Varshosaz
19                                 K&L GATES, LLP
                                   1717 Main Street, Suite 2800
20                                 Dallas, TX  75201
                                   (214) 939-5659
21
     For the Advisors:             Jay Ong
22                                 MUNSCH HARDT KOPF & HARR, P.C.
                                   1717 West 6th Street, Suite 250
23                                 Austin, TX  78703-4777
                                   (512) 391-6124
24

25
```

000897

Case 19-34054-sgj11 Doc 3594 Filed 10/21/22 Entered 10/21/22 10:15/42 Desc
Case 3:23-cv-00573-E Document 14 Main Document Filed 05/22/23 Page 6 of 104 PageID 1070

2

```
 1   APPEARANCES, cont'd.:

 2   For Dugaboy Investment        Douglas S. Draper
     Trust:                        HELLER, DRAPER & HORN, LLC
 3                                 650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
 4                                 (504) 299-3300

 5   Recorded by:                  Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
 6                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
 7                                 (214) 753-2062

 8   Transcribed by:               Kathy Rehling
                                   311 Paradise Cove
 9                                 Shady Shores, TX  76208
                                   (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

000898


Case 19-34054-sgj11 Doc 3594 Filed 10/22/23 Entered 10/22/23 20:15:42 Desc
Main Document Page 7 of 104 PageID 1071
Case 3:23-cv-00573-E Document 1-4 Filed 05/02/23 Page 7 of 104 PageID 1071

3

1              <u>DALLAS, TEXAS - OCTOBER 26, 2022 - 1:39 P.M.</u>

2         THE COURT: All right. The other matter we have set

3 is Highland, the motion to conform plan filed by Highland.

4 This is Case No. 19-34054. I will get appearances. Mr.

5 Pomerantz, you're appearing for the Debtor today?

6         MR. POMERANTZ: Yes. Good afternoon, Your Honor.

7 Jeff Pomerantz; Pachulski Stang Ziehl & Jones; appearing on

8 behalf of (audio gap).

9         THE COURT: Okay.

10    (Court confers with Clerk.)

11         THE COURT: Okay. Mr. Pomerantz, we heard your

12 appearance, but then you froze up towards the last few

13 seconds.

14         MR. POMERANTZ: Oh. Can you -- can you -- can you

15 hear me, Your Honor?

16         THE COURT: I can hear you again now. Okay. Thank

17 you.

18         MR. POMERANTZ: Am I unfrozen?

19         THE COURT: You're unfrozen now.

20         MR. POMERANTZ: I may have been very still.

21         THE COURT: Like a mannequin. Okay. Thank you.

22    We have some objections to the Reorganized Debtor's

23 motion, and so I'll get appearances from those Objectors.

24 First, on behalf of the Funds, Mr. Hogewood, are you appearing

25 for the Funds?

000899


Case 19-34054-sgj11 Doc 3694 Filed 10/22/21 Entered 10/22/21 18:15:42 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 8 of 104 PageID 1072

4

1           MR. HOGEWOOD:  Good afternoon, Your Honor.  Lee

2    Hogewood of K&L Gates representing Highland Income Fund,

3    NexPoint Strategic Opportunities Fund, Highland Global

4    Allocation Fund, and NexPoint Capital, Inc., the four funds

5    that we've been calling the Funds collectively.  And Artoush

6    Varshosaz, my partner in Dallas, is here as local counsel as

7    well.  Thank you.

8           THE COURT:  Okay.  Thank you.  All right.  We also

9    had a limited objection from the parties we call the Advisors,

10   NexPoint Advisors and HCMFA.  Do we have Mr. Rukavina or

11   someone appearing for those parties?

12          MR. ONG:  Good afternoon, Your Honor.  This is Jay

13   Ong of Munsch Hardt Kopf & Harr appearing on behalf of

14   NexPoint Advisors, LP and Highland Capital Management Fund

15   Advisors, LP.

16      Mr. Rukavina unfortunately has scheduling conflicts with

17   other proceedings this afternoon, so I am appearing on behalf

18   of the Advisors in his stead and with apologies to the Court

19   for the unavailability.

20          THE COURT:  Okay.  Thank you.  All right.  The

21   Dugaboy Trust joined in the Funds' response.  Mr. Draper, are

22   you appearing for Dugaboy?

23      (Interruption.)

24          THE COURT:  Mr. Draper, we see you --

25          A VOICE:  Doug, you're --

Case 10-35013-sgj11 Doc 6594 Filed 10/22/20 Entered 10/22/20 20:15:42 Desc
Case 3:23-cv-00573-E Main Document Page 2 of 50 Filed 05/02/23 Page 9 of 104 PageID 1073

5

 1          THE COURT:  We see you but we cannot hear you.  Can

 2    you try turning up your volume?

 3       (No response.)

 4          THE COURT:  Okay.  We're not hearing you at all, Mr.

 5    Draper.  I don't know.  Can you try again?

 6          MR. DRAPER:  Could I try again?

 7          THE COURT:  Okay.

 8          MR. DRAPER:  Can you hear me at this moment?

 9          THE COURT:  We hear you now.  It's --

10          MR. DRAPER:  Right.  Your Honor, --

11          THE COURT:  It's better.  It could be even better,

12    but it's at least audible now.

13          MR. DRAPER:  The good part is, Your Honor, I'm

14    appearing on behalf of the Dugaboy Trust.  Nancy Dondero is

15    present, as the Court has ordered.  You won't have a problem

16    with my speaking because I'm just -- I'm going to let Mr.

17    Hogewood make the argument, and I probably -- I will be saying

18    nothing in connection with that.

19          THE COURT:  Okay.  Thank you.  All right.  I think

20    we've covered everyone who filed a pleading.  Is there anyone

21    else who wishes to appear?

22       (No response.)

23          THE COURT:  All right.  Well, I guess we have

24    interested observers, but only these four participants, sets

25    of participants.



1    Mr. Pomerantz, I'll hear your presentation.

2         MR. POMERANTZ:  Thank you, Your Honor.  On September

3    7th, the Fifth Circuit issued its amended opinion, which

4    remanded the matter back to this Court for further proceedings

5    consistent with the opinion.

6    As a result, the Reorganized Debtor filed its motion to

7    conform the plan which requests that the Debtor -- that the

8    Court conform the plan to address the one narrow provision

9    that the Fifth Circuit held was unlawful.

10   The only issue that the Fifth Circuit had with the plan

11   and the confirmation order was the inclusion of certain

12   parties in the definition of Exculpated Parties.  The Fifth

13   Circuit ruled that a plan that Exculpated Parties other than

14   the Debtor, the Independent Directors, the Committee and its

15   members, was an unauthorized nondebtor release that violated

16   Section 524(e) of the Code.

17   The opinion makes clear in several places that this was

18   the only part of the plan that the Fifth Circuit found to be

19   objectionable and that the plan and the Court's factual

20   findings were confirmed in all other respects.

21   La Asia, will you put Slide 1 on the screen, please?

22   Your Honor, Slide 1 sets forth five separate places in the

23   opinion which reinforces what I just said, and I will read

24   them for the Court's convenience.

25   On Page 10, the Fifth Circuit said, We then turn to the

000902

Case 19-34054-sgj11 Doc 3594 Filed 10/22/24 Entered 10/22/24 08:25:42 Desc
Case 3:23-cv-00573-E Document 4 Main Document Filed 05/02/23 Page 11 of 104 PageID 1075

7

1    merits, conclude that the plan exculpates certain nondebtors

2    beyond the Bankruptcy Court's authority, and affirm in all

3    other respects.

4        On Page 16, the Court said, We do, however, agree with

5    Appellants that the Bankruptcy Court exceeded its authority

6    under 524(e) by exculpating certain nondebtors, and so we

7    reverse and vacate the plan only to that extent.

8        On Page 22, the Fifth Circuit said, Though the injunction

9    and gatekeeping provisions are sound, the exculpation of

10   certain nondebtors exceeds the Bankruptcy Court's authority.

11   We reverse and vacate that limited portion of the plan.

12       On Page 22, the Court says, We must reverse and strike the

13   few unlawful parts of the plan's exculpation provision.

14       And lastly, Your Honor, in summing up on Page 30, the

15   Court said, In sum, the plan violates Section 524(e), but only

16   insofar as it exculpates and enjoins certain nondebtors.  The

17   exculpatory order is therefore vacated as to all parties

18   except for Highland Capital, the Committee and its members,

19   and the Independent Directors, for conduct within the scope of

20   their duties.  We otherwise affirm the inclusion of the

21   injunction and the gatekeeper provisions in the plan.

22       This language, Your Honor, repeated throughout the

23   opinion, is crystal clear.  The Fifth Circuit's only issue

24   with the plan was nondebtors being included in the definition

25   of Exculpated Parties and released for negligence claims.

1    Based upon the direction provided by the Fifth Circuit,

2    the motion before Your Honor seeks to conform the definition

3    of Exculpated Parties as directed by the Fifth Circuit,

4    removing all parties from the definition other than the

5    Debtor, the Independent Directors, the Committee and its

6    members.

7    The Funds and the Advisors have both objected to the

8    motion, and Dugaboy has joined.  They argue that the Fifth

9    Circuit did far more than revise the definition of Exculpated

10   Parties, and that more extensive surgery to the confirmation

11   order is required to bring the plan in compliance with the

12   Fifth Circuit opinion.

13   They argue that the Fifth Circuit not only limited the

14   definition of Exculpated Parties, but also significantly

15   restricted the protections afforded by the gatekeeper to the

16   Protected Parties.  Protected Parties, a defined term only

17   used in the gatekeeper provision.

18   They argue that the gatekeeper only applies to Exculpated

19   Parties and not the broader list of Protected Parties as

20   otherwise set forth, explicitly and unambiguously set forth in

21   the plan.  And so they would have us limit the term Protected

22   Parties to the newly-limited definition of Exculpated Parties.

23   And their position is largely based upon the one-sentence

24   change that the Fifth Circuit made to its opinion as a result

25   of the Funds' petition for rehearing, a change that the Fifth


000904

Case 10-34053-sgj11 Doc 6594 Filed 10/12/22 Entered 10/12/22 Desc
Case 3:23-cv-00573-E Document 4 Filed 05/02/23 Page 13 of 104 PageID 1077

9

1    Circuit made in one business day and without requesting a

2    response from the Reorganized Debtor or any other party.

3        La Asia, could you put Slide 2 on the screen, please?

4        Your Honor, Slide 2 shows the only change made to the

5    opinion.  The Fifth Circuit deleted the sentence, The

6    injunction and gatekeeper provisions are, on the other hand,

7    perfectly lawful, and replaced it with the sentence, We now

8    turn to the plan's injunction and gatekeeper provisions.

9        That's it.  The Objectors argue that this means, this one-

10   sentence change, that the Fifth Circuit agreed with the

11   Objectors' interpretation of the opinion that the gatekeeper

12   can only apply to the Exculpated Parties, thereby requiring

13   the definition of Protected Parties to be limited.  That

14   position would narrowly and significantly alter the scope,

15   effect, and protections of the gatekeeper.  But neither the

16   language nor the reasoning of the Fifth Circuit opinion

17   supports that interpretation.

18       But perhaps the best indication that the Objectors'

19   interpretation is overreaching is by comparing what the

20   Objectors asked for in the motion for rehearing and what the

21   Fifth Circuit actually did.  In their petition, they asked the

22   Court to narrow the opinion to confirm what they believed was

23   the holding.  And they state in their petition that the

24   impermissibly Exculpated Parties are similarly struck from the

25   protections of the injunction and the gatekeeper provisions in

000905 

Case 19-34054-sgj11 Doc 3594 Filed 10/22/22 Entered 10/22/22 Entered 08/25/2023 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 14 of 104 PageID 1078

10

1    the plan.  In other words, that such parties cannot constitute

2    Protected Parties, such that the injunction and the gatekeeper

3    provisions extend only to Highland Capital, the Committee, its

4    members, and the Independent Directors.  That is what they

5    asked for in their petition for hearing.

6        The Fifth Circuit ignored the Funds' request to clarify

7    that the gatekeeper only protects the narrow universe of

8    Exculpated Parties.  The Fifth Circuit did not modify the

9    gatekeeper provision or its applicable definition of Protected

10   Parties in any way, let alone in the manner that Objectors

11   requested.  And they did not include anything in its opinion

12   to indicate that they agreed with the Objectors' analysis.

13   It's hard to fathom that if the Fifth Circuit actually agreed

14   with what the Objectors were saying that this page on the

15   screen would be the only change to the opinion.  It just stuck

16   with the original finding, that the gatekeeper was sound.

17       In other words, the Fifth Circuit heard the Objectors'

18   request for a change in the definition of Protected Parties

19   and rejected it.

20       And recently, the Fifth Circuit denied the Objectors'

21   request to recall and stay the mandate, which would have had

22   the effect of essentially staying the hearing before Your

23   Honor that we're having today.  And one of the arguments that

24   Objectors made in that petition was that there was a

25   disagreement between the parties' interpretation of what the

Case 10-34500-sgj11 Doc 3594 Filed 10/22/20 Entered 10/22/20 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 15 of 104 PageID 1079

11

1  gatekeeper provided.

2      The Fifth Circuit denied that motion immediately on the

3  same day and without any comment.  And the motion, Your Honor,

4  and the order can be found on the Fifth Circuit's docket.

5  It's -- the citations are in Footnote 23 of our reply brief.

6      Nevertheless, Objectors persist in their argument that the

7  deletion of the sentence that the gatekeeper and injunction

8  provisions are perfectly lawful was a wholesale

9  acknowledgement of their position.  But that argument, Your

10  Honor, is wishful thinking, not supported by any reasonable

11  interpretation of the words on the page or the reasoning that

12  underlies the opinion.

13      There really is only one interpretation of why the Court

14  deleted that sentence.  The original opinion included language

15  that, and I quote, "Appellants' primary contention that the

16  plan's injunction is overbroad by releasing Debtors in

17  violation of Section 524(e) is resolved by striking out the

18  impermissibly Exculpated Parties."

19      Importantly, that sentence I just read only applies to the

20  injunction.  Doesn't apply to the gatekeeper.

21      So the language that the injunction is perfectly legal is

22  inconsistent with the Court's determination that the

23  injunction needed to be curtailed as a result of the

24  limitation of Exculpated Parties.

25      And how was the injunction affected by the Court's

Case 10-34054-sgj Doc 6594 Filed 10/25/22 Entered 10/25/22 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 16 of 104 PageID 1080

12

1   exculpation holding?  La Asia, can you please put Slide 3 on

2   the screen?

3       Your Honor, this is the injunction as it's set forth in

4   the plan.  It's three paragraphs.  The second paragraph is the

5   meat of it.  And Romanette (i) through (iv) enjoins a variety

6   of actions against the Debtor.   And the following paragraph,

7   Paragraph 3 on the page, extends the injunction to actions

8   against the successors of the Debtor.

9       Contrary to the argument I think was made in the Advisors'

10  brief, nothing in the opinion affects the Debtor's successors

11  from the protections afforded under the injunction, and to

12  hold otherwise would essentially render the injunction

13  meaningless because the Debtor ceased to exist on the

14  effective date.

15      Romanette (v), though, Your Honor, is the key to

16  understanding what the Fifth Circuit meant when it deleted its

17  sentence.  It prohibits parties from taking actions that do

18  not conform to or are not in compliance with the plan.

19  Accordingly, without any revision, the injunction prohibited

20  parties from pursuing claims against the originally Exculpated

21  Parties, including those parties the Fifth Circuit said could

22  not be Exculpated Parties.

23      Having determined that the plan unlawfully exculpated

24  certain parties, the injunction necessarily had to be pared

25  back so that it would only apply to the new (audio gap) of



Case 10-34500-sgj11 Doc 3659 Filed 10/18/21 Entered 10/18/21 20:25:40 Desc
Case 3:23-cv-00573-E Document 14-4 Filed 05/02/23 Page 17 of 104 PageID 1081

13

1    Exculpated Parties.

2          The Advisors also argue that because the opinion states

3    the Court must strike the few unlawful parts of the

4    exculpation provision, then more than just the (audio gap) --

5               THE COURT:  You froze again.

6               MR. POMERANTZ:  -- was the definition of Exculpated

7    Parties, includes several parties that the Court has

8    determined are not entitled to exculpation, and those parties

9    have to be -- those few parties have to be deleted from the

10   definition.

11         There is just no language in the opinion at all that

12   supports Objectors' interpretation.  But more importantly,

13   Your Honor, the reasoning behind the opinion does not support

14   the interpretation that the gatekeeper must be limited to

15   Exculpated Parties.  As I mentioned before, the Court affirmed

16   the confirmation order in all respects except to the extent

17   that the plan exculpated parties and released them in

18   violation of 524(e).  According to the Fifth Circuit, 524(e)

19   prohibits a party from -- prohibits the release of any

20   nondebtors.  The release of any nondebtors.

21         La Asia, can you put Slide 4 on the screen, please?

22         This is the exculpation provision, and the highlighted

23   language at the beginning clearly states that, subject to all

24   respects, Article 12(b) of the plan, and the maximum extent

25   permitted by applicable law, no Exculpated Party (audio gap)

Case 10-3-3405-stg534 DoC3594nerFileB 10Pa3e2211EnteDate6/Bad208/2542028 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/28 Page 18 of 104 PageID 1082

14

1    and each Exculpated Party is hereby exculpated -- *i.e.*,

2    released -- from any claim, obligation, suit, judgment,

3    demand, debt, right, cause of action, remedy, loss, and

4    liability for certain defined conduct.

5        It is clearly a release.  It's a release of the Exculpated

6    Parties for -- with the exception of fraud, gross negligence,

7    and willful misconduct, for the variety of actions they took

8    in connection with the plan.  The Fifth Circuit ruled that

9    that release, that release of broad list of parties violated

10   Section 524(e), and accordingly, Exculpated Party definition

11   had to be revised.

12       Now let's look at the gatekeeper provision.  La Asia, can

13   you put the next slide on the screen, please?

14       Okay.  The gatekeeper provision says that no enjoined

15   party may commence or pursue a claim or cause of action of any

16   kind against any Protected Party without the Bankruptcy Court

17   first determining, after notice and a hearing, that such claim

18   or cause of action represents a colorable claim of any kind.

19       In contrast to the exculpation provision, the gatekeeper

20   provision releases no one.  Instead of releasing specific

21   claims, the gatekeeper serves a completely different purpose,

22   to prevent frivolous litigation of claims that are preserved

23   to be brought under the plan.

24       Thus, if any party believed they have any claim against a

25   Protected Party, they need to seek a colorability

Case 10-34503-sgj11 Doc 3694 Filed 10/12/21 Entered 10/12/21 Desc
Case 3:23-cv-00573-E Document 114 Filed 05/02/23 Page 19 of 104 PageID 1083

15

1    determination from this Court.

2          But importantly, Your Honor, no claim, colorable or not,

3    is in any way released by the gatekeeper provision.  And

4    Objectors' repeated characterization over and over that the

5    gatekeeper amounts to a release is just wrong.  The

6    exculpation is a release and covers the Exculpated Parties.

7    The gatekeeper is not a release but a procedural requirement

8    that parties have to file before filing a claim against the

9    Protected Parties.

10         The definition of Protected Parties that applies to the

11   gatekeeper provision is considerably broader than the

12   definition of parties exculpated, and that's because it covers

13   the post-effective date management -- the Claimant Trustee,

14   the Litigation Sub-Trustee, the Oversight Board.

15         Objectors argued to the Fifth Circuit that this Court did

16   not have jurisdiction to act as a gatekeeper because it may

17   not have jurisdiction to address the underlying claim if it's

18   determined to be colorable.  The Fifth Circuit rejected that

19   argument, relying on its opinion, prior opinion in *Villegas*.

20         Objectors argue that 28 U.S.C. § 959(a) prevented the

21   Court from acting as a gatekeeper, and the Fifth Circuit

22   disagreed, reasoning that the determination of whether 959(a)

23   applies shall be left in the future to the Bankruptcy Courts

24   and the District Court, that gatekeeper is not a release and

25   it does not implicate Section 524 in any way.  And the reason

000911

Case 19-34054-sgj11 Doc 3594 Filed 10/03/22 Entered 10/03/22 15:42:08 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 20 of 104 PageID 1084

16

1    for limiting the exculpation, that nondebtor parties are

2    released, has nothing to do with the gatekeeper.

3        Therefore, Your Honor, there is no principal reason for

4    the Fifth Circuit to have limited the gatekeeper's

5    applicability to parties entitled to the exculpation.

6        And lastly, Your Honor, the Objectors' interpretation of

7    the opinion would eviscerate the gatekeeper and render it

8    effectively meaningless.  And why do I say that?  Well, first,

9    limiting the definition to Exculpated Parties would mean that

10   the gatekeeper has no effect on any conduct that occurred

11   after the effective date.  That's because the Independent

12   Directors are gone, the Committee is gone, the members are

13   gone.  They all ceased to exist on the effective date.  And

14   the Debtor doesn't need a gatekeeper for pre-effective date

15   because they were discharged.  And incidentally, the Objectors

16   appealed the discharge under 1141, and that argument was

17   rejected by the Fifth Circuit.

18       Second, the Exculpated Parties don't need the gatekeeper

19   to the extent any pre-effective-date claims asserted against

20   them sound in negligence, because they've been exculpated for

21   those claims.

22       Third, the gatekeeper is largely forward-looking, to

23   prevent harassment of post-effective-date management as they

24   consummate the plan, wind down the assets, and administer the

25   Claimant Trust and the Litigation Sub-Trust.

Case 19-34054-sgj11 Doc 3594 Filed 10/22/24 Entered 10/22/24 08:15:42 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 21 of 104 PageID 1085
Main Document Page 21 of 88

17

1        So, if Objectors are right, then the gatekeeper provisions

2   only apply to fraud and gross negligence claims that can be

3   asserted by third parties against the Independent Directors,

4   the Committee, and its members.  That limits the gatekeeper

5   nearly out of existence, since none of those parties, as I

6   said, have any role in the post-effective-date management.

7        Given the substantial record that led this Court to make

8   the findings it did in the confirmation order, findings which

9   were adopted by the Fifth Circuit in its opinion, without

10  exception, and the discussion in the opinion holding the need

11  for and the legal underpinnings of the gatekeeper, it is

12  inconceivable that the Fifth Circuit intended for the

13  gatekeeper to essentially be rewritten out of the plan.

14       The language of the opinion, the reasoning, and the post-

15  opinion motion practice all point to one inescapable

16  conclusion:  That the Fifth Circuit affirmed the confirmation

17  order in all respects, merely paring back the definition of

18  Exculpated Parties.  And that is the change to the plan that

19  we ask that Your Honor conform the plan consistent with the

20  opinion.

21       And while we're really -- we're clearly right on the law,

22  Your Honor, it's hard to ignore the context of the current

23  dispute, which the Court has repeatedly said matters.  The

24  opposition to this motion is Mr. Dondero and its affiliates'

25  last-gasp desperate efforts to do anything possible to avoid

Case 19-34054-sgj11 Doc 3594 Filed 10/12/22 Entered 10/12/22 22:... Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 22 of 104 PageID 1086

18

1    this Court and to be able to sue Mr. Seery and anyone

2    connected with the restructuring in any court in the world.

3    Their connection with the bankruptcy case is even more tenuous

4    now than it was before, but that hasn't stopped them from

5    their relentless pursuit of frivolous, harassing litigation,

6    which has resulted in seven appeals to the Fifth Circuit, and

7    counting, and millions of dollars of fees and expenses.

8         And Your Honor, the gatekeeper isn't all that onerous.

9    All Dondero needs to do is set forth a colorable claim against

10   any of the Protected Parties and he will be allowed to pursue

11   it, either in this Court, if it has jurisdiction, or some

12   other court.  And if Dondero does not like Your Honor's

13   decision on colorability, he certainly knows how to appeal

14   your decision, something he has done many, many times in this

15   case already.

16        Thank you, Your Honor.  I have nothing further, but I'm

17   happy to answer any questions you might have.

18             THE COURT:  Okay.  I have one quick question.  You

19   had Ms. Canty pull up on the WebEx the injunction provision in

20   the plan, Article 9(f).  And you walked through the different

21   components of the injunction, and you mentioned Romanette (v)

22   is one provision that would necessarily be affected by the

23   changed definition in Exculpated Parties, right?  I mean,

24   because every other --

25             MR. POMERANTZ:  Right.

Case 19-34054-sgj11 Doc 3594 Filed 10/22/16 Page 216 Entered 10/22/2023 Desc
Case 3:23-cv-00573-E Main Document 1-4 Filed 05/02/23 Page 23 of 104 PageID 1087

19

1        THE COURT:  -- injunction provision goes at the

2   Debtor and protects the Debtor and the Debtor's property.  But

3   then you've got kind of that catch-all.

4        MR. POMERANTZ:  Correct.

5        THE COURT:  Uh-huh.

6        MR. POMERANTZ:  Correct, Your Honor.

7        THE COURT:  You froze for about ten seconds after you

8   addressed that, and I wondered if, in that frozen time period,

9   you addressed the next paragraph, the third paragraph of the

10  injunction section right before it gets into the gatekeeper

11  provision.

12       And I'm zeroing in on this because I know the Advisors in

13  their objection said, we think that needs to be deleted.  So

14  I'm wondering what your response is, too, on that one, because

15  it does seem aimed at protecting the Litigation Sub-Trust, the

16  Claimant Trust, Reorganized Debtor.  And one, I think, could

17  make a credible argument that, no, for those, you just -- you

18  go to the gatekeeper provisions as the device that kicks in.

19       What is your response to that?

20       MR. POMERANTZ:  So, Your Honor, I think you have to

21  understand the injunction.  It prevents people from taking

22  actions against the Debtor, and that's 1 through 4 of the

23  injunction.  The Reorganized Debtor, the Sub-Trust, are

24  successors of the Debtor.  Okay?  If you were going to limit

25  the injunction, 1 through 4 in the second paragraph, to the

000915

Case 10-34055-sgj11 Doc 6594 Filed 10/18/21 Entered 10/18/21 20:15:42 Desc
Case 3:23-cv-00573-E Document 1-4 Filed 05/02/23 Page 24 of 104 PageID 1088
Main Document Page 22 of 50

20

1  Debtor, it would kind of be meaningless, right, because --

2          THE COURT:  Okay.

3          MR. POMERANTZ:  -- there is no more Debtor after the

4  effective date.  They are successors of the Debtor.  They

5  don't raise the same things.  This is not a release.  The

6  injunction is not a release.  It prevents you from pursuing

7  claims that you could have pursued against the Debtor, and it

8  protects the successors of the Debtor.

9      That's a whole different issue as to whether some party is

10 being released for specific claims they have against those

11 parties.  The injunction essentially provides for injunction

12 against matters pre-confirmation coming up post-confirmation.

13 It doesn't address, notwithstanding how they characterize it,

14 new claims against the Reorganized Debtor, the Claimant Trust.

15 You have any claims like that, you will be able to seek a

16 gatekeeper if the Reorganized Debtor, if the Claimant Sub-

17 Trust, if the Litigation Sub-Trust takes any actions post-

18 effective date.  But to the extent they are successors of the

19 Debtor, they are entitled to protections in the injunction or

20 else the injunction is meaningless.

21         THE COURT:  Okay.  Thank you.  All right.  Mr.

22 Hogewood, would you like to go next?  You're on mute.

23         MR. HOGEWOOD:  Thank you, Your Honor.  Can you --

24         THE COURT:  Now I can hear you.

25         MR. HOGEWOOD:  Thank you very much.  Can you hear me

Case 19-34054-sgj11 Doc 3594 Filed 10/22/21 Entered 10/22/21 20:24:28 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 25 of 104 PageID 1089

21

 1    now?

 2              THE COURT:  Yes.

 3              MR. HOGEWOOD:  So, I, once again, Your Honor, I'm

 4    with K&L Gates, representing Highland Income Fund, NexPoint

 5    Strategic Opportunities Fund, Highland Global Allocation

 6    Fund, NexPoint Capital, Inc., four publicly-traded retail

 7    funds.  Thank you very much for hearing us today.

 8         And I think there were, just before we get started, there

 9    were a couple of points where the broad term Objectors was

10    used in Mr. Pomerantz's comments, and I want to be really

11    clear.  We haven't filed -- we, the Funds, haven't filed any

12    further appeals in the case.  Our involvement has been to

13    file an objection to confirmation, to lose on that objection,

14    and to file an appeal with the Fifth Circuit, and have been a

15    defendant in a lawsuit brought by the Debtor.  And that

16    lawsuit was settled a long time ago.

17         So I understand Mr. Pomerantz's point about the recent

18    pleading that was filed in the Fifth Circuit and the very

19    swift overruling of that pleading, but we were not involved,

20    our clients were not involved in that matter, and I want to

21    be really clear about that.

22         As I mentioned, the Funds did indeed file a separate

23    appeal of the confirmation order, challenging the extent of

24    the exculpation, injunction, and gatekeeping provisions of

25    the plan.  The Fifth Circuit referred to these collectively

000917

Case 10-34023-sgj534 Doc 3594 Filed 10/12/21 Page 221 Entered 10/12/21 208/15/2023 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 26 of 104 PageID 1090

22

1    as the Protection Provisions in its -- both in its original

2    and its reissued opinion.

3        Our appeal was consolidated with the other Appellants and

4    proceeded with this Court's blessing, the parties' consent,

5    and the Fifth Circuit's concurrence to a direct appeal to the

6    Fifth Circuit.

7        In that appeal, we asserted and the Fifth Circuit agreed

8    that the Protection Provisions should only extend to a narrow

9    group of entities that the Debtor had included and the Court

10   approved under the confirmed plan.

11       Based on the language in the original opinion, we believe

12   there was some ambiguity on this point, and we accordingly

13   took the unusual step of petitioning for a panel rehearing to

14   clarify the point.

15       Specifically, in our petition, which can be found at

16   Docket 3539, our Exhibit B, we stated the following in the

17   first paragraph.  Appellants, whom I've just mentioned, the

18   Funds, petition the Court to grant rehearing for the limited

19   purpose of clarifying and confirming one part of its August

20   19, '22 -- 2022 order.  Specifically, the Funds request that

21   the Court confirm the scope of the injunction and gatekeeper

22   provisions in the plan are limited in accordance with the

23   Court's holding on the exculpation provision.

24       That petition was filed on September 2, 2022, the Friday

25   before Labor Day.  It was the deadline on which that petition

Case 10-34 cv-00534 Doc 6594 Filed 10/22/22 Entered 10/18/2023 Desc
Case 3:23-cv-00573-E  Main Document 1-4 Filed 05/02/23  Page 27 of 104  PageID 1091

23

1   was due.

2        We did not ask the Fifth Circuit to reconsider its

3   decision.  We did not ask the Fifth Circuit to amend or

4   modify or change its decision in any respect.  We asked for

5   clarification, which the Fifth Circuit granted, in similarly

6   record time.  It granted that relief on the following

7   Wednesday, September 7, 2022.

8        On the second court day after the petition was filed, the

9   Fifth Circuit issued its ruling.  The first paragraph of that

10  decision, which is at Exhibit C of our response -- again,

11  Docket 3539 -- is unequivocal.  The petition for panel

12  rehearing is granted.  The petition for panel rehearing is

13  granted.  We withdraw our previous opinion reported at 2022

14  WL 3571094 and substitute the following.  The petition is not

15  granted in part.  It is not denied.  It is granted without

16  condition, without reservation or caveat.

17       Had the Fifth Circuit disagreed with our requested

18  clarification, which was specifically to confirm that the

19  scope of the injunction and the gatekeeper provisions were

20  limited in accordance with the Court's holding on the

21  exculpation provision, it had no need to grant our petition.

22  It would have and could have and should have denied it,

23  ignored it.  It did not.  The petition was granted.

24       Now, the Debtor did spend a good bit of argument, both in

25  its papers and today, on what the Court did not do in terms

Case 10-34054-sgj11 Doc 3594 Filed 10/22/21 Entered 10/22/21 12:12 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/24 Page 28 of 104 PageID 1092

24

1   of specific adjustments to the language in the opinion.  No

2   adjustment was required to clarify the opinion other than the

3   one that the Court made.

4       As everyone concedes, the Court believed the language

5   that the gatekeeper and injunction provisions were, quote,

6   perfectly lawful in the reissued opinion.

7       Combined with that unequivocal grant of -- combined with

8   that and the unequivocal grant of our petition, the Court

9   needed to do nothing else to clarify its opinion.  Indeed, it

10  did not deem it necessary to reissue the mandate.

11      So, Your Honor, I agree with Mr. Pomerantz that the Fifth

12  Circuit was not making any sort of monumental change to its

13  prior ruling when it granted the petition.  It simply and

14  straightforwardly confirmed that the Funds had interpreted

15  the opinion correctly and it therefore granted our petition.

16      Our view, under the Fifth Circuit's analysis, and,

17  really, the only fair reading of its opinion in light of the

18  granted petition for clarification, the Protection Provisions

19  -- gatekeeper, injunction, and exculpation -- are three legs

20  of the same stool.  One or two legs can't be longer than the

21  other or the stool will fall over.  Just as with a three-

22  legged stool, the three provisions are coextensive.  They are

23  the same size.  They protect the same limited group of

24  parties.  There is no correct other reading.

25      Indeed, to give broader reach to the protection of the

Case 10-34000-sgj11 Doc 3594 Filed 10/22/22 Entered 10/22/22 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 29 of 104 PageID 1093

25

1    injunction and gatekeeper provisions would undercut exactly

2    what the Fifth Circuit did in limiting the exculpation

3    provision.

4        The parties have remedies outside of the plan. As noted

5    in Footnote 19 of the opinion, the Fifth Circuit said that

6    the Debtor -- exculpation within a plan is not a lawful means

7    to impose injunctions and sanctions on vexatious litigants,

8    of which our clients are not. Nondebtor injunctions are not

9    okay in the reorganized plan.

10       That view in Footnote 19 is reaffirmed by the quote at

11   Page 29 that the plan violates Section 524(e) insofar as it

12   inculpates -- exculpates and enjoins, and enjoins, certain

13   nondebtors. That's reaffirmed by the quote on Page 28, that

14   the overbreadth of the injunction is resolved by striking the

15   impermissibly Exculpated Parties.

16       As a consequence, we submitted Exhibit B to our response,

17   a proposed order that correctly conforms the plan to the

18   Fifth Circuit's opinion. There is a redline of that proposed

19   order that compares it to the order proposed by the Debtor.

20   There are minor changes to the preamble in that proposed

21   order, and we add one substantive provision. It is to the

22   definition of Protected Parties in Article 1.b.105 of the

23   plan. That section should be deleted in its entirety and the

24   following language should be inserted: Protected Parties

25   means, collectively (i) the Debtor; (ii) the Independent

23-00524-1098

Case 10-34503-sgj11 Doc 6594 Filed 10/22/22 Entered 10/22/22 20:15:42 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 30 of 104 PageID 1094

Main Document Page 223 of 433

26

1    Directors; (iii) the Committee; (iv) the members of the

2    Committee in their official capacities.

3        Including this language in the conformed plan will bring

4    it into conformity with the Fifth Circuit's decision.

5    Failing to do so would be only to approve part of that

6    decision.  We respectfully request that the Court adopt the

7    Funds' proposed order rather than the order proposed by the

8    Debtor.

9        Thank you, and I'm happy to respond to any questions.

10        THE COURT:  I have a couple of questions.  You've

11   made the statement that an exculpation and an injunction and

12   a gatekeeper provision are three legs to the same stool.  But

13   a two-part question.  Number one, isn't a gatekeeping

14   provision very, very different from an exculpation?  It's not

15   a release.  It's clear that the Fifth Circuit regards an

16   exculpation as the same thing as a third-party release,

17   thinking both of them are prohibited by 524(e) of the

18   Bankruptcy Code.  But a gatekeeper provision, it's not

19   releasing anything.  It's just implementing the Barton

20   Doctrine in the context of a Chapter 11 plan, where it's not

21   purely a trustee or receiver who's the beneficiary.  It's

22   saying, go to the Bankruptcy Court and ask permission before

23   you sue.  It's not a release.

24        So, I mean, if you could respond to that.  You say

25   they're three legs to the same stool.  Aren't they very

000922

Case 10-35053-sgj5   Doc 6594   Filed 10/22/24   Page 224   Entered 10/22/2024   Desc
Case 3:23-cv-00573-E   Document 11-4   Filed 05/02/23   Page 31 of 104   PageID 1095

27

1 | different?

2 | MR. HOGEWOOD: Your Honor, I don't disagree that the

3 | -- that the three legs to the same stool are different.  I

4 | think what the Fifth Circuit said when they granted our

5 | petition for rehearing, asking for this precise

6 | clarification, is that at least in this case the provisions

7 | are coextensive because that's -- in terms of the Protected

8 | Parties.  The Protected Parties are coextensive in connection

9 | with those three provisions.  They were reading them

10 | together, as is clear from almost all of the opinion.  And

11 | they -- they could have denied our petition and made the

12 | minor change that they made to the decision.  They didn't do

13 | that.  They granted our petition.  The request that we made

14 | was very, very clear.  Clarify that the groups of parties

15 | protected by those three provisions are exactly the same.

16 | They granted that request.

17 | So it is true that gatekeeper, injunction, exculpation

18 | provide different forms of relief to those who may have been

19 | involved in the process of confirming a Chapter 11 plan and

20 | its further implementation.  But what the Fifth Circuit said

21 | in clarifying their opinion, in our view, is, at least in

22 | this case, that group of protected people are the same.

23 | THE COURT: Okay.  The second part of my question, I

24 | guess, and I mean this with all respect:  Do you think the

25 | Fifth Circuit was confused about your request?  Because it

Case 19-34054-sgj11 Doc 3594 Filed 10/22/25 Entered 10/22/25 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 32 of 104 PageID 1096

28

looks to me as though your request, your petition for

rehearing, was pretty explicit on Page 4, the second line:

The Funds are concerned that the Court's statement that such

provisions -- meaning the gatekeeper provisions -- are,

quote, perfectly lawful might be argued to mean that the

injunction and gatekeeper provisions, without any tailoring,

are allowed to stand.

Next paragraph. Therefore, the Funds file this petition

in order to request that the Court narrowly amend the opinion

in order to confirm the Court's holding that the

impermissibly Exculpated Parties are similarly struck from

the protections of the injunction and gatekeeper provisions

of the plan (in other words, that such parties cannot

constitute "Protected Parties") such that the injunction and

gatekeeper provisions extend only to Highland Capital, the

Committee and its members, and the Independent Directors.

So, it seems to me that you are crystal clear that,

number one, you were concerned about that "perfectly lawful"

language regarding the gatekeeper provisions and injunction

provisions, and then you were even more crystal clear, we

think you need to go the extra step and define Protected

Parties as consistent with Exculpated Parties.

And then if you look at the Fifth Circuit's revised

opinion, basically, okay, we'll strike that language about

perfectly lawful, but they didn't take the bait, so to speak,

Case 10-34503-sgj534  Doc 6594  Filed 10/22/26  Page 226  Entered 10/8/14 20:15:42/2028  Desc
Case 3:23-cv-00573-E  Document 11-4  Main Document  Filed 05/02/23  Page 33 of 104  Page 33 of 50  PageID 1097

29

 1  on your other request.

 2      I mean, again, I don't know how else to say it except,

 3  are you saying they were confused?  Because it looks to me

 4  like, okay, you know, we'll take out this, you know, it's

 5  perfect, the gatekeeping provision, but we're not going to,

 6  you know, answer your second request to change anything about

 7  the gatekeeper provisions per se or the Protected Parties.

 8      So, I mean, what is your response?  Were they -- were

 9  they confused?

10          MR. HOGEWOOD:  So, --

11          THE COURT:  Did they not like your request?  Or --

12          MR. HOGEWOOD:  So, --

13          THE COURT:  -- were they imprecise with their

14  wording, or what?

15          MR. HOGEWOOD:  So, Your Honor, I think they were

16  entirely precise with their wording, and they certainly

17  weren't confused.  They said -- the petition was granted.

18  They didn't say the petition was granted in part.  They

19  didn't say -- they didn't condition the grant of their -- of

20  the petition.  They granted the petition, they withdrew an

21  opinion, and they issued a new one.

22      Now, I know in the oral argument before the Fifth Circuit

23  a question was asked of the other side whether perhaps the

24  Ninth Circuit was confused or sloppy in connection with their

25  opinion, which is slightly -- which is different from *Pacific*

000925

Case 10-34054-sgj11 Doc 3694 Filed 10/12/22 Entered 10/12/22 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 34 of 104 PageID 1098

30

1    *Lumber.* And the last thing I would ever do is suggest that a

2    panel of the Fifth Circuit was sloppy, confused, or otherwise

3    not clear. I think they were -- our request was crystal

4    clear, as the Court just said. Their grant of the petition

5    was crystal clear and unequivocal. And I don't think it

6    requires us to do a lot of interpretation about what they

7    meant. They granted the petition for clarification that we

8    requested, which was to make the three legs of the stool the

9    same length and to extend to the same parties.

10           THE COURT: All right. The revised opinion, though,

11   it only deletes one sentence, right?

12           MR. HOGEWOOD: That is correct, and that was the

13   most important sentence for them to delete. We believe the

14   rest of the opinion supports our view that the three legs of

15   the stool are the -- are coextensive with one another,

16   because that was our specific request for clarification.

17           THE COURT: All right.

18           MR. HOGEWOOD: And it was granted, and it was

19   granted without equivocation.

20           THE COURT: Well, what about the language on 22 of

21   the revised opinion, which was unaltered? And I'm looking at

22   the paragraph right before the one titled, "Nondebtor

23   Exculpation." After discussing the different plan protection

24   provisions -- generically, I guess you could say -- that next

25   to the last paragraph on Page 22, right before the Nondebtor

Case 10-34023-sgj11 Doc 6594 Filed 10/22/25 Entered 10/22/25 20:15:42 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 35 of 104 PageID 1099

31

1  Exculpation section, says, The Bankruptcy Court deemed the

2  provisions legally necessary under the circumstances and in

3  the best interests of all parties.  We agree, but only in

4  part.  Though the injunction and gatekeeping provisions are

5  sound, the exculpation of certain nondebtors exceeds the

6  Bankruptcy Court's authority.  We reverse and vacate that

7  limited portion of the plan.

8      Why did they say, why do they continue to say, this is

9  unchanged, "The injunction and gatekeeping provisions are

10  sound"?

11          MR. HOGEWOOD:  Your Honor, we would argue that the

12  entirety of the opinion, read fairly, treats the Protection

13  Provisions as a unit, and that those -- that those protected

14  by them are the same group.

15      And I'm not going to disagree that there's -- that

16  there's ambiguity in that language in comparison to other

17  parts of the opinion.  I'll just be candid about that.

18          THE COURT:  Okay.  All right.  Thank you.  I'll hear

19  from Mr. Ong.

20          MR. ONG:  Thank you, Your Honor.  Jay Ong for the

21  parties who we have colloquially referred to in this case as

22  the Advisors.

23      Your Honor, we filed a limited "me, too" objection, and

24  so we'll defer to Mr. Hogewood's argument and follow his

25  lead.  I did have a number of arguments prepared to submit to

Case 10-34036-sgj11 Doc 6594 Filed 10/22/22 Entered 10/22/22 15:42:28 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 36 of 104 PageID 1100

32

1  the Court, but I think he's effectively stolen my thunder

2  with respect to most of those.  And so I will confine my

3  additional comments to two arguments and observations, which,

4  in fairness, I think, have already been submitted to the

5  Court but bear emphasis.

6      The first, Your Honor, is Note 19 of the Circuit Court's

7  opinion.  Here, Your Honor, the Court expressly acknowledges

8  that this Court has the ability to competently address and

9  curtail vexatious litigation.  Mr. Pomerantz in his argument

10  on the record just now acknowledged and conceded that that is

11  the exact purpose of the gatekeeper function.  But yet the

12  Circuit Court states in that opinion, in that footnote, that

13  a plan and confirmation order are not the proper vehicles and

14  mechanisms to accomplish that potentially laudable objective.

15      Secondly, Your Honor, I would focus the Court on a clause

16  that Mr. Pomerantz himself cited under the opinion.  It is

17  the last clause of the opinion, and I think it informs the

18  Court's questions both to Mr. Pomerantz and Mr. Hogewood.  In

19  that opinion on Page 30, the Court summarizes its own opinion

20  by stating, The plan violates Section 524(e), but only

21  insofar as it exculpates and enjoins.

22      Your Honor, Mr. Pomerantz has spent a lot of time today

23  trying to differentiate injunctive provisions from release

24  provisions, and has attempted to cast the Fifth Circuit's

25  opinion as only concerned with releases.  Your Honor's own

Case 10-34065-sgj11 Doc 3694 Filed 10/12/23 Entered 10/12/23 16:52:08 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 37 of 104 PageID 1101

33

1    question with respect to Section -- or Page 22 of the

2    opinion, in which the Court refers to the exculpation -- or,

3    I'm sorry, the injunction and gatekeeping provisions.  Well,

4    Your Honor, it's clear that we cannot take that comment as

5    concluding that there is no infirmity in the injunctive

6    provisions of the plan, because the Fifth Circuit's language

7    on Page 30 expressly refutes that.

8        Your Honor, the only way that we can reconcile the

9    language that's contained in the opinion and that's been

10   highlighted by both parties with respect to the dispute

11   that's presently before the Court is to conform the

12   provisions of the plan to the extent they relate to the

13   exculpation provision to the same effective ruling that has

14   been admonished by the Fifth Circuit.

15       Your Honor, that necessarily means that we must conform

16   the injunctive provisions of the plan to the Court of

17   Appeals' ruling with respect to what parties are and are not

18   properly protected under a Chapter 11 plan.

19       Thank you, Your Honor.

20           THE COURT:  All right.  Well, I will tell you, the

21   head-scratcher part of this to me -- just a moment.  The

22   head-scratcher part to me, if there be one, is the issue I

23   raised with Mr. Pomerantz, the Section 9(f) of the plan

24   entitled, Injunctions.  I wondered if Paragraph (v) or

25   Section (v) of Paragraph 2 might be something that needed to

Case 10-34053-sgj11 Doc 3694 Filed 10/12/23 Entered 10/12/23 08:15:20 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/24 Page 38 of 104 PageID 1102

34

1   be conformed to the new definition of Exculpated Parties,

2   somehow conformed.  And I wondered about that next paragraph,

3   which you raised, Mr. Ong, in your pleading, the third

4   paragraph of the plan injunction language.  Mr. Pomerantz

5   gave me his view of that.

6       But as far as the gatekeeper provision, which is

7   Paragraph 4 of the injunction section, it's just a bridge too

8   far to me.  I mean, this is a hugely important section of the

9   plan.  And the Fifth Circuit keeps intact all of its

10   discussion of the Barton Doctrine and the *Villegas* opinion.

11   And it has to -- just because you say, ah, you can't release,

12   you can't exculpate parties under 524(e), having a

13   gatekeeping provision is an entirely different thing besides

14   a release or exculpation.

15       So it seems to me that what you all are asking me to do

16   is make a huge leap with regard to what the Fifth Circuit

17   didn't say in its revised final opinion.

18       I'm not so sure about, again, the paragraph before the

19   gatekeeper provision and Romanette (v), but, I mean, address

20   that.  A gatekeeper provision is not a release.  It's not an

21   exculpation.

22       MR. HOGEWOOD:  Your Honor, my -- I mean, I think --

23   I don't want to annoy you by repeating the same thing that

24   I've said a few times, but that's precisely what we asked for

25   in our petition for rehearing.  I think the Court knows that

000930

Case 10-35053-sgj1 Doc 6594 Filed 10/12/23 Entered 10/12/23 23:42:... Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/25 Page 39 of 104 PageID 1103

35

1    a petition for panel rehearing is a rare thing.  A petition

2    for, you know, review by the entire Fifth Circuit is a rare

3    thing.  We went the route of a panel rehearing to clarify a

4    point and to clarify our reading that the Court was saying

5    that the three forms of protection were limited to the same

6    parties.  That's precisely what we asked for in our petition.

7    And within a matter of three days, they granted that

8    petition, they granted our petition.

9        I know we've all been at this a long time, but grants of

10   petitions for rehearing by a Circuit Court of Appeals are an

11   extremely rare thing.  We all know that to be true.  They

12   granted it, they granted it without equivocation, and they

13   reissued an opinion that removed the offending language from

14   that opinion.

15       And I think it could not be clearer that they expect the

16   conforming of the plan to treat all three of the legs of the

17   stool exactly the same, that the same group of parties,

18   whether gatekeeper, whether injunction, whether release, they

19   are the -- they should be the same Protected Parties because

20   that's what the Fifth Circuit said in granting our petition

21   for clarification.

22       It's entirely clear that the Debtor doesn't agree with

23   it.  It is entirely clear to me, and I agree with the Court,

24   that the three legs of the stool do different things.  And a

25   gatekeeper provision may be less onerous than a complete

Case 10-34500-sgj5 Doc 3609 Filed 10/23/23 Entered 10/23/23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 40 of 104 PageID 1104

36

1  release or an injunction, but it is a protection of a party

2  that's really not entitled to it post-confirmation.  And I

3  think that's what the Fifth Circuit said.  I think they've

4  confirmed it when they -- when they granted our petition for

5  clarification.  And I'd respectfully request that the Court

6  enter the proposed order that we submitted.

7          THE COURT:  All right.  Mr. Pomerantz, I'll give you

8  the last word.  I would like you to at least address once

9  again my head-scratcher comment about Romanette (v) of

10  Paragraph 2 of Section Article 5 of the plan, as well as the

11  third paragraph of Article 9(f) of the plan.

12      (Pause.)

13          THE COURT:  You're on mute.

14          MR. PEZANOSKY:  Sorry about that.  I will respond to

15  Your Honor's questions before I then respond to the comments

16  that were made by counsel.

17      So, the injunction has the three paragraphs, and the

18  second paragraph really is the guts of it, like, what you can

19  do and what you can't do.  And Romanette (v) says you cannot

20  act or proceed in any manner that does not conform to the

21  plan.  The plan that that referred to was a plan that

22  exculpated a whole host of parties.  The Fifth Circuit said

23  you can't exculpate a whole host of parties.  The Fifth

24  Circuit in its original opinion said that the concern with

25  the breadth of an injunction is addressed by dealing with the

000932

Case 10-34052-sgj1 Doc 3504 Filed 10/22/23 Entered 10/22/23 15:42:43 Desc
Case 3:23-cv-00573-E Document 14-4 Filed 05/22/23 Page 41 of 104 PageID 1105

37

1    Exculpated Parties.

2        So the original opinion had two inconsistent sentences.

3    It had a sentence that said that the injunction is perfectly

4    lawful, and it had a sentence that said that the injunction

5    is limited by the definition of Exculpated Parties.

6        So, when Mr. Hogewood stands before Your Honor and says,

7    well, it's perfectly clear, we asked in several different

8    ways, we asked for a change of the definition, we asked for

9    guidance, we asked for an explanation, they did none of that.

10   They took out the sentence because of the reason I said they

11   took out the sentence, and neither Mr. Hogewood or Mr. Ong

12   has any answer or any response to it.

13       They would have the Court believe that notwithstanding

14   all the provisions I put forth in the -- in the -- that all

15   talk about exculpation, release, exculpation, release,

16   injunction and gatekeeper, okay, injunction and gatekeeper,

17   okay, that it could not be clearer really that that one-

18   sentence change, with doing nothing else to the opinion,

19   necessarily means that they are going to write the gatekeeper

20   out of the plan.

21       Your Honor, that argument just does not pass the straight

22   face test.  The Fifth Circuit wrote a 30-page opinion.  It

23   took a lot of time.  I think it took several months before we

24   got an opinion.  If the Fifth Circuit wanted to clarify its

25   opinion in the manner that was requested, it could have added

Case 19-34054-sgj11 Doc 3659 Filed 10/22/23 Entered 10/22/23 08:25:40 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 42 of 104 PageID 1106

38

1    a sentence or two.  It did not.  I gave Your Honor an

2    explanation on how to reconcile that deleted sentence with

3    the rest of the opinion.  Neither Mr. Ong or Mr. Hogewood

4    have even responded to that.

5        With respect to the third paragraph, again, Your Honor,

6    again, I don't look at that as a release.  The injunction, if

7    you look at 1 through 4, it's enforcing claims against the

8    Debtor.  It's talking about people who have claims,

9    interests, doing anything against the Debtor on account of

10   their claims.  That's what the injunction is prohibiting.

11       As Your Honor noted, the first four parts only deal with

12   the Debtor.  The Debtor goes away after the effective date.

13   Who are the successors to the Debtor?  The Reorganized

14   Debtor, the Claimant Trust, the Litigation Sub-Trust.  Since

15   the Debtor can't enforce the injunction because it's gone, of

16   course the successors to the Debtor have to be able to

17   enforce the injunction.  This paragraph on this injunction

18   has nothing to do with further claims that may be asserted

19   against the Reorganized Debtor, against the Litigation Sub-

20   Trust, against the Claimant Trust, for actions occurring

21   after the effective date.  If there are those claims, that is

22   what the gatekeeper will take into account, and that's what a

23   party will have to come before Your Honor and seek a

24   colorability determination.

25       Your Honor hit the point right on with your first

000934

Case 10-34652-sgj11 Doc 3594 Filed 10/12/23 Entered 10/12/23 08:15:42 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 43 of 104 PageID 1107

39

1    question for Mr. Hogewood.  To say that the three legs of the

2    stool are coexistent makes absolutely no sense.  In many

3    cases, all you have is an exculpation and injunction.  In

4    some cases, you have an injunction without an exculpation.

5    And in this case, you have three.  You have different

6    definitions.  The exculpation deals with pre-effective-date

7    parties and negligence claims.  That's what the exculpation

8    does.

9         The injunction prevents people from pursuing the

10   Reorganized Debtor.  It doesn't even talk about either the

11   Protected Parties or the Exculpated Parties.  That has

12   nothing to do with the injunction.  The injunction just says

13   injunction is essentially in aid of the discharge.  You can't

14   go after the Debtor or its successors for actions related to

15   the pre-effective-date conduct.

16        Now, of course, the Objectors argued to the Fifth Circuit

17   that the use of the term implementation and consummation of

18   the plan were ambiguous and could sort of be read to include

19   post-confirmation activities and would interfere with their

20   contracts and their rights.  The Fifth Circuit didn't buy

21   that.  The Fifth Circuit found nothing ambiguous with

22   implementation or consummation of the plan.  Okay?

23        So you have an injunction that performs a certain

24   purpose.  You have an exculpation, performs a certain

25   purpose.  And based upon your findings, Your Honor, which the

000935

Case 19-34054-sgj11 Doc 3594 Filed 10/12/22 Entered 10/12/22 08:15/22 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 44 of 104 PageID 1108

40

1    Fifth Circuit didn't change one iota to, adopted all those

2    findings regarding the reasons why a gatekeeper was

3    important, a gatekeeper applies to Protected Parties, not

4    Exculpated Parties, is not a release, and only provides that

5    people have to come into court.  That is the key.

6        And of course, I understand Mr. Hogewood's attempt to try

7    to conflate all the three.  He conflated them in his

8    petitions to the Fifth Circuit and he conflated them in his

9    opposition to Your Honor.  But there was no response when I

10   put the provisions on the screen that the definition of the

11   parties are different.  You cannot view these all the same.

12   And it's too convenient and it does not pass the straight

13   face test to say, well, they're all the same, it just had a

14   problem with the Exculpated Parties and it has to be narrowed

15   and it's crystal clear from that taking that one sentence

16   out.  That argument just does not pass the straight face

17   test.

18       Your Honor, Mr. Ong referenced the Note 19 with vexatious

19   litigant.  It was done in the context of exculpation.  The

20   Court said, yeah, you can't basically exculpate parties under

21   524(e), but you can go seek a vexatious litigant ruling.  It

22   didn't say that's in lieu of a gatekeeper.  And in fact, Your

23   Honor, a gatekeeper is different from a vexatious litigant

24   finding.  Why?  Because a vexatious litigant finding, which,

25   if made by the District Court, can come with some serious

Case 19-34054-sgj11 Doc 3594 Filed 10/12/23 Entered 10/12/23 08:15:42 Desc
Case 3:23-cv-00573-E Main Document Page 45 of 104 PageID 1109

41

1   penalties for violating it, can come with criminal contempt,

2   that violation of the gatekeeper would not be able to because

3   Your Honor, as an Article I Court, does not have that power.

4   Under the case law, a vexatious litigant finding entitles the

5   Court to say, in any matter you file a lawsuit, you have to

6   file the order deeming you a vexatious litigant.

7       So, again, to make out of whole cloth an argument that

8   one footnote that says, hey, if you want to go and seek

9   vexatious ruling, nothing in this opinion forecloses it, to

10  say, well, of course, that means what a gatekeeper means, and

11  if that means what a gatekeeper means, then of course the

12  gatekeeper doesn't apply and it's meaningless and we're going

13  to just write it out of the plan.  Just does not make any

14  sense.

15      And last, Your Honor, Mr. Hogewood started by sort of,

16  again, as he's done throughout this case, unsuccessfully

17  before Your Honor and unsuccessfully before the Fifth

18  Circuit, trying to disassociate himself and his -- or his

19  clients from Mr. Dondero.  Your Honor found that they are

20  under the thumb of Mr. Dondero.  They appealed that finding.

21  The Fifth Circuit found there was ample evidence.

22      So we are -- and while it is true they may have not filed

23  certain pleadings, they have, I'm sure, done that

24  strategically, but let's call it for what it is.  All these

25  parties opposing us, as has been the case since Mr. Dondero

000937

Case 10-3459-sg054  Doc 6594  Filed 10/23/23  Page 239  Entered 16/8d/208/25/2028  Desc
Case 3:23-cv-00573-E  Document 11-4  Main Docuhent Filed 05/02/23  Page 46 of 104  PageID 1110

42

1    said he would burn down the house, are all dancing to Mr.

2    Dondero's drum.  He is the puppeteer, and these are all his

3    instruments.

4         Thank you, Your Honor.

5              THE COURT:  Okay.  Thank you.  Just a moment.

6         (Pause.)

7              THE COURT:  All right.  Well, I promise you all

8    this.  I and my law clerk have spent a heck of a lot of time

9    reading and rereading the Fifth Circuit's opinion, reading

10   your pleadings, going back and reading the plan definitions

11   and thinking about this.

12        I think, at bottom, it is worth reminding people that the

13   exculpation was all about setting forth parties, so-called

14   Exculpated Parties, who could not be sued for negligence

15   claims -- *i.e.*, anything short of gross negligence, willful

16   misconduct, fraud; I just shorthand that negligence; I guess

17   it could be breach of contract -- those parties could not be

18   sued for negligence, breach of contract, anything short of

19   gross negligence, willful misconduct, for postpetition

20   conduct related to the plan or the case.  Okay.  That's

21   shorthand.

22        Even though some people in the bankruptcy world

23   differentiate an exculpation from a third-party release,

24   okay, third-party release, quintessential example, we'll use

25   the *Purdue Pharma* case, okay.  Sackler family, insurance

Case 19-34054-sgj11 Doc 3594 Filed 10/22/24 Entered 10/22/24 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 47 of 104 PageID 1111

43

1   companies, third parties, not debtors, getting a release from

2   creditors of Purdue. Even though many of us in the

3   bankruptcy world tend to think an exculpation is very, very

4   different from that -- it's not a release of any and all

5   claims from the beginning of time until plan confirmation;

6   it's just a release of negligence claims for postpetition

7   conduct, okay -- nevertheless, while many people will

8   differentiate those two things, a third-party release and an

9   exculpation, the Fifth Circuit said no. If it's

10  nonconsensual, no. We think an exculpation violates 524(e),

11  so we're carving out that section of the Highland plan.

12      The gatekeeper provision, Paragraph 5 of Article IX.F of

13  the plan, is something very different, and I think the

14  Highland confirmation order spells that out in great detail.

15  I went back and looked, and Pages 48 through 59 of the

16  Highland confirmation order collectively talked about

17  exculpations, injunctions, gatekeeper provisions, but

18  gatekeeper provision in particular started at Page 54. And

19  54 through 59 of the confirmation order focused on the

20  factual underpinnings as well as the law, the Barton

21  Doctrine, et cetera, justifying the gatekeeping provisions.

22      So my point is I think the Fifth Circuit was very clear

23  in understanding exculpations, injunctions, gatekeeper

24  provisions. I think they were very clear. I think the

25  confirmation order was spelling it out thoroughly. I haven't

Case 10-34 523-stg534 Doc 8 Filed 38 10 Page 224 Entered 16/Fed/208 15/2028  Desc
Case 3:23-cv-00573-E  Docu Docu-he Filed 95/02/28 of Page 48 of 104  PageID 1112

44

1  seen your briefing, all of you parties that you filed briefs

2  in the Fifth Circuit, haven't seen it.  I have no doubt you

3  all presented brilliant briefs that thoroughly explained the

4  distinctions here.  And while there may have been times where

5  the Fifth Circuit, in both its original opinion and its final

6  opinion, said plan protections generically, I think they were

7  clear on the difference.  And I think the fact that they

8  granted a petition for rehearing, and without oral argument,

9  without giving anyone else the opportunity to file briefs,

10  they simply took out that one sentence that said, The

11  injunctions and the gatekeeper provisions are perfectly

12  legal.  They took that out, but then there's plenty of other

13  places where they said they're sound.  We're not changing

14  anything else except the exculpation provisions.  We're

15  unpersuaded that the gatekeeper provisions are problematic.

16      So, again, we've read this.  We've reread this.  We've

17  thought about it.  We've debated it.  As you can glean from

18  my questioning, I thought really hard about Article IX.F,

19  Paragraph 2, provision Romanette (v).  Did that need to be

20  tweaked to cross-reference the amended definition of

21  Exculpated Parties that the Fifth Circuit mandated?  Did that

22  fourth paragraph need to be tweaked to cross-reference the

23  new definition of Exculpated Parties?  I'm afraid of doing

24  what the Fifth Circuit declined to do.  All they did was

25  narrow the definition of Exculpated Parties and take out one

Case 10-35013-sgj1 Doc 6594 Filed 10/03/23 Page 242 Entered 10/03/23 08:25:42 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 49 of 104 PageID 1113

45

1    sentence that may have been too rosy, glowing, with regard to

2    gatekeeper provisions generally.  You know, perfectly lawful.

3    But they kept in the language that they were sound.  I don't

4    know what they were concerned about.  None of us can

5    completely read their minds.  But I know they declined to go

6    any further than taking out that one sentence.  All they did

7    was said the exculpation provision went too far.  The only

8    Exculpated Parties should be Debtors, Committee, Committee

9    members, and the Independent Directors who were quasi-

10   trustees.  And then they said, oh, by the way, we note that

11   there were earlier orders in the case, January 2020, June or

12   July 2020, that actually gave a little bit broader protection

13   to professionals representing the Independent Directors and

14   those other parties.

15       But anyway, be that as it may, I feel like I would be

16   overstepping my role if I went any further than the Fifth

17   Circuit explicitly went.  I feel like they declined the

18   invitation to tamper with that gatekeeping provision or the

19   other language in the injunction section.  They definitely

20   declined the invitation to rein in the defined term Protected

21   Parties.  I mean, the plan, Exculpated Parties, Defined Term

22   #62.  Protected Parties, Defined Term 105.  Also had a

23   defined term for Enjoined Parties.

24       I have every reason to believe the Fifth Circuit looked

25   at all of this.  And so, for this reason, I'm going to grant

000941
000944.1118

Case 10-34652-sgj11 Doc 3694 Filed 10/22/24 Entered 10/22/24 21:20:28 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 02/02/23 Page 50 of 104 PageID 1114

46

1   the Debtor's motion as presented so that the Debtor shall

2   conform the plan to be consistent with the Fifth Circuit's

3   final opinion and mandate, and the Debtor shall do that by

4   changing the defined term Exculpated Parties at Defined Term

5   #62, delete it as it exists and replace it to only include

6   Debtor, Independent Directors, Committee, and members of the

7   Committee.  And except for that, the plan shall be

8   unaffected.

9       So, is there anything else?  Mr. Pomerantz, I think --

10          MR. PEZANOSKY:  Your --

11          THE COURT:  -- we are coming back next week for a

12  trial on a proof of claim of HCRE.  Anything else that you

13  want to preview?

14          MR. PEZANOSKY:  Your Honor, just on the motion, and

15  appreciate Your Honor granting the motion.  As you will not

16  find surprising, I think the chances of this being -- your

17  order being appealed is a hundred percent.  And we are likely

18  to have the same battle of the pleadings that we had before

19  Your Honor in the Fifth Circuit.  While I always hesitate to

20  ask Your Honor to do more work because you've done quite

21  enough work in this case, I think it would be extremely

22  helpful to the Fifth Circuit if you wrote an opinion that

23  laid out your reasoning, as we have talked today, about the

24  different definitions and why you're coming to a conclusion.

25  Because, in my experience, Your Honor's words on the page and

Case 10-34502-sgj11 Doc 3594 Filed 10/18/22 Entered 10/18/22 15:42:08 Desc
Case 3:23-cv-00573-E Document 14-4 Filed 05/02/23 Page 51 of 104 PageID 1115

47

1    your reasoning is going to be perhaps a lot more effective

2    than ours.

3        And, again, that's not that you're going to be able to

4    tell the Fifth Circuit what it meant.  Right?  Nobody would

5    be so bold as to say any of us can tell the Fifth Circuit

6    what it meant.  But I think, in laying out the different

7    provisions, the reasoning, and why you believed that this is

8    what they meant, we think it would be extremely helpful, and

9    if Your Honor would indulge us on that, we think it would be

10   helpful to the process.

11           THE COURT:  All right.  Mr. Hogewood and Mr. Ong,

12   anything you want to say on that point?  I don't know that

13   you would have anything to say, but I --

14           MR. HOGEWOOD:  No.  I would just simply --

15           THE COURT:  Unless you say --

16           MR. HOGEWOOD:  I would say I don't --

17           THE COURT:  -- oh, I have authority right now, I'm

18   not appealing, you know, I would save myself the work.  But I

19   know you can't say that.  So anything you want to add?

20           MR. HOGEWOOD:  I would say that I don't disagree

21   with Mr. Pomerantz.  And indeed, in having a written opinion,

22   you give us the ability to have a reasoned conversation with

23   our client.

24           THE COURT:  Okay.  Mr. Ong, anything you want to

25   say?

Case 1:23-cv-00534 Document 36 Filed 10/32 Page 224 Entered Filed 08/25/2023 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 52 of 104 PageID 1116

48

1        MR. ONG: No, Your Honor. I have nothing further to

2  add on this particular issue, but I appreciate the Court's

3  inquiry very much.

4        THE COURT: Okay. All right. Well, we will write

5  this up. And you know how it goes. I always say I'll get it

6  out as quickly as possible, but it's sometimes longer than I

7  want it to be.

8       You know, I guess this is as good a time as any to

9  mention something that we were thinking about in chambers the

10  other day. I'm not going to put this in an order. I'm just

11  making a request, and I hopefully won't have to put it into

12  an order: When anyone files an amended pleading in this case

13  of any type, I'm going to request that you follow it up with

14  a redline copy of the changes and send it to my courtroom

15  deputy, Traci, and then copy the other lawyers in the case.

16  Frankly, this started with the Fifth Circuit. I would never

17  make this request to the Fifth Circuit, of course. But when

18  they issued their amended opinion, it took us a few pass-

19  throughs to figure out what did they change. But then it

20  seemed to start -- maybe we just started noticing it more

21  lately in this case. Sometimes an amended pleading would be

22  filed and we'd -- what did they change, what did they change?

23  So, anyway, to save us all a lot of trouble, I'm going to

24  request that the parties, whenever you file an amended

25  pleading, again, send to my courtroom deputy a redline

000944

Case 10-34052-sgj Doc 3694 Filed 10/31/22 Entered 10/31/22 15:47:23 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 53 of 104 PageID 1117

49

1   showing what you changed.

2       I guess another method would be this.  This is what I

3   sometimes do when I amend an opinion.  I will put a footnote

4   after the word Amended in the title and say, This amends the

5   previous order only to change, you know, Page 3, whatever.

6   That's another thing you can do, if it just deletes a

7   sentence or changes something immaterial.  But, again, we all

8   read a lot of paper in this case, and I'm just asking as a

9   courtesy that that be done, and hopefully that request is all

10  we'll have to do, we won't have to do an order.  All right.

11      (Proceedings concluded at 2:58 p.m.)

12                          --oOo--

13

14

15

16

17

18

19                        CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                    **10/29/2022**

23  _____      _____

24  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

25

50

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                       42

END OF PROCEEDINGS                                            49

INDEX                                                         50

**Amended 10/31/2022**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | October 26, 2022 |
|  | ) | 1:30 p.m. Docket |
| Reorganized Debtor. | ) |  |
|  | ) | MOTION TO CONFORM PLAN FILED |
|  | ) | BY DEBTOR HIGHLAND CAPITAL |
|  | ) | MANAGEMENT, LP [3503] |
| _____ | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtor: | Jeffrey Nathan Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br>  11th Floor<br>Los Angeles, CA  90067<br>(310) 277-6910 |
| For the Funds: | A. Lee Hogewood III<br>K&L GATES, LLP<br>4350 Lassiter at North Hills<br>  Avenue, Suite 300<br>Raleigh, NC  27609<br>(919) 743-7306 |
| For the Funds: | Artoush Varshosaz<br>K&L GATES, LLP<br>1717 Main Street, Suite 2800<br>Dallas, TX  75201<br>(214) 939-5659 |
| For the Advisors: | Jay Ong<br>MUNSCH HARDT KOPF & HARR, P.C.<br>1717 West 6th Street, Suite 250<br>Austin, TX  78703-4777<br>(512) 391-6124 |

Case 10-34508-sgj11 Doc 660 Filed 11/22/11 Entered 11/22/11 08:09:52 Desc
Case 3:23-cv-00573-E   Document 4   Filed 05/02/23   Page 56 of 104   PageID 1120

2

```
 1

 2      APPEARANCES, cont'd.:

 3      For Dugaboy Investment        Douglas S. Draper
        Trust:                        HELLER, DRAPER & HORN, LLC
 4                                    650 Poydras Street, Suite 2500
                                      New Orleans, LA  70130
 5                                    (504) 299-3300

 6      Recorded by:                  Michael F. Edmond, Sr.
                                      UNITED STATES BANKRUPTCY COURT
 7                                    1100 Commerce Street, 12th Floor
                                      Dallas, TX  75242
 8                                    (214) 753-2062

 9      Transcribed by:               Kathy Rehling
                                      311 Paradise Cove
10                                    Shady Shores, TX  76208
                                      (972) 786-3063
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
              Proceedings recorded by electronic sound recording;
```

000948

Case 19-34054-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:52:23 Desc
Case 3:23-cv-00573-E Main Document Amended Filed 05/02/23 Page 57 of 104 PageID 1121

3

1    transcript produced by transcription service.

2    <u>DALLAS, TEXAS - OCTOBER 26, 2022 - 1:39 P.M.</u>

3    THE COURT:  All right.  The other matter we have set

4    is Highland, the motion to conform plan filed by Highland.

5    This is Case No. 19-34054.  I will get appearances.  Mr.

6    Pomerantz, you're appearing for the Debtor today?

7    MR. POMERANTZ:  Yes.  Good afternoon, Your Honor.

8    Jeff Pomerantz; Pachulski Stang Ziehl & Jones; appearing on

9    behalf of (audio gap).

10    THE COURT:  Okay.

11    (Court confers with Clerk.)

12    THE COURT:  Okay.  Mr. Pomerantz, we heard your

13    appearance, but then you froze up towards the last few

14    seconds.

15    MR. POMERANTZ:  Oh.  Can you -- can you -- can you

16    hear me, Your Honor?

17    THE COURT:  I can hear you again now.  Okay.  Thank

18    you.

19    MR. POMERANTZ:  Am I unfrozen?

20    THE COURT:  You're unfrozen now.

21    MR. POMERANTZ:  I may have been very still.

22    THE COURT:  Like a mannequin.  Okay.  Thank you.

23    We have some objections to the Reorganized Debtor's

24    motion, and so I'll get appearances from those Objectors.

25    First, on behalf of the Funds, Mr. Hogewood, are you appearing

for the Funds?

Case 10-34054-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:53:23 Desc
Case 3:23-cv-00573-E Document 4 Main Document Filed 05/02/23 Page 58 of 104 PageID 1122

4

1          MR. HOGEWOOD:  Good afternoon, Your Honor.  Lee

2     Hogewood of K&L Gates representing Highland Income Fund,

3     NexPoint Strategic Opportunities Fund, Highland Global

4     Allocation Fund, and NexPoint Capital, Inc., the four funds

5     that we've been calling the Funds collectively.  And Artoush

6     Varshosaz, my partner in Dallas, is here as local counsel as

7     well.  Thank you.

8          THE COURT:  Okay.  Thank you.  All right.  We also

9     had a limited objection from the parties we call the Advisors,

10    NexPoint Advisors and HCMFA.  Do we have Mr. Rukavina or

11    someone appearing for those parties?

12         MR. ONG:  Good afternoon, Your Honor.  This is Jay

13    Ong of Munsch Hardt Kopf & Harr appearing on behalf of

14    NexPoint Advisors, LP and Highland Capital Management Fund

15    Advisors, LP.

16      Mr. Rukavina unfortunately has scheduling conflicts with

17    other proceedings this afternoon, so I am appearing on behalf

18    of the Advisors in his stead and with apologies to the Court

19    for the unavailability.

20         THE COURT:  Okay.  Thank you.  All right.  The

21    Dugaboy Trust joined in the Funds' response.  Mr. Draper, are

22    you appearing for Dugaboy?

23      (Interruption.)

24         THE COURT:  Mr. Draper, we see you --

25         A VOICE:  Doug, you're --

Case 1:23-ap-05024 Doc 66 Filed 11/03/23 Entered 11/03/23 09:52:23 Desc
Case 3:23-cv-00573-E   Document 4   Filed 05/02/23   Page 59 of 104   PageID 1123

5

1        THE COURT:  We see you but we cannot hear you.  Can

2  you try turning up your volume?

3      (No response.)

4        THE COURT:  Okay.  We're not hearing you at all, Mr.

5  Draper.  I don't know.  Can you try again?

6        MR. DRAPER:  Could I try again?

7        THE COURT:  Okay.

8        MR. DRAPER:  Can you hear me at this moment?

9        THE COURT:  We hear you now.  It's --

10        MR. DRAPER:  Right.  Your Honor, --

11        THE COURT:  It's better.  It could be even better,

12  but it's at least audible now.

13        MR. DRAPER:  The good part is, Your Honor, I'm

14  appearing on behalf of the Dugaboy Trust.  Nancy Dondero is

15  present, as the Court has ordered.  You won't have a problem

16  with my speaking because I'm just -- I'm going to let Mr.

17  Hogewood make the argument, and I probably -- I will be saying

18  nothing in connection with that.

19        THE COURT:  Okay.  Thank you.  All right.  I think

20  we've covered everyone who filed a pleading.  Is there anyone

21  else who wishes to appear?

22      (No response.)

23        THE COURT:  All right.  Well, I guess we have

24  interested observers, but only these four participants, sets

25  of participants.

000951

Case 19-34054-sgj11 Doc 3601 Filed 11/22/23 Entered 11/20/23 09:52:23 Desc
Case 3:23-cv-00573-E Document 4-1 Filed 05/02/23 Page 60 of 104 PageID 1124
Main Document Page 53 of 59

6

1    Mr. Pomerantz, I'll hear your presentation.

2          MR. POMERANTZ:  Thank you, Your Honor.  On September

3    7th, the Fifth Circuit issued its amended opinion, which

4    remanded the matter back to this Court for further proceedings

5    consistent with the opinion.

6    As a result, the Reorganized Debtor filed its motion to

7    conform the plan which requests that the Debtor -- that the

8    Court conform the plan to address the one narrow provision

9    that the Fifth Circuit held was unlawful.

10   The only issue that the Fifth Circuit had with the plan

11   and the confirmation order was the inclusion of certain

12   parties in the definition of Exculpated Parties.  The Fifth

13   Circuit ruled that a plan that Exculpated Parties other than

14   the Debtor, the Independent Directors, the Committee and its

15   members, was an unauthorized nondebtor release that violated

16   Section 524(e) of the Code.

17   The opinion makes clear in several places that this was

18   the only part of the plan that the Fifth Circuit found to be

19   objectionable and that the plan and the Court's factual

20   findings were confirmed in all other respects.

21   La Asia, will you put Slide 1 on the screen, please?

22   Your Honor, Slide 1 sets forth five separate places in the

23   opinion which reinforces what I just said, and I will read

24   them for the Court's convenience.

25   On Page 10, the Fifth Circuit said, We then turn to the

000952

Case 19-34054-sgj11 Doc 3601 Filed 11/22/25 Entered 11/20/05 2025 Desc
Case 3:23-cv-00573-E Document 1 Filed 05/02/23 Page 61 of 104 PageID 1125

7

1    merits, conclude that the plan exculpates certain nondebtors

2    beyond the Bankruptcy Court's authority, and affirm in all

3    other respects.

4        On Page 16, the Court said, We do, however, agree with

5    Appellants that the Bankruptcy Court exceeded its authority

6    under 524(e) by exculpating certain nondebtors, and so we

7    reverse and vacate the plan only to that extent.

8        On Page 22, the Fifth Circuit said, Though the injunction

9    and gatekeeping provisions are sound, the exculpation of

10   certain nondebtors exceeds the Bankruptcy Court's authority.

11   We reverse and vacate that limited portion of the plan.

12       On Page 22, the Court says, We must reverse and strike the

13   few unlawful parts of the plan's exculpation provision.

14       And lastly, Your Honor, in summing up on Page 30, the

15   Court said, In sum, the plan violates Section 524(e), but only

16   insofar as it exculpates and enjoins certain nondebtors.  The

17   exculpatory order is therefore vacated as to all parties

18   except for Highland Capital, the Committee and its members,

19   and the Independent Directors, for conduct within the scope of

20   their duties.  We otherwise affirm the inclusion of the

21   injunction and the gatekeeper provisions in the plan.

22       This language, Your Honor, repeated throughout the

23   opinion, is crystal clear.  The Fifth Circuit's only issue

24   with the plan was nondebtors being included in the definition

25   of Exculpated Parties and released for negligence claims.

1       Based upon the direction provided by the Fifth Circuit,

2   the motion before Your Honor seeks to conform the definition

3   of Exculpated Parties as directed by the Fifth Circuit,

4   removing all parties from the definition other than the

5   Debtor, the Independent Directors, the Committee and its

6   members.

7       The Funds and the Advisors have both objected to the

8   motion, and Dugaboy has joined.  They argue that the Fifth

9   Circuit did far more than revise the definition of Exculpated

10  Parties, and that more extensive surgery to the confirmation

11  order is required to bring the plan in compliance with the

12  Fifth Circuit opinion.

13      They argue that the Fifth Circuit not only limited the

14  definition of Exculpated Parties, but also significantly

15  restricted the protections afforded by the gatekeeper to the

16  Protected Parties.  Protected Parties, a defined term only

17  used in the gatekeeper provision.

18      They argue that the gatekeeper only applies to Exculpated

19  Parties and not the broader list of Protected Parties as

20  otherwise set forth, explicitly and unambiguously set forth in

21  the plan.  And so they would have us limit the term Protected

22  Parties to the newly-limited definition of Exculpated Parties.

23  And their position is largely based upon the one-sentence

24  change that the Fifth Circuit made to its opinion as a result

25  of the Funds' petition for rehearing, a change that the Fifth

000954

APP.131

Case 10-34054-sgj11  Doc 6601  Filed 11/22/25  Entered 11/22/25  Desc
Case 3:23-cv-00573-E   Main Document   Filed 05/02/23   Page 63 of 104   PageID 1127

9

1  Circuit made in one business day and without requesting a

2  response from the Reorganized Debtor or any other party.

3      La Asia, could you put Slide 2 on the screen, please?

4      Your Honor, Slide 2 shows the only change made to the

5  opinion.  The Fifth Circuit deleted the sentence, The

6  injunction and gatekeeper provisions are, on the other hand,

7  perfectly lawful, and replaced it with the sentence, We now

8  turn to the plan's injunction and gatekeeper provisions.

9      That's it.  The Objectors argue that this means, this one-

10  sentence change, that the Fifth Circuit agreed with the

11  Objectors' interpretation of the opinion that the gatekeeper

12  can only apply to the Exculpated Parties, thereby requiring

13  the definition of Protected Parties to be limited.  That

14  position would narrowly and significantly alter the scope,

15  effect, and protections of the gatekeeper.  But neither the

16  language nor the reasoning of the Fifth Circuit opinion

17  supports that interpretation.

18      But perhaps the best indication that the Objectors'

19  interpretation is overreaching is by comparing what the

20  Objectors asked for in the motion for rehearing and what the

21  Fifth Circuit actually did.  In their petition, they asked

22  Court to narrow the opinion to confirm what they believed was

23  the holding.  And they state in their petition that the

24  impermissibly Exculpated Parties are similarly struck from the

25  protections of the injunction and the gatekeeper provisions in

Case 19-34054-sgj11 Doc 3601 Filed 11/22 Entered 11/22/23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 64 of 104 PageID 1128

10

1  the plan.  In other words, that such parties cannot constitute

2  Protected Parties, such that the injunction and the gatekeeper

3  provisions extend only to Highland Capital, the Committee, its

4  members, and the Independent Directors.  That is what they

5  asked for in their petition for hearing.

6      The Fifth Circuit ignored the Funds' request to clarify

7  that the gatekeeper only protects the narrow universe of

8  Exculpated Parties.  The Fifth Circuit did not modify the

9  gatekeeper provision or its applicable definition of Protected

10  Parties in any way, let alone in the manner that Objectors

11  requested.  And they did not include anything in its opinion

12  to indicate that they agreed with the Objectors' analysis.

13  It's hard to fathom that if the Fifth Circuit actually agreed

14  with what the Objectors were saying that this page on the

15  screen would be the only change to the opinion.  It just stuck

16  with the original finding, that the gatekeeper was sound.

17      In other words, the Fifth Circuit heard the Objectors'

18  request for a change in the definition of Protected Parties

19  and rejected it.

20      And recently, the Fifth Circuit denied the Objectors'

21  request to recall and stay the mandate, which would have had

22  the effect of essentially staying the hearing before Your

23  Honor that we're having today.  And one of the arguments that

24  Objectors made in that petition was that there was a

25  disagreement between the parties' interpretation of what the

Case 10-34503-sgj11 Doc 3601 Filed 11/22/25 Page 225 Entered Filed 11/22/25 11:35:28 Desc
Case 3:23-cv-00573-E Document 11-1 Filed 05/02/23 Page 65 of 104 PageID 1129

11

1   gatekeeper provided.

2       The Fifth Circuit denied that motion immediately on the

3   same day and without any comment.  And the motion, Your Honor,

4   and the order can be found on the Fifth Circuit's docket.

5   It's -- the citations are in Footnote 23 of our reply brief.

6       Nevertheless, Objectors persist in their argument that the

7   deletion of the sentence that the gatekeeper and injunction

8   provisions are perfectly lawful was a wholesale

9   acknowledgement of their position.  But that argument, Your

10  Honor, is wishful thinking, not supported by any reasonable

11  interpretation of the words on the page or the reasoning that

12  underlies the opinion.

13      There really is only one interpretation of why the Court

14  deleted that sentence.  The original opinion included language

15  that, and I quote, "Appellants' primary contention that the

16  plan's injunction is overbroad by releasing Debtors in

17  violation of Section 524(e) is resolved by striking out the

18  impermissibly Exculpated Parties."

19      Importantly, that sentence I just read only applies to the

20  injunction.  Doesn't apply to the gatekeeper.

21      So the language that the injunction is perfectly legal is

22  inconsistent with the Court's determination that the

23  injunction needed to be curtailed as a result of the

24  limitation of Exculpated Parties.

25      And how was the injunction affected by the Court's

Case 19-34054-sgj11  Doc 3601  Filed 11/03/23  Entered 11/03/23  Desc
Case 3:23-cv-00573-E  Document 11-4  Filed 05/02/23  Page 66 of 104  PageID 1130

12

1   exculpation holding?  La Asia, can you please put Slide 3 on

2   the screen?

3       Your Honor, this is the injunction as it's set forth in

4   the plan.  It's three paragraphs.  The second paragraph is the

5   meat of it.  And Romanette (i) through (iv) enjoins a variety

6   of actions against the Debtor.   And the following paragraph,

7   Paragraph 3 on the page, extends the injunction to actions

8   against the successors of the Debtor.

9       Contrary to the argument I think was made in the Advisors'

10  brief, nothing in the opinion affects the Debtor's successors

11  from the protections afforded under the injunction, and to

12  hold otherwise would essentially render the injunction

13  meaningless because the Debtor ceased to exist on the

14  effective date.

15      Romanette (v), though, Your Honor, is the key to

16  understanding what the Fifth Circuit meant when it deleted its

17  sentence.  It prohibits parties from taking actions that do

18  not conform to or are not in compliance with the plan.

19  Accordingly, without any revision, the injunction prohibited

20  parties from pursuing claims against the originally Exculpated

21  Parties, including those parties the Fifth Circuit said could

22  not be Exculpated Parties.

23      Having determined that the plan unlawfully exculpated

24  certain parties, the injunction necessarily had to be pared

25  back so that it would only apply to the new (audio gap) of

Case 10-34500-sgj11 Doc 60 Filed 11/22/06 Entered 11/20/95/2008 Desc
Case 3:23-cv-00573-E   Document 1-4   Filed 05/02/23   Page 67 of 104   PageID 1131

13

1   Exculpated Parties.

2        The Advisors also argue that because the opinion states

3   the Court must strike the few unlawful parts of the

4   exculpation provision, then more than just the (audio gap) --

5            THE COURT:  You froze again.

6            MR. POMERANTZ:  -- was the definition of Exculpated

7   Parties, includes several parties that the Court has

8   determined are not entitled to exculpation, and those parties

9   have to be -- those few parties have to be deleted from the

10  definition.

11       There is just no language in the opinion at all that

12  supports Objectors' interpretation.  But more importantly,

13  Your Honor, the reasoning behind the opinion does not support

14  the interpretation that the gatekeeper must be limited to

15  Exculpated Parties.  As I mentioned before, the Court affirmed

16  the confirmation order in all respects except to the extent

17  that the plan exculpated parties and released them in

18  violation of 524(e).  According to the Fifth Circuit, 524(e)

19  prohibits a party from -- prohibits the release of any

20  nondebtors.  The release of any nondebtors.

21       La Asia, can you put Slide 4 on the screen, please?

22       This is the exculpation provision, and the highlighted

23  language at the beginning clearly states that, subject to all

24  respects, Article 12(b) of the plan, and the maximum extent

25  permitted by applicable law, no Exculpated Party (audio gap)

Case 10-34500-sgj5 Doc 3601 Filed 11/13/23 Entered 11/13/23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 68 of 104 PageID 1132

14

1   and each Exculpated Party is hereby exculpated -- *i.e.*,

2   released -- from any claim, obligation, suit, judgment,

3   demand, debt, right, cause of action, remedy, loss, and

4   liability for certain defined conduct.

5        It is clearly a release.  It's a release of the Exculpated

6   Parties for -- with the exception of fraud, gross negligence,

7   and willful misconduct, for the variety of actions they took

8   in connection with the plan.  The Fifth Circuit ruled that

9   that release, that release of broad list of parties violated

10  Section 524(e), and accordingly, Exculpated Party definition

11  had to be revised.

12       Now let's look at the gatekeeper provision.  La Asia, can

13  you put the next slide on the screen, please?

14       Okay.  The gatekeeper provision says that no enjoined

15  party may commence or pursue a claim or cause of action of any

16  kind against any Protected Party without the Bankruptcy Court

17  first determining, after notice and a hearing, that such claim

18  or cause of action represents a colorable claim of any kind.

19       In contrast to the exculpation provision, the gatekeeper

20  provision releases no one.  Instead of releasing specific

21  claims, the gatekeeper serves a completely different purpose,

22  to prevent frivolous litigation of claims that are preserved

23  to be brought under the plan.

24       Thus, if any party believed they have any claim against a

25  Protected Party, they need to seek a colorability

Case 19-34054-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:55:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 69 of 104 PageID 1133

15

1  determination from this Court.

2       But importantly, Your Honor, no claim, colorable or not,

3  is in any way released by the gatekeeper provision.  And

4  Objectors' repeated characterization over and over that the

5  gatekeeper amounts to a release is just wrong.  The

6  exculpation is a release and covers the Exculpated Parties.

7  The gatekeeper is not a release but a procedural requirement

8  that parties have to file before filing a claim against the

9  Protected Parties.

10      The definition of Protected Parties that applies to the

11  gatekeeper provision is considerably broader than the

12  definition of parties exculpated, and that's because it covers

13  the post-effective date management -- the Claimant Trustee,

14  the Litigation Sub-Trustee, the Oversight Board.

15      Objectors argued to the Fifth Circuit that this Court did

16  not have jurisdiction to act as a gatekeeper because it may

17  not have jurisdiction to address the underlying claim if it's

18  determined to be colorable.  The Fifth Circuit rejected that

19  argument, relying on its opinion, prior opinion in *Villegas*.

20      Objectors argue that 28 U.S.C. § 959(a) prevented the

21  Court from acting as a gatekeeper, and the Fifth Circuit

22  disagreed, reasoning that the determination of whether 959(a)

23  applies shall be left in the future to the Bankruptcy Courts

24  and the District Court, that gatekeeper is not a release and

25  it does not implicate Section 524 in any way.  And the reason

000961

APP1138

Case 19-34054-sgj11   Doc 3601   Filed 11/22/23   Entered 11/22/23   Desc
Case 3:23-cv-00573-E   Document 14   Filed 05/02/23   Page 70 of 104   PageID 1134

16

1  for limiting the exculpation, that nondebtor parties are

2  released, has nothing to do with the gatekeeper.

3      Therefore, Your Honor, there is no principal reason for

4  the Fifth Circuit to have limited the gatekeeper's

5  applicability to parties entitled to the exculpation.

6      And lastly, Your Honor, the Objectors' interpretation of

7  the opinion would eviscerate the gatekeeper and render it

8  effectively meaningless.  And why do I say that?  Well, first,

9  limiting the definition to Exculpated Parties would mean that

10  the gatekeeper has no effect on any conduct that occurred

11  after the effective date.  That's because the Independent

12  Directors are gone, the Committee is gone, the members are

13  gone.  They all ceased to exist on the effective date.  And

14  the Debtor doesn't need a gatekeeper for pre-effective date

15  because they were discharged.  And incidentally, the Objectors

16  appealed the discharge under 1141, and that argument was

17  rejected by the Fifth Circuit.

18      Second, the Exculpated Parties don't need the gatekeeper

19  to the extent any pre-effective-date claims asserted against

20  them sound in negligence, because they've been exculpated for

21  those claims.

22      Third, the gatekeeper is largely forward-looking, to

23  prevent harassment of post-effective-date management as they

24  consummate the plan, wind down the assets, and administer the

25  Claimant Trust and the Litigation Sub-Trust.

Case 19-34054-sgj11 Doc 3601 Filed 11/13/23 Entered 11/13/23 09:53:23 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 71 of 104 PageID 1135

17

1    So, if Objectors are right, then the gatekeeper provisions

2    only apply to fraud and gross negligence claims that can be

3    asserted by third parties against the Independent Directors,

4    the Committee, and its members.  That limits the gatekeeper

5    nearly out of existence, since none of those parties, as I

6    said, have any role in the post-effective-date management.

7        Given the substantial record that led this Court to make

8    the findings it did in the confirmation order, findings which

9    were adopted by the Fifth Circuit in its opinion, without

10   exception, and the discussion in the opinion holding the need

11   for and the legal underpinnings of the gatekeeper, it is

12   inconceivable that the Fifth Circuit intended for the

13   gatekeeper to essentially be rewritten out of the plan.

14       The language of the opinion, the reasoning, and the post-

15   opinion motion practice all point to one inescapable

16   conclusion:  That the Fifth Circuit affirmed the confirmation

17   order in all respects, merely paring back the definition of

18   Exculpated Parties.  And that is the change to the plan that

19   we ask that Your Honor conform the plan consistent with the

20   opinion.

21       And while we're really -- we're clearly right on the law,

22   Your Honor, it's hard to ignore the context of the current

23   dispute, which the Court has repeatedly said matters.  The

24   opposition to this motion is Mr. Dondero and its affiliates'

25   last-gasp desperate efforts to do anything possible to avoid

000963

Case 19-34054-sgj11 Doc 3601 Filed 11/08/22 Entered 11/08/22 09:52:22 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 72 of 104 PageID 1136

18

1    this Court and to be able to sue Mr. Seery and anyone

2    connected with the restructuring in any court in the world.

3    Their connection with the bankruptcy case is even more tenuous

4    now than it was before, but that hasn't stopped them from

5    their relentless pursuit of frivolous, harassing litigation,

6    which has resulted in seven appeals to the Fifth Circuit, and

7    counting, and millions of dollars of fees and expenses.

8        And Your Honor, the gatekeeper isn't all that onerous.

9    All Dondero needs to do is set forth a colorable claim against

10   any of the Protected Parties and he will be allowed to pursue

11   it, either in this Court, if it has jurisdiction, or some

12   other court.  And if Dondero does not like Your Honor's

13   decision on colorability, he certainly knows how to appeal

14   your decision, something he has done many, many times in this

15   case already.

16       Thank you, Your Honor.  I have nothing further, but I'm

17   happy to answer any questions you might have.

18           THE COURT:  Okay.  I have one quick question.  You

19   had Ms. Canty pull up on the WebEx the injunction provision in

20   the plan, Article 9(f).  And you walked through the different

21   components of the injunction, and you mentioned Romanette (v)

22   is one provision that would necessarily be affected by the

23   changed definition in Exculpated Parties, right?  I mean,

24   because every other --

25           MR. POMERANTZ:  Right.

000964

Case 19-34054-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:35:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 73 of 104 PageID 1137

19

1          THE COURT:  -- injunction provision goes at the

2     Debtor and protects the Debtor and the Debtor's property.  But

3     then you've got kind of that catch-all.

4          MR. POMERANTZ:  Correct.

5          THE COURT:  Uh-huh.

6          MR. POMERANTZ:  Correct, Your Honor.

7          THE COURT:  You froze for about ten seconds after you

8     addressed that, and I wondered if, in that frozen time period,

9     you addressed the next paragraph, the third paragraph of the

10    injunction section right before it gets into the gatekeeper

11    provision.

12         And I'm zeroing in on this because I know the Advisors in

13    their objection said, we think that needs to be deleted.  So

14    I'm wondering what your response is, too, on that one, because

15    it does seem aimed at protecting the Litigation Sub-Trust, the

16    Claimant Trust, Reorganized Debtor.  And one, I think, could

17    make a credible argument that, no, for those, you just -- you

18    go to the gatekeeper provisions as the device that kicks in.

19         What is your response to that?

20         MR. POMERANTZ:  So, Your Honor, I think you have to

21    understand the injunction.  It prevents people from taking

22    actions against the Debtor, and that's 1 through 4 of the

23    injunction.  The Reorganized Debtor, the Sub-Trust, are

24    successors of the Debtor.  Okay?  If you were going to limit

25    the injunction, 1 through 4 in the second paragraph, to the

Case 19-34054-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:52:23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 74 of 104 PageID 1138

20

1   Debtor, it would kind of be meaningless, right, because --

2           THE COURT:  Okay.

3           MR. POMERANTZ:  -- there is no more Debtor after the

4   effective date.  They are successors of the Debtor.  They

5   don't raise the same things.  This is not a release.  The

6   injunction is not a release.  It prevents you from pursuing

7   claims that you could have pursued against the Debtor, and it

8   protects the successors of the Debtor.

9       That's a whole different issue as to whether some party is

10  being released for specific claims they have against those

11  parties.  The injunction essentially provides for injunction

12  against matters pre-confirmation coming up post-confirmation.

13  It doesn't address, notwithstanding how they characterize it,

14  new claims against the Reorganized Debtor, the Claimant Trust.

15  You have any claims like that, you will be able to seek a

16  gatekeeper if the Reorganized Debtor, if the Claimant Sub-

17  Trust, if the Litigation Sub-Trust takes any actions post-

18  effective date.  But to the extent they are successors of the

19  Debtor, they are entitled to protections in the injunction or

20  else the injunction is meaningless.

21          THE COURT:  Okay.  Thank you.  All right.  Mr.

22  Hogewood, would you like to go next?  You're on mute.

23          MR. HOGEWOOD:  Thank you, Your Honor.  Can you --

24          THE COURT:  Now I can hear you.

25          MR. HOGEWOOD:  Thank you very much.  Can you hear me

Case 19-34054-sgj11 Doc 3661 Filed 11/22/23 Entered 11/22/23 20:59:22 Desc
Case 3:23-cv-00573-E Document 14 Filed 05/02/23 Page 75 of 104 PageID 1139

21

1    now?

2              THE COURT:  Yes.

3              MR. HOGEWOOD:  So, I, once again, Your Honor, I'm

4    with K&L Gates, representing Highland Income Fund, NexPoint

5    Strategic Opportunities Fund, Highland Global Allocation

6    Fund, NexPoint Capital, Inc., four publicly-traded retail

7    funds.  Thank you very much for hearing us today.

8         And I think there were, just before we get started, there

9    were a couple of points where the broad term Objectors was

10   used in Mr. Pomerantz's comments, and I want to be really

11   clear.  We haven't filed -- we, the Funds, haven't filed any

12   further appeals in the case.  Our involvement has been to

13   file an objection to confirmation, to lose on that objection,

14   and to file an appeal with the Fifth Circuit, and have been a

15   defendant in a lawsuit brought by the Debtor.  And that

16   lawsuit was settled a long time ago.

17        So I understand Mr. Pomerantz's point about the recent

18   pleading that was filed in the Fifth Circuit and the very

19   swift overruling of that pleading, but we were not involved,

20   our clients were not involved in that matter, and I want to

21   be really clear about that.

22        As I mentioned, the Funds did indeed file a separate

23   appeal of the confirmation order, challenging the extent of

24   the exculpation, injunction, and gatekeeping provisions of

25   the plan.  The Fifth Circuit referred to these collectively

000967

Case 10-34500-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:52:03 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 76 of 104 PageID 1140

22

1  as the Protection Provisions in its -- both in its original

2  and its reissued opinion.

3      Our appeal was consolidated with the other Appellants and

4  proceeded with this Court's blessing, the parties' consent,

5  and the Fifth Circuit's concurrence to a direct appeal to the

6  Fifth Circuit.

7      In that appeal, we asserted and the Fifth Circuit agreed

8  that the Protection Provisions should only extend to a narrow

9  group of entities that the Debtor had included and the Court

10  approved under the confirmed plan.

11     Based on the language in the original opinion, we believe

12  there was some ambiguity on this point, and we accordingly

13  took the unusual step of petitioning for a panel rehearing to

14  clarify the point.

15     Specifically, in our petition, which can be found at

16  Docket 3539, our Exhibit B, we stated the following in the

17  first paragraph.  Appellants, whom I've just mentioned, the

18  Funds, petition the Court to grant rehearing for the limited

19  purpose of clarifying and confirming one part of its August

20  19, '22 -- 2022 order.  Specifically, the Funds request that

21  the Court confirm the scope of the injunction and gatekeeper

22  provisions in the plan are limited in accordance with the

23  Court's holding on the exculpation provision.

24     That petition was filed on September 2, 2022, the Friday

25  before Labor Day.  It was the deadline on which that petition

1  was due.

2      We did not ask the Fifth Circuit to reconsider its

3  decision.  We did not ask the Fifth Circuit to amend or

4  modify or change its decision in any respect.  We asked for

5  clarification, which the Fifth Circuit granted, in similarly

6  record time.  It granted that relief on the following

7  Wednesday, September 7, 2022.

8      On the second court day after the petition was filed, the

9  Fifth Circuit issued its ruling.  The first paragraph of that

10  decision, which is at Exhibit C of our response -- again,

11  Docket 3539 -- is unequivocal.  The petition for panel

12  rehearing is granted.  The petition for panel rehearing is

13  granted.  We withdraw our previous opinion reported at 2022

14  WL 3571094 and substitute the following.  The petition is not

15  granted in part.  It is not denied.  It is granted without

16  condition, without reservation or caveat.

17      Had the Fifth Circuit disagreed with our requested

18  clarification, which was specifically to confirm that the

19  scope of the injunction and the gatekeeper provisions were

20  limited in accordance with the Court's holding on the

21  exculpation provision, it had no need to grant our petition.

22  It would have and could have and should have denied it,

23  ignored it.  It did not.  The petition was granted.

24      Now, the Debtor did spend a good bit of argument, both in

25  its papers and today, on what the Court did not do in terms

Case 1:23-cv-00534 Document 38 Filed 11/22/23 Page 227 Entered Filed 08/09/2023 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/24 Page 78 of 104 PageID 1142

24

1  of specific adjustments to the language in the opinion.  No

2  adjustment was required to clarify the opinion other than the

3  one that the Court made.

4       As everyone concedes, the Court believed the language

5  that the gatekeeper and injunction provisions were, quote,

6  perfectly lawful in the reissued opinion.

7       Combined with that unequivocal grant of -- combined with

8  that and the unequivocal grant of our petition, the Court

9  needed to do nothing else to clarify its opinion.  Indeed, it

10 did not deem it necessary to reissue the mandate.

11      So, Your Honor, I agree with Mr. Pomerantz that the Fifth

12 Circuit was not making any sort of monumental change to its

13 prior ruling when it granted the petition.  It simply and

14 straightforwardly confirmed that the Funds had interpreted

15 the opinion correctly and it therefore granted our petition.

16      Our view, under the Fifth Circuit's analysis, and,

17 really, the only fair reading of its opinion in light of the

18 granted petition for clarification, the Protection Provisions

19 -- gatekeeper, injunction, and exculpation -- are three legs

20 of the same stool.  One or two legs can't be longer than the

21 other or the stool will fall over.  Just as with a three-

22 legged stool, the three provisions are coextensive.  They are

23 the same size.  They protect the same limited group of

24 parties.  There is no correct other reading.

25      Indeed, to give broader reach to the protection of the

000970

Case 10-34583-sgj534 Doc 660 Filed 33 11 Page 2272 Entered Filed 08/09/23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 79 of 104 PageID 1143

25

1    injunction and gatekeeper provisions would undercut exactly

2    what the Fifth Circuit did in limiting the exculpation

3    provision.

4        The parties have remedies outside of the plan.  As noted

5    in Footnote 19 of the opinion, the Fifth Circuit said that

6    the Debtor -- exculpation within a plan is not a lawful means

7    to impose injunctions and sanctions on vexatious litigants,

8    of which our clients are not.  Nondebtor injunctions are not

9    okay in the reorganized plan.

10        That view in Footnote 19 is reaffirmed by the quote at

11   Page 29 that the plan violates Section 524(e) insofar as it

12   inculpates -- exculpates and enjoins, and enjoins, certain

13   nondebtors.  That's reaffirmed by the quote on Page 28, that

14   the overbreadth of the injunction is resolved by striking the

15   impermissibly Exculpated Parties.

16        As a consequence, we submitted Exhibit B to our response,

17   a proposed order that correctly conforms the plan to the

18   Fifth Circuit's opinion.  There is a redline of that proposed

19   order that compares it to the order proposed by the Debtor.

20   There are minor changes to the preamble in that proposed

21   order, and we add one substantive provision.  It is to the

22   definition of Protected Parties in Article 1.b.105 of the

23   plan.  That section should be deleted in its entirety and the

24   following language should be inserted:  Protected Parties

25   means, collectively (i) the Debtor; (ii) the Independent

Case 10-34105-sgj11 Doc 6601 Filed 11/22/23 Entered 11/22/23 09:53:23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 80 of 104 PageID 1144

26

1  Directors; (iii) the Committee; (iv) the members of the

2  Committee in their official capacities.

3       Including this language in the conformed plan will bring

4  it into conformity with the Fifth Circuit's decision.

5  Failing to do so would be only to approve part of that

6  decision. We respectfully request that the Court adopt the

7  Funds' proposed order rather than the order proposed by the

8  Debtor.

9       Thank you, and I'm happy to respond to any questions.

10       THE COURT: I have a couple of questions. You've

11 made the statement that an exculpation and an injunction and

12 a gatekeeper provision are three legs to the same stool. But

13 a two-part question. Number one, isn't a gatekeeping

14 provision very, very different from an exculpation? It's not

15 a release. It's clear that the Fifth Circuit regards an

16 exculpation as the same thing as a third-party release,

17 thinking both of them are prohibited by 524(e) of the

18 Bankruptcy Code. But a gatekeeper provision, it's not

19 releasing anything. It's just implementing the Barton

20 Doctrine in the context of a Chapter 11 plan, where it's not

21 purely a trustee or receiver who's the beneficiary. It's

22 saying, go to the Bankruptcy Court and ask permission before

23 you sue. It's not a release.

24       So, I mean, if you could respond to that. You say

25 they're three legs to the same stool. Aren't they very

Case 10-34509-sgj534   Doc 601   Filed 11/33   Page 274   Entered Date Filed 08/05/2023   Desc
Case 3:23-cv-00573-E   Document 11-4   Filed 05/02/23   Page 81 of 104   PageID 1145

27

1    different?

2             MR. HOGEWOOD:  Your Honor, I don't disagree that the

3    -- that the three legs to the same stool are different.  I

4    think what the Fifth Circuit said when they granted our

5    petition for rehearing, asking for this precise

6    clarification, is that at least in this case the provisions

7    are coextensive because that's -- in terms of the Protected

8    Parties.  The Protected Parties are coextensive in connection

9    with those three provisions.  They were reading them

10   together, as is clear from almost all of the opinion.  And

11   they -- they could have denied our petition and made the

12   minor change that they made to the decision.  They didn't do

13   that.  They granted our petition.  The request that we made

14   was very, very clear.  Clarify that the groups of parties

15   protected by those three provisions are exactly the same.

16   They granted that request.

17       So it is true that gatekeeper, injunction, exculpation

18   provide different forms of relief to those who may have been

19   involved in the process of confirming a Chapter 11 plan and

20   its further implementation.  But what the Fifth Circuit said

21   in clarifying their opinion, in our view, is, at least in

22   this case, that group of protected people are the same.

23             THE COURT:  Okay.  The second part of my question, I

24   guess, and I mean this with all respect:  Do you think the

25   Fifth Circuit was confused about your request?  Because it

Case 19-34054-sgj11 Doc 3601 Filed 11/03/22 Entered 11/03/22 09:52:23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 82 of 104 PageID 1146

28

1   looks to me as though your request, your petition for

2   rehearing, was pretty explicit on Page 4, the second line:

3   The Funds are concerned that the Court's statement that such

4   provisions -- meaning the gatekeeper provisions -- are,

5   quote, perfectly lawful might be argued to mean that the

6   injunction and gatekeeper provisions, without any tailoring,

7   are allowed to stand.

8        Next paragraph.  Therefore, the Funds file this petition

9   in order to request that the Court narrowly amend the opinion

10  in order to confirm the Court's holding that the

11  impermissibly Exculpated Parties are similarly struck from

12  the protections of the injunction and gatekeeper provisions

13  of the plan (in other words, that such parties cannot

14  constitute "Protected Parties") such that the injunction and

15  gatekeeper provisions extend only to Highland Capital, the

16  Committee and its members, and the Independent Directors.

17       So, it seems to me that you are crystal clear that,

18  number one, you were concerned about that "perfectly lawful"

19  language regarding the gatekeeper provisions and injunction

20  provisions, and then you were even more crystal clear, we

21  think you need to go the extra step and define Protected

22  Parties as consistent with Exculpated Parties.

23       And then if you look at the Fifth Circuit's revised

24  opinion, basically, okay, we'll strike that language about

25  perfectly lawful, but they didn't take the bait, so to speak,

Case 1:23-cv-00534 Document 33 Filed 11/22/276 Entered 12/06/2023 Desc
Case 3:23-cv-00573-E  Main Document 1-4 Filed 05/02/23  Page 83 of 104  PageID 1147

29

1  on your other request.

2       I mean, again, I don't know how else to say it except,

3  are you saying they were confused?  Because it looks to me

4  like, okay, you know, we'll take out this, you know, it's

5  perfect, the gatekeeping provision, but we're not going to,

6  you know, answer your second request to change anything about

7  the gatekeeper provisions per se or the Protected Parties.

8       So, I mean, what is your response?  Were they -- were

9  they confused?

10           MR. HOGEWOOD:  So, --

11           THE COURT:  Did they not like your request?  Or --

12           MR. HOGEWOOD:  So, --

13           THE COURT:  -- were they imprecise with their

14  wording, or what?

15           MR. HOGEWOOD:  So, Your Honor, I think they were

16  entirely precise with their wording, and they certainly

17  weren't confused.  They said -- the petition was granted.

18  They didn't say the petition was granted in part.  They

19  didn't say -- they didn't condition the grant of their -- of

20  the petition.  They granted the petition, they withdrew an

21  opinion, and they issued a new one.

22       Now, I know in the oral argument before the Fifth Circuit

23  a question was asked of the other side whether perhaps the

24  Ninth Circuit was confused or sloppy in connection with their

25  opinion, which is slightly -- which is different from *Pacific*

Case 10-34052-sgj11 Doc 660 Filed 11/28/23 Entered 11/28/23 09:55:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 84 of 104 PageID 1148

30

1   *Lumber.* And the last thing I would ever do is suggest that a

2   panel of the Fifth Circuit was sloppy, confused, or otherwise

3   not clear. I think they were -- our request was crystal

4   clear, as the Court just said. Their grant of the petition

5   was crystal clear and unequivocal. And I don't think it

6   requires us to do a lot of interpretation about what they

7   meant. They granted the petition for clarification that we

8   requested, which was to make the three legs of the stool the

9   same length and to extend to the same parties.

10          THE COURT: All right. The revised opinion, though,

11  it only deletes one sentence, right?

12          MR. HOGEWOOD: That is correct, and that was the

13  most important sentence for them to delete. We believe the

14  rest of the opinion supports our view that the three legs of

15  the stool are the -- are coextensive with one another,

16  because that was our specific request for clarification.

17          THE COURT: All right.

18          MR. HOGEWOOD: And it was granted, and it was

19  granted without equivocation.

20          THE COURT: Well, what about the language on 22 of

21  the revised opinion, which was unaltered? And I'm looking at

22  the paragraph right before the one titled, "Nondebtor

23  Exculpation." After discussing the different plan protection

24  provisions -- generically, I guess you could say -- that next

25  to the last paragraph on Page 22, right before the Nondebtor

000976

Case 10-34059-sgj534 Doc 601 Filed 11/22/27 Entered 11/22/23 08/05/2023 Desc
Case 3:23-cv-00573-E Document 14 Main Document Filed 05/02/23 Page 85 of 104 PageID 1149

31

1  Exculpation section, says, The Bankruptcy Court deemed the

2  provisions legally necessary under the circumstances and in

3  the best interests of all parties.  We agree, but only in

4  part.  Though the injunction and gatekeeping provisions are

5  sound, the exculpation of certain nondebtors exceeds the

6  Bankruptcy Court's authority.  We reverse and vacate that

7  limited portion of the plan.

8      Why did they say, why do they continue to say, this is

9  unchanged, "The injunction and gatekeeping provisions are

10 sound"?

11        MR. HOGEWOOD:  Your Honor, we would argue that the

12 entirety of the opinion, read fairly, treats the Protection

13 Provisions as a unit, and that those -- that those protected

14 by them are the same group.

15     And I'm not going to disagree that there's -- that

16 there's ambiguity in that language in comparison to other

17 parts of the opinion.  I'll just be candid about that.

18        THE COURT:  Okay.  All right.  Thank you.  I'll hear

19 from Mr. Ong.

20        MR. ONG:  Thank you, Your Honor.  Jay Ong for the

21 parties who we have colloquially referred to in this case as

22 the Advisors.

23     Your Honor, we filed a limited "me, too" objection, and

24 so we'll defer to Mr. Hogewood's argument and follow his

25 lead.  I did have a number of arguments prepared to submit to

000977

Case 10-34503-sgj11 Doc 3601 Filed 11/22/27 Entered 11/20/23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 86 of 104 PageID 1150

32

1  the Court, but I think he's effectively stolen my thunder

2  with respect to most of those.  And so I will confine my

3  additional comments to two arguments and observations, which,

4  in fairness, I think, have already been submitted to the

5  Court but bear emphasis.

6     The first, Your Honor, is Note 19 of the Circuit Court's

7  opinion.  Here, Your Honor, the Court expressly acknowledges

8  that this Court has the ability to competently address and

9  curtail vexatious litigation.  Mr. Pomerantz in his argument

10  on the record just now acknowledged and conceded that that is

11  the exact purpose of the gatekeeper function.  But yet the

12  Circuit Court states in that opinion, in that footnote, that

13  a plan and confirmation order are not the proper vehicles and

14  mechanisms to accomplish that potentially laudable objective.

15     Secondly, Your Honor, I would focus the Court on a clause

16  that Mr. Pomerantz himself cited under the opinion.  It is

17  the last clause of the opinion, and I think it informs the

18  Court's questions both to Mr. Pomerantz and Mr. Hogewood.  In

19  that opinion on Page 30, the Court summarizes its own opinion

20  by stating, The plan violates Section 524(e), but only

21  insofar as it exculpates and enjoins.

22     Your Honor, Mr. Pomerantz has spent a lot of time today

23  trying to differentiate injunctive provisions from release

24  provisions, and has attempted to cast the Fifth Circuit's

25  opinion as only concerned with releases.  Your Honor's own

Case 10-34025-sgj534 Doc 6601 Filed 33 11/22/28 Entered 11/22/28 09:52:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 87 of 104 PageID 1151

33

1    question with respect to Section -- or Page 22 of the

2    opinion, in which the Court refers to the exculpation -- or,

3    I'm sorry, the injunction and gatekeeping provisions.  Well,

4    Your Honor, it's clear that we cannot take that comment as

5    concluding that there is no infirmity in the injunctive

6    provisions of the plan, because the Fifth Circuit's language

7    on Page 30 expressly refutes that.

8        Your Honor, the only way that we can reconcile the

9    language that's contained in the opinion and that's been

10   highlighted by both parties with respect to the dispute

11   that's presently before the Court is to conform the

12   provisions of the plan to the extent they relate to the

13   exculpation provision to the same effective ruling that has

14   been admonished by the Fifth Circuit.

15       Your Honor, that necessarily means that we must conform

16   the injunctive provisions of the plan to the Court of

17   Appeals' ruling with respect to what parties are and are not

18   properly protected under a Chapter 11 plan.

19       Thank you, Your Honor.

20           THE COURT:  All right.  Well, I will tell you, the

21   head-scratcher part of this to me -- just a moment.  The

22   head-scratcher part to me, if there be one, is the issue I

23   raised with Mr. Pomerantz, the Section 9(f) of the plan

24   entitled, Injunctions.  I wondered if Paragraph (v) or

25   Section (v) of Paragraph 2 might be something that needed to

Case 10-34054-sgj11 Doc 3601 Filed 11/22/22 Entered 11/22/22 09:32:23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/24 Page 88 of 104 PageID 1152

34

1  be conformed to the new definition of Exculpated Parties,

2  somehow conformed.  And I wondered about that next paragraph,

3  which you raised, Mr. Ong, in your pleading, the third

4  paragraph of the plan injunction language.  Mr. Pomerantz

5  gave me his view of that.

6       But as far as the gatekeeper provision, which is

7  Paragraph 4 of the injunction section, it's just a bridge too

8  far to me.  I mean, this is a hugely important section of the

9  plan.  And the Fifth Circuit keeps intact all of its

10  discussion of the Barton Doctrine and the *Villegas* opinion.

11  And it has to -- just because you say, ah, you can't release,

12  you can't exculpate parties under 524(e), having a

13  gatekeeping provision is an entirely different thing besides

14  a release or exculpation.

15       So it seems to me that what you all are asking me to do

16  is make a huge leap with regard to what the Fifth Circuit

17  didn't say in its revised final opinion.

18       I'm not so sure about, again, the paragraph before the

19  gatekeeper provision and Romanette (v), but, I mean, address

20  that.  A gatekeeper provision is not a release.  It's not an

21  exculpation.

22            MR. HOGEWOOD:  Your Honor, my -- I mean, I think --

23  I don't want to annoy you by repeating the same thing that

24  I've said a few times, but that's precisely what we asked for

25  in our petition for rehearing.  I think the Court knows that

Case 10-34503-sgj11 Doc 3601 Filed 11/22/22 Entered 11/20/23 09:52:29 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 09/25/23 Page 89 of 104 PageID 1153

35

1    a petition for panel rehearing is a rare thing.  A petition

2    for, you know, review by the entire Fifth Circuit is a rare

3    thing.  We went the route of a panel rehearing to clarify a

4    point and to clarify our reading that the Court was saying

5    that the three forms of protection were limited to the same

6    parties.  That's precisely what we asked for in our petition.

7    And within a matter of three days, they granted that

8    petition, they granted our petition.

9        I know we've all been at this a long time, but grants of

10   petitions for rehearing by a Circuit Court of Appeals are an

11   extremely rare thing.  We all know that to be true.  They

12   granted it, they granted it without equivocation, and they

13   reissued an opinion that removed the offending language from

14   that opinion.

15       And I think it could not be clearer that they expect the

16   conforming of the plan to treat all three of the legs of the

17   stool exactly the same, that the same group of parties,

18   whether gatekeeper, whether injunction, whether release, they

19   are the -- they should be the same Protected Parties because

20   that's what the Fifth Circuit said in granting our petition

21   for clarification.

22       It's entirely clear that the Debtor doesn't agree with

23   it.  It is entirely clear to me, and I agree with the Court,

24   that the three legs of the stool do different things.  And a

25   gatekeeper provision may be less onerous than a complete

Case 10-35023-sgj534 Doc 601ment Fil3d 11Page2228 Entered Filed 08/09/52023 Desc
Case 3:23-cv-00573-E Document 11-4 Main Filed 95/02/23 of 5Page 90 of 104 PageID 1154

36

1   release or an injunction, but it is a protection of a party

2   that's really not entitled to it post-confirmation. And I

3   think that's what the Fifth Circuit said. I think they've

4   confirmed it when they -- when they granted our petition for

5   clarification. And I'd respectfully request that the Court

6   enter the proposed order that we submitted.

7           THE COURT: All right. Mr. Pomerantz, I'll give you

8   the last word. I would like you to at least address once

9   again my head-scratcher comment about Romanette (v) of

10  Paragraph 2 of Section Article 5 of the plan, as well as the

11  third paragraph of Article 9(f) of the plan.

12      (Pause.)

13          THE COURT: You're on mute.

14          MR. POMERANTZ: Sorry about that. I will respond to

15  Your Honor's questions before I then respond to the comments

16  that were made by counsel.

17      So, the injunction has the three paragraphs, and the

18  second paragraph really is the guts of it, like, what you can

19  do and what you can't do. And Romanette (v) says you cannot

20  act or proceed in any manner that does not conform to the

21  plan. The plan that that referred to was a plan that

22  exculpated a whole host of parties. The Fifth Circuit said

23  you can't exculpate a whole host of parties. The Fifth

24  Circuit in its original opinion said that the concern with

25  the breadth of an injunction is addressed by dealing with the

000982

Case 10-34052-sgj1 Doc 6601 Filed 11/22/24 Entered 11/22/24 09:52:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 91 of 104 PageID 1155

37

1   Exculpated Parties.

2       So the original opinion had two inconsistent sentences.

3   It had a sentence that said that the injunction is perfectly

4   lawful, and it had a sentence that said that the injunction

5   is limited by the definition of Exculpated Parties.

6       So, when Mr. Hogewood stands before Your Honor and says,

7   well, it's perfectly clear, we asked in several different

8   ways, we asked for a change of the definition, we asked for

9   guidance, we asked for an explanation, they did none of that.

10  They took out the sentence because of the reason I said they

11  took out the sentence, and neither Mr. Hogewood or Mr. Ong

12  has any answer or any response to it.

13      They would have the Court believe that notwithstanding

14  all the provisions I put forth in the -- in the -- that all

15  talk about exculpation, release, exculpation, release,

16  injunction and gatekeeper, okay, injunction and gatekeeper,

17  okay, that it could not be clearer really that that one-

18  sentence change, with doing nothing else to the opinion,

19  necessarily means that they are going to write the gatekeeper

20  out of the plan.

21      Your Honor, that argument just does not pass the straight

22  face test.  The Fifth Circuit wrote a 30-page opinion.  It

23  took a lot of time.  I think it took several months before we

24  got an opinion.  If the Fifth Circuit wanted to clarify its

25  opinion in the manner that was requested, it could have added

000983

Case 19-34054-sgj11   Doc 3601   Filed 11/22/22   Entered 11/22/22 09:55:20   Desc
Case 3:23-cv-00573-E   Document 11-4   Filed 05/02/23   Page 92 of 104   PageID 1156

38

1   a sentence or two. It did not. I gave Your Honor an

2   explanation on how to reconcile that deleted sentence with

3   the rest of the opinion. Neither Mr. Ong or Mr. Hogewood

4   have even responded to that.

5       With respect to the third paragraph, again, Your Honor,

6   again, I don't look at that as a release. The injunction, if

7   you look at 1 through 4, it's enforcing claims against the

8   Debtor. It's talking about people who have claims,

9   interests, doing anything against the Debtor on account of

10   their claims. That's what the injunction is prohibiting.

11       As Your Honor noted, the first four parts only deal with

12   the Debtor. The Debtor goes away after the effective date.

13   Who are the successors to the Debtor? The Reorganized

14   Debtor, the Claimant Trust, the Litigation Sub-Trust. Since

15   the Debtor can't enforce the injunction because it's gone, of

16   course the successors to the Debtor have to be able to

17   enforce the injunction. This paragraph on this injunction

18   has nothing to do with further claims that may be asserted

19   against the Reorganized Debtor, against the Litigation Sub-

20   Trust, against the Claimant Trust, for actions occurring

21   after the effective date. If there are those claims, that is

22   what the gatekeeper will take into account, and that's what a

23   party will have to come before Your Honor and seek a

24   colorability determination.

25       Your Honor hit the point right on with your first

000984

Case 10-34023-sgj5 Doc 3606 Filed 11/23/22 Entered 11/23/22 09:52:2023  Desc
Case 3:23-cv-00573-E   Document 1-4   Filed 05/02/23   Page 93 of 104   PageID 1157

39

1   question for Mr. Hogewood.  To say that the three legs of the

2   stool are coexistent makes absolutely no sense.  In many

3   cases, all you have is an exculpation and injunction.  In

4   some cases, you have an injunction without an exculpation.

5   And in this case, you have three.  You have different

6   definitions.  The exculpation deals with pre-effective-date

7   parties and negligence claims.  That's what the exculpation

8   does.

9       The injunction prevents people from pursuing the

10  Reorganized Debtor.  It doesn't even talk about either the

11  Protected Parties or the Exculpated Parties.  That has

12  nothing to do with the injunction.  The injunction just says

13  injunction is essentially in aid of the discharge.  You can't

14  go after the Debtor or its successors for actions related to

15  the pre-effective-date conduct.

16      Now, of course, the Objectors argued to the Fifth Circuit

17  that the use of the term implementation and consummation of

18  the plan were ambiguous and could sort of be read to include

19  post-confirmation activities and would interfere with their

20  contracts and their rights.  The Fifth Circuit didn't buy

21  that.  The Fifth Circuit found nothing ambiguous with

22  implementation or consummation of the plan.  Okay?

23      So you have an injunction that performs a certain

24  purpose.  You have an exculpation, performs a certain

25  purpose.  And based upon your findings, Your Honor, which the

Case 1:23-cv-01534 Doc 60-1 Filed 11/22/23 Page 228 Entered Date Filed 2/09/5/2023 Desc
Case 3:23-cv-00573-E   Document 14-1 Filed 05/02/23 of 50 Page 94 of 104   PageID 1158

40

1   Fifth Circuit didn't change one iota to, adopted all those

2   findings regarding the reasons why a gatekeeper was

3   important, a gatekeeper applies to Protected Parties, not

4   Exculpated Parties, is not a release, and only provides that

5   people have to come into court.  That is the key.

6       And of course, I understand Mr. Hogewood's attempt to try

7   to conflate all the three.  He conflated them in his

8   petitions to the Fifth Circuit and he conflated them in his

9   opposition to Your Honor.  But there was no response when I

10  put the provisions on the screen that the definition of the

11  parties are different.  You cannot view these all the same.

12  And it's too convenient and it does not pass the straight

13  face test to say, well, they're all the same, it just had a

14  problem with the Exculpated Parties and it has to be narrowed

15  and it's crystal clear from that taking that one sentence

16  out.  That argument just does not pass the straight face

17  test.

18      Your Honor, Mr. Ong referenced the Note 19 with vexatious

19  litigant.  It was done in the context of exculpation.  The

20  Court said, yeah, you can't basically exculpate parties under

21  524(e), but you can go seek a vexatious litigant ruling.  It

22  didn't say that's in lieu of a gatekeeper.  And in fact, Your

23  Honor, a gatekeeper is different from a vexatious litigant

24  finding.  Why?  Because a vexatious litigant finding, which,

25  if made by the District Court, can come with some serious

Case 10-34590-sgj11 Doc 3601 Filed 11/22/23 Entered 11/22/23 08:29:38 Desc
Case 3:23-cv-00573-E Document 14-4 Filed 05/02/23 Page 95 of 104 PageID 1159

41

1   penalties for violating it, can come with criminal contempt,

2   that violation of the gatekeeper would not be able to because

3   Your Honor, as an Article I Court, does not have that power.

4   Under the case law, a vexatious litigant finding entitles the

5   Court to say, in any matter you file a lawsuit, you have to

6   file the order deeming you a vexatious litigant.

7       So, again, to make out of whole cloth an argument that

8   one footnote that says, hey, if you want to go and seek

9   vexatious ruling, nothing in this opinion forecloses it, to

10  say, well, of course, that means what a gatekeeper means, and

11  if that means what a gatekeeper means, then of course the

12  gatekeeper doesn't apply and it's meaningless and we're going

13  to just write it out of the plan.  Just does not make any

14  sense.

15      And last, Your Honor, Mr. Hogewood started by sort of,

16  again, as he's done throughout this case, unsuccessfully

17  before Your Honor and unsuccessfully before the Fifth

18  Circuit, trying to disassociate himself and his -- or his

19  clients from Mr. Dondero.  Your Honor found that they are

20  under the thumb of Mr. Dondero.  They appealed that finding.

21  The Fifth Circuit found there was ample evidence.

22      So we are -- and while it is true they may have not filed

23  certain pleadings, they have, I'm sure, done that

24  strategically, but let's call it for what it is.  All these

25  parties opposing us, as has been the case since Mr. Dondero

000987

0291984/1164

Case 10-35023-sgj11 Doc 6001 Filed 11/22/23 Entered 11/22/23 09:55:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/23 Page 96 of 104 PageID 1160

42

said he would burn down the house, are all dancing to Mr.
Dondero's drum. He is the puppeteer, and these are all his
instruments.

Thank you, Your Honor.

THE COURT: Okay. Thank you. Just a moment.

(Pause.)

THE COURT: All right. Well, I promise you all
this. I and my law clerk have spent a heck of a lot of time
reading and rereading the Fifth Circuit's opinion, reading
your pleadings, going back and reading the plan definitions
and thinking about this.

I think, at bottom, it is worth reminding people that the
exculpation was all about setting forth parties, so-called
Exculpated Parties, who could not be sued for negligence
claims -- *i.e.*, anything short of gross negligence, willful
misconduct, fraud; I just shorthand that negligence; I guess
it could be breach of contract -- those parties could not be
sued for negligence, breach of contract, anything short of
gross negligence, willful misconduct, for postpetition
conduct related to the plan or the case. Okay. That's
shorthand.

Even though some people in the bankruptcy world
differentiate an exculpation from a third-party release,
okay, third-party release, quintessential example, we'll use
the *Purdue Pharma* case, okay. Sackler family, insurance

000988

Case 19-34054-sgj11 Doc 3601 Filed 11/22/23 Entered 11/22/23 Desc
Case 3:23-cv-00573-E Document 11-4 Filed 05/02/23 Page 97 of 104 PageID 1161

43

1  companies, third parties, not debtors, getting a release from

2  creditors of Purdue.  Even though many of us in the

3  bankruptcy world tend to think an exculpation is very, very

4  different from that -- it's not a release of any and all

5  claims from the beginning of time until plan confirmation;

6  it's just a release of negligence claims for postpetition

7  conduct, okay -- nevertheless, while many people will

8  differentiate those two things, a third-party release and an

9  exculpation, the Fifth Circuit said no.  If it's

10  nonconsensual, no.  We think an exculpation violates 524(e),

11  so we're carving out that section of the Highland plan.

12      The gatekeeper provision, Paragraph 5 of Article IX.F of

13  the plan, is something very different, and I think the

14  Highland confirmation order spells that out in great detail.

15  I went back and looked, and Pages 48 through 59 of the

16  Highland confirmation order collectively talked about

17  exculpations, injunctions, gatekeeper provisions, but

18  gatekeeper provision in particular started at Page 54.  And

19  54 through 59 of the confirmation order focused on the

20  factual underpinnings as well as the law, the Barton

21  Doctrine, et cetera, justifying the gatekeeping provisions.

22      So my point is I think the Fifth Circuit was very clear

23  in understanding exculpations, injunctions, gatekeeper

24  provisions.  I think they were very clear.  I think the

25  confirmation order was spelling it out thoroughly.  I haven't

Case 19-34054-sgj11 Doc 3661 Filed 11/12/23 Entered 11/12/23 09:32:23 Desc
Case 3:23-cv-00573-E Document 14-1 Filed 05/02/24 Page 98 of 104 PageID 1162

44

1    seen your briefing, all of you parties that you filed briefs

2    in the Fifth Circuit, haven't seen it.  I have no doubt you

3    all presented brilliant briefs that thoroughly explained the

4    distinctions here.  And while there may have been times where

5    the Fifth Circuit, in both its original opinion and its final

6    opinion, said plan protections generically, I think they were

7    clear on the difference.  And I think the fact that they

8    granted a petition for rehearing, and without oral argument,

9    without giving anyone else the opportunity to file briefs,

10   they simply took out that one sentence that said, The

11   injunctions and the gatekeeper provisions are perfectly

12   legal.  They took that out, but then there's plenty of other

13   places where they said they're sound.  We're not changing

14   anything else except the exculpation provisions.  We're

15   unpersuaded that the gatekeeper provisions are problematic.

16        So, again, we've read this.  We've reread this.  We've

17   thought about it.  We've debated it.  As you can glean from

18   my questioning, I thought really hard about Article IX.F,

19   Paragraph 2, provision Romanette (v).  Did that need to be

20   tweaked to cross-reference the amended definition of

21   Exculpated Parties that the Fifth Circuit mandated?  Did that

22   fourth paragraph need to be tweaked to cross-reference the

23   new definition of Exculpated Parties?  I'm afraid of doing

24   what the Fifth Circuit declined to do.  All they did was

25   narrow the definition of Exculpated Parties and take out one

000990


Case 10-34052-sgj Doc 3601 Filed 11/13/23 Entered 11/13/23 Desc
Case 3:23-cv-00573-E   Document 14-4 Filed 05/02/23 Page 99 of 104   PageID 1163

45

1   sentence that may have been too rosy, glowing, with regard to

2   gatekeeper provisions generally.  You know, perfectly lawful.

3   But they kept in the language that they were sound.  I don't

4   know what they were concerned about.  None of us can

5   completely read their minds.  But I know they declined to go

6   any further than taking out that one sentence.  All they did

7   was said the exculpation provision went too far.  The only

8   Exculpated Parties should be Debtors, Committee, Committee

9   members, and the Independent Directors who were quasi-

10  trustees.  And then they said, oh, by the way, we note that

11  there were earlier orders in the case, January 2020, June or

12  July 2020, that actually gave a little bit broader protection

13  to professionals representing the Independent Directors and

14  those other parties.

15      But anyway, be that as it may, I feel like I would be

16  overstepping my role if I went any further than the Fifth

17  Circuit explicitly went.  I feel like they declined the

18  invitation to tamper with that gatekeeping provision or the

19  other language in the injunction section.  They definitely

20  declined the invitation to rein in the defined term Protected

21  Parties.  I mean, the plan, Exculpated Parties, Defined Term

22  #62.  Protected Parties, Defined Term 105.  Also had a

23  defined term for Enjoined Parties.

24      I have every reason to believe the Fifth Circuit looked

25  at all of this.  And so, for this reason, I'm going to grant

000991

Case 10-34500-sgj34 Doc 3601 Filed 11/18/22 Entered 11/18/22 09:55:28 Desc
Case 3:23-cv-00573-E Document 4 Filed 05/02/23 Page 100 of 104 PageID 1164

46

1    the Debtor's motion as presented so that the Debtor shall

2    conform the plan to be consistent with the Fifth Circuit's

3    final opinion and mandate, and the Debtor shall do that by

4    changing the defined term Exculpated Parties at Defined Term

5    #62, delete it as it exists and replace it to only include

6    Debtor, Independent Directors, Committee, and members of the

7    Committee.  And except for that, the plan shall be

8    unaffected.

9         So, is there anything else?  Mr. Pomerantz, I think --

10             MR. POMERANTZ:  Your --

11             THE COURT:  -- we are coming back next week for a

12   trial on a proof of claim of HCRE.  Anything else that you

13   want to preview?

14             MR. POMERANTZ:  Your Honor, just on the motion, and

15   appreciate Your Honor granting the motion.  As you will not

16   find surprising, I think the chances of this being -- your

17   order being appealed is a hundred percent.  And we are likely

18   to have the same battle of the pleadings that we had before

19   Your Honor in the Fifth Circuit.  While I always hesitate to

20   ask Your Honor to do more work because you've done quite

21   enough work in this case, I think it would be extremely

22   helpful to the Fifth Circuit if you wrote an opinion that

23   laid out your reasoning, as we have talked today, about the

24   different definitions and why you're coming to a conclusion.

25   Because, in my experience, Your Honor's words on the page and

Case 10-34509-sgj11 Doc 660 Filed 11/13/23 Entered 11/13/23 08:05:28 Desc
Case 3:23-cv-00573-E  Document 1-4  Filed 05/02/23  Page 101 of 104  PageID 1165

47

1  your reasoning is going to be perhaps a lot more effective

2  than ours.

3       And, again, that's not that you're going to be able to

4  tell the Fifth Circuit what it meant.  Right?  Nobody would

5  be so bold as to say any of us can tell the Fifth Circuit

6  what it meant.  But I think, in laying out the different

7  provisions, the reasoning, and why you believed that this is

8  what they meant, we think it would be extremely helpful, and

9  if Your Honor would indulge us on that, we think it would be

10  helpful to the process.

11       THE COURT:  All right.  Mr. Hogewood and Mr. Ong,

12  anything you want to say on that point?  I don't know that

13  you would have anything to say, but I --

14       MR. HOGEWOOD:  No.  I would just simply --

15       THE COURT:  Unless you say --

16       MR. HOGEWOOD:  I would say I don't --

17       THE COURT:  -- oh, I have authority right now, I'm

18  not appealing, you know, I would save myself the work.  But I

19  know you can't say that.  So anything you want to add?

20       MR. HOGEWOOD:  I would say that I don't disagree

21  with Mr. Pomerantz.  And indeed, in having a written opinion,

22  you give us the ability to have a reasoned conversation with

23  our client.

24       THE COURT:  Okay.  Mr. Ong, anything you want to

25  say?

Case 1:23-cv-00534 Document 33 11 Page 2295 Entered Date Filed 2/09/52/2023 Desc
Case 3:23-cv-00573-E    Document Main Document Filed 05/02/23 of 50ge 102 of 104    PageID 1166

48

1          MR. ONG:  No, Your Honor.  I have nothing further to

2     add on this particular issue, but I appreciate the Court's

3     inquiry very much.

4          THE COURT:  Okay.  All right.  Well, we will write

5     this up.  And you know how it goes.  I always say I'll get it

6     out as quickly as possible, but it's sometimes longer than I

7     want it to be.

8          You know, I guess this is as good a time as any to

9     mention something that we were thinking about in chambers the

10    other day.  I'm not going to put this in an order.  I'm just

11    making a request, and I hopefully won't have to put it into

12    an order:  When anyone files an amended pleading in this case

13    of any type, I'm going to request that you follow it up with

14    a redline copy of the changes and send it to my courtroom

15    deputy, Traci, and then copy the other lawyers in the case.

16    Frankly, this started with the Fifth Circuit.  I would never

17    make this request to the Fifth Circuit, of course.  But when

18    they issued their amended opinion, it took us a few pass-

19    throughs to figure out what did they change.  But then it

20    seemed to start -- maybe we just started noticing it more

21    lately in this case.  Sometimes an amended pleading would be

22    filed and we'd -- what did they change, what did they change?

23    So, anyway, to save us all a lot of trouble, I'm going to

24    request that the parties, whenever you file an amended

25    pleading, again, send to my courtroom deputy a redline

000994

Case 10-03502-sgj5 Doc 660 Filed 11/08/23 Entered 11/08/23 09:55:29 Desc
Case 3:23-cv-00573-E   Document 14   Filed 05/02/24   Page 103 of 104   PageID 1167

49

 1   showing what you changed.

 2        I guess another method would be this.  This is what I

 3   sometimes do when I amend an opinion.  I will put a footnote

 4   after the word Amended in the title and say, This amends the

 5   previous order only to change, you know, Page 3, whatever.

 6   That's another thing you can do, if it just deletes a

 7   sentence or changes something immaterial.  But, again, we all

 8   read a lot of paper in this case, and I'm just asking as a

 9   courtesy that that be done, and hopefully that request is all

10   we'll have to do, we won't have to do an order.  All right.

11        (Proceedings concluded at 2:58 p.m.)

12                         --oOo--

13

14

15

16

17

18

19                      CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    /s/ Kathy Rehling                        10/29/2022

23   _____    _____

24   Kathy Rehling, CETD-444                         Date
     Certified Electronic Court Transcriber

25

50

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                       42

END OF PROCEEDINGS                                            49

INDEX                                                         50


                        E R R A T A

        Pages 36 and 46:  Pezanosky corrected to Pomerantz

# TAB 6

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2022

Lyle W. Cayce
Clerk

No. 21-10449

---

In the Matter of: Highland Capital Management, L.P.,

*Debtor*,

NexPoint Advisors, L.P.; Highland Capital Management
Fund Advisors, L.P.; Highland Income Fund; NexPoint
Strategic Opportunities Fund; Highland Global
Allocation Fund; NexPoint Capital, Incorporated;
James Dondero; The Dugaboy Investment Trust; Get
Good Trust,

*Appellants*,

*versus*

Highland Capital Management, L.P.,

*Appellee*.

---

Appeal from the United States Bankruptcy Court
for the Northern District of Texas
USDC No. 19-34054
USDC No. 3:21-CV-538

---

Before Wiener, Graves, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

No. 21-10449

Highland Capital Management, L.P., a Dallas-based investment firm, managed billion-dollar, publicly traded investment portfolios for nearly three decades. By 2019, however, myriad unpaid judgments and liabilities forced Highland Capital to file for Chapter 11 bankruptcy. This provoked a nasty breakup between Highland Capital and its co-founder James Dondero. Under those trying circumstances, the bankruptcy court successfully mediated with the largest creditors and ultimately confirmed a reorganization plan amenable to most of the remaining creditors.

Dondero and other creditors unsuccessfully objected to the confirmation order and then sought review in this court. In turn, Highland Capital moved to dismiss their appeal as equitably moot. First, we hold that equitable mootness does not bar our review of any claim. Second, we affirm the confirmation order in large part. We reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds.

## I. Background

### A. Parties

In 1993, Mark Okada and appellant James Dondero co-founded Highland Capital Management, L.P. ("Highland Capital") in Dallas. Highland Capital managed portfolios and assets for other investment advisers and funds through a complex of entities under the Highland umbrella. Highland Capital's ownership-interest holders included Hunter Mountain Investment Trust (99.5%); appellant The Dugaboy Investment Trust, Dondero's family trust (0.1866%);[1] Okada, personally and through

---

[1] The Dugaboy Investment Trust appeals alongside Dondero's other family trust Get Good Trust (collectively, the "Trusts").

2

000764

No. 21-10449

trusts (0.0627%); and Strand Advisors, Inc. (0.25%), the only general partner, which Dondero wholly owned.

Dondero also manages two of Highland Capital's clients—appellants Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Advisors"). Both the Advisors and Highland Capital serviced and advised billion-dollar, publicly traded investment funds for appellants Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. (collectively, the "Funds"), among others. For example, on behalf of the Funds, Highland Capital managed certain investment vehicles known as collateral loan obligations ("CLOs") under individualized servicing agreements.

### B. Bankruptcy Proceedings

Strapped with a series of unpaid judgments, Highland Capital filed for Chapter 11 bankruptcy in the District of Delaware in October 2019. The creditors included Highland Capital's interest holders, business affiliates, contractors, former partners, employees, defrauded investors, and unpaid law firms. Among those creditors, the Office of the United States Trustee appointed a four-member Unsecured Creditors' Committee (the "Committee").[2] *See* 11 U.S.C. § 1102(a)(1), (b)(1). Throughout the bankruptcy proceedings, the Committee investigated Highland Capital's past and current operations, oversaw its continuing operations, and

---

[2] First, Redeemer Committee of the Highland Crusader Fund had obtained a $191 million arbitration award after a decade of litigation against Highland Capital. Second, Acis Capital Management, L.P. and Acis Capital Management GP, LLC had sued Highland Capital after facing an adverse $8 million arbitration award, arising in part from its now-extinguished affiliation. Third, UBS Securities LLC and UBS AG London Branch had received a $1 billion judgment against Highland Capital following a 2019 bench trial in New York. Fourth, discovery vendor Meta-E Discovery had $779,000 in unpaid invoices. The Committee members are not parties on appeal.

3

No. 21-10449

negotiated the reorganization plan. *See id.* § 1103(c). Upon the Committee's request, the court transferred the case to the Northern District of Texas in December 2019.

Highland Capital's reorganization did not proceed under the governance of a traditional Chapter 11 trustee. Instead, the Committee reached a corporate governance settlement agreement to displace Dondero, which the bankruptcy court approved in January 2020. Under the agreed order, Dondero stepped down as director and officer of Highland Capital and Strand to be an unpaid portfolio manager and "agreed not to cause any Related Entity . . . to terminate any agreements" with Highland Capital. The Committee selected a board of three independent directors to act as a quasi-trustee and to govern Strand and Highland Capital: James Seery Jr., John Dubel, and retired Bankruptcy Judge Russell Nelms (collectively, the "Independent Directors"). The order also barred any claim against the Independent Directors in their official roles without the bankruptcy court's authorizing the claim as a "colorable claim[] of willful misconduct or gross negligence." Six months later, at the behest of the creditors, the bankruptcy court appointed Seery as Highland Capital's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. The order contained an identical bar on claims against Seery acting in these roles. Neither order was appealed.

Throughout summer 2020, Dondero proposed several reorganization plans, each opposed by the Committee and the Independent Directors. Unpersuaded by Dondero, the Committee and Independent Directors negotiated their own plan. When Dondero's plans failed, he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients. *See Highland Cap. Mgmt., L.P. v. Dondero (In*

000766

No. 21-10449

*re Highland Cap. Mgmt., L.P.*), Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex. June 7, 2021) (holding Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a "nasty divorce"). In Seery's words, Dondero wanted to "burn the place down" because he did not get his way. The Independent Directors insisted Dondero resign from Highland Capital, which he did in October 2020.

Highland Capital, meanwhile, proceeded toward confirmation of its reorganization plan—the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan"). In August 2020, the Independent Directors filed the Plan and an accompanying disclosure statement with the support of the Committee. *See* 11 U.S.C. §§ 1121, 1125. The bankruptcy court approved the statement as well as proposed notice and voting procedures for creditors, teeing up confirmation. Leading up to the confirmation hearing, the Advisors and the Funds asked the court to bar Highland Capital from trading or disposing of CLO assets pending confirmation. The bankruptcy court denied the request, and Highland Capital declined to voluntarily abstain and continued to manage the CLO assets.

Before confirmation, Dondero and other creditors (including several non-appellants) filed over a dozen objections to the Plan. Like Dondero, the United States Trustee primarily objected to the Plan's exculpation of certain non-debtors as unlawful. Highland Capital voluntarily modified the Plan to resolve six such objections. The Plan proposed to create eleven classes of creditors and equity holders and three classes of administrative claimants. *See* 11 U.S.C. § 1122. Of the voting-eligible classes, classes 2, 7, and 9 voted to accept the Plan while classes 8, 10, and 11 voted to reject it.

000767

No. 21-10449

## C. Reorganization Plan

The Plan works like this: It dissolves the Committee, and creates four entities—the Claimant Trust, the Reorganized Debtor, HCMLP GP LLC,[3] and the Litigation Sub-Trust. Administered by its trustee Seery, the Claimant Trust "wind[s]-down" Highland Capital's estate over approximately three years by liquidating its assets and issuing distributions to class-8 and -9 claimants as trust beneficiaries. Highland Capital vests its ongoing servicing agreements with the Reorganized Debtor, which "among other things" continues to manage the CLOs and other investment portfolios. The Reorganized Debtor's only general partner is HCMLP GP LLC. And the Litigation Sub-Trust resolves pending claims against Highland Capital under the direction of its trustee Marc Kirschner.

The whole operation is overseen by a Claimant Trust Oversight Board (the "Oversight Board") comprised of four creditor representatives and one restructuring advisor. The Claimant Trust wholly owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust. The Claimant Trust (and its interests) will dissolve either at the soonest of three years after the effective date (August 2024) or (1) when it is unlikely to obtain additional proceeds to justify further action, (2) all claims and objections are resolved, (3) all distributions are made, and (4) the Reorganized Debtor is dissolved.

Anticipating Dondero's continued litigiousness, the Plan shields Highland Capital and bankruptcy participants from lawsuits through an exculpation provision, which is enforced by an injunction and a gatekeeper

---

[3] The Plan calls this entity "New GP LLC," but according to the motion to dismiss as equitably moot, the new general partner was later named HCMLP GP LLC. For the sake of clarity, we use HCMLP GP LLC.

000768

No. 21-10449

provision (collectively, "protection provisions"). The protection provisions extend to nearly all bankruptcy participants: Highland Capital and its employees and CEO; Strand; the Independent Directors; the Committee; the successor entities and Oversight Board; professionals retained in this case; and all "Related Persons"[4] (collectively, "protected parties").[5]

The Plan exculpates the protected parties from claims based on any conduct "in connection with or arising out of" (1) the filing and administration of the case, (2) the negotiation and solicitation of votes preceding the Plan, (3) the consummation, implementation, and funding of the Plan, (4) the offer, issuance, and distribution of securities under the Plan before or after the filing of the bankruptcy, and (5) any related negotiations, transactions, and documentation. But it excludes "acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct" *and* actions by Strand and its employees predating the appointment of the Independent Directors.

Under the Plan, bankruptcy participants are enjoined "from taking any actions to interfere with the implementation or consummation of the Plan" or filing any claim related to the Plan or proceeding. Should a party seek to bring a claim against any of the protected parties, it must go to the bankruptcy court to "first determin[e], after notice and a hearing, that such

---

[4] The Plan generously defines "Related Persons" to include all former, present, and future officers, directors, employees, managers, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, heirs, agents, other representatives, subsidiaries, divisions, and managing companies.

[5] The Plan expressly excludes from the protections Dondero and Okada; NexPoint Advisors, L.P.; Highland Capital Management Fund Advisors, L.P; their subsidiaries, managed entities, managed entities, and members; and the Dugaboy Investment Trust and its trustees, among others.

claim or cause of action represents a colorable claim of any kind." Only then may the bankruptcy court "specifically authoriz[e]" the party to bring the claim. The Plan reserves for the bankruptcy court the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable" and then to adjudicate the claim if the court has jurisdiction over the merits.

### D. Confirmation Order

At a February 2021 hearing, the bankruptcy court confirmed the Plan from the bench over several remaining objections. *See* Fed. R. Bankr. P. 3017–18; 11 U.S.C. §§ 1126, 1128, 1129. In its later-written decision, the bankruptcy court observed that Highland Capital's bankruptcy was "not a garden variety chapter 11 case." The type of debtor, the reason for the bankruptcy filing, the kinds of creditor claims, the corporate governance structure, the unusual success of the mediation efforts, and the small economic interests of the current objectors all make this case unique.

The confirmation order criticized Dondero's behavior before and during the bankruptcy proceedings. The court could not "help but wonder" if Highland Capital's deficit "was necessitated because of enormous litigation fees and expenses incurred" due to Highland Capital's "culture of litigation." Recounting Highland Capital's litigation history, it deduced that Dondero is a "serial litigator." It reasoned that, while "Dondero wants his company back," this "is not a good faith basis to lob objections to the Plan." It attributed Dondero's bad faith to the Advisors, the Trusts, and the Funds, given the "remoteness of their economic interests." For example, the bankruptcy court "was not convinced of the[] [Funds'] independence" from Dondero because the Funds' board members did not testify and had "engaged with the Highland complex for many years." And so the bankruptcy court "consider[ed] them all to be marching pursuant to the orders of Mr. Dondero." The court, meanwhile, applauded the members of

000770
23-10564.943

the Committee for their "wills of steel" for fighting "hard before and during this Chapter 11 Case" and "represent[ing] their constituency . . . extremely well."

On the merits of the Plan, the bankruptcy court again approved the Plan's voting and confirmation procedures as well as the fairness of the Plan's classes. *See* 11 U.S.C. §§ 1122, 1125(a)–(c). The court held the Plan complied with the statutory requirements for confirmation. *See id.* §§ 1123(a)(1)–(7), 1129(a)(1)–(7), (9)–(13). Because classes 8, 10, and 11 had voted to reject the Plan, it was confirmable only by cramdown.[6] *See id.* § 1129(b). The bankruptcy court found that the Plan treated the dissenting classes fairly and equitably and satisfied the absolute-priority rule, so the Plan was confirmable. *See id.* § 1129(b)(2)(B)–(C). The court also concluded that the protection provisions were fair, equitable, and reasonable, as well as "integral elements" of the Plan under the circumstances, and were within both the court's jurisdiction and authority. The court confirmed the Plan as proposed and discharged Highland Capital's debts. *Id.* § 1141(d)(1). After confirmation and satisfaction of several conditions precedent, the Plan took effect August 11, 2021.

## E. The Appeal

Dondero, the Advisors, the Funds, and the Trusts (collectively, "Appellants") timely appealed, objecting to the Plan's legality and some of

---

[6] The bankruptcy court must proceed by nonconsensual confirmation, or "cramdown," 11 U.S.C. § 1129(b), when a class of unsecured creditors rejects a Chapter 11 reorganization plan, *id.* § 1129(a)(8), but at least one impaired class accepts it, *id.* § 1129(a)(10). A cramdown requires that the plan be "fair and equitable" to dissenting classes and satisfy the absolute priority rule—that is, dissenting classes are paid in full before any junior class can retain any property. *Id.* § 1129(b)(2)(B); *see Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).

000771

No. 21-10449

the bankruptcy court's factual findings.[7] Together with Highland Capital, Appellants moved to directly appeal the confirmation order to this court, which the bankruptcy court granted. *See* 28 U.S.C. § 158(d). A motions panel certified and consolidated the direct appeals. *See ibid.* Both the bankruptcy court and the motions panel declined to stay the Plan's confirmation pending appeal. Given the Plan's substantial consummation since its confirmation, Highland Capital moved to dismiss the appeal as equitably moot, a motion the panel ordered carried with the case.

\*     \*     \*

We first consider equitable mootness and decline to invoke it here. We then turn to the merits, conclude the Plan exculpates certain non-debtors beyond the bankruptcy court's authority, and affirm in all other respects.

## II. Standard of Review

A confirmation order is an appealable final order, over which we have jurisdiction. *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015); *see* 28 U.S.C. §§ 158(d), 1291. This court reviews a bankruptcy court's factual findings for clear error and legal conclusions *de novo. Evolve Fed. Credit Union v. Barragan-Flores (In re Barragan-Flores)*, 984 F.3d 471, 473 (5th Cir. 2021) (citation omitted).

## III. Equitable Mootness

Highland Capital moved to dismiss this appeal as equitably moot. It argues we should abstain from appellate review because clawing back the implemented Plan "would generate untold chaos." We disagree and deny the motion.

---

[7] The Trusts adopt the Funds' and the Advisors' briefs in full, and Dondero adopts the Funds' brief in full and the Advisors' brief in part. Fed. R. App. P. 28(i).

000772

The judge-made doctrine of equitable mootness allows appellate courts to abstain from reviewing bankruptcy orders confirming "complex plans whose implementation has substantial secondary effects." *New Indus., Inc. v. Byman (In re Sneed Shipbuilding, Inc.)*, 916 F.3d 405, 409 (5th Cir. 2019) (citing *In re Trib. Media Co.*, 799 F.3d 272, 274, 281 (3d Cir. 2015)). It seeks to balance "the equitable considerations of finality and good faith reliance on a judgment" and "the right of a party to seek review of a bankruptcy order adversely affecting him." *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (quoting *First Union Real Estate Equity & Mortg. Inv. v. Club Assocs. (In re Club Assocs.)*, 956 F.3d 1065, 1069 (11th Cir. 1992)); *see In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008); *see also* 7 Collier on Bankruptcy ¶ 1129.09 (16th ed.), LexisNexis (database updated June 2022) (observing "the equitable mootness doctrine is embraced in every circuit").[8]

This court uses equitable mootness as a "scalpel rather than an axe," applying it claim-by-claim, instead of appeal-by-appeal. *In re Pac. Lumber Co.(Pacific Lumber)*, 584 F.3d 229, 240–41 (5th Cir. 2009). For each claim, we analyze three factors: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re Manges*, 29 F.3d at 1039 (citing *In re Block Shim*

---

[8] The doctrine's atextual balancing act has been criticized. *See In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) ("Despite its apparent virtues, equitable mootness is a judicial anomaly."); *In re One2One Commc'ns, LLC*, 805 F.3d 428, 438–54 (3rd Cir. 2015) (Krause, J., concurring); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (banishing the term "equitable mootness" as a misnomer); *In re Cont'l Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (en banc) (Alito, J., dissenting); *see also* Bruce A. Markell, *The Needs of the Many: Equitable Mootness' Pernicious Effects*, 93 Am. Bankr. L.J. 377, 393–96 (2019) (addressing the varying applications between circuits). *But see In re Trib. Media*, 799 F.3d at 287–88 (Ambro, J., concurring) (highlighting some benefits of the equitable mootness doctrine).

000773

No. 21-10449

*Dev. Co.*, 939 F.2d 289, 291 (5th Cir. 1991); and *Cleveland, Barrios, Kingsdorf & Casteix v. Thibaut*, 166 B.R. 281, 286 (E.D. La. 1994)); *see also, e.g.*, *In re Blast Energy Servs.*, 593 F.3d 418, 424–25 (5th Cir. 2010); *In re Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022). No one factor is dispositive. *See In re Manges*, 29 F.3d at 1039.

Here, the bankruptcy court and this court declined to stay the Plan pending appeal, and it took effect August 11, 2021. Given the months of progress, no party meaningfully argues the Plan has not been substantially consummated.[9] *See Pacific Lumber*, 584 F.3d at 242 (observing "consummation includes transferring all or substantially all of the property covered by the plan, the assumption of business by the debtors' successors, and the commencement of plan distributions" (citing 11 U.S.C. § 1141; and *In re Manges*, 29 F.3d at 1041 n.10)). But that alone does not trigger equitable mootness. *See In re SCOPAC*, 624 F.3d 274, 281–82 (5th Cir. 2010). Instead, for each claim, the inquiry turns on whether the court can craft relief for that

---

[9] Since the Plan's effectuation, Highland Capital paid $2.2 million in claims to a committee member and $525,000 in "cure payments" to other counterparties. The independent directors resigned. The Reorganized Debtor, the Claimant Trust, HCMLP GP LLC, and the Litigation Sub-Trust were created and organized in accordance with the Plan. The bankruptcy court appointed the Oversight Board members, the Litigation Sub-Trust trustee, and the Claimant Trust trustee. Highland Capital assumed certain service contracts, including management of twenty CLOs with approximately $700 million in assets, and transferred its assets and estate claims to the successor entities. Highland Capital's pre-petition partnership interests were cancelled and cease to exist. A third party, Blue Torch Capital, infused $45 million in exit financing, fully guaranteed by the Reorganized Debtor, its operating subsidiaries, the Claimant Trust, and most of their assets. From the exit financing, an Indemnity Trust was created to indemnify claims that arise against the Reorganized Debtor, Claimant Trust, Ligation Sub-Trust, Claimant Trustee, Litigation Trustee, or Oversight Board members. The lone class-1 creditor withdrew its claim against Highland Capital. The lone class-2 creditor has been fully paid approximately $500,000 and issued a note of $5.2 million secured by $23 million of the Reorganized Debtor's assets. Classes 3 and 4 have been paid $165,412. Class 7 has received $5.1 million in distributions from the Claimant Trust, totaling 77% of class-7 claims filed.

000774

claim that would not have significant adverse consequences to the reorganization. Highland Capital highlights four possible disruptions: (1) the unraveling of the Claimant Trust and its entities, (2) the expense of disgorging disbursements, (3) the threat of defaulting on exit-financing loans, and (4) the exposure to vexatious litigation.

Each party first suggests its own all-or-nothing equitable mootness applications. To Highland Capital, Appellants' broad requested remedy with only a minor economic stake demands mooting the entire appeal. To Appellants, the type of reorganization plan categorically bars equitable mootness, or, alternatively, Highland Capital's joining the motion to certify the appeal estops it from asserting equitable mootness. These arguments are unpersuasive and foreclosed by *Pacific Lumber*.

First, Highland Capital contends the entire appeal is equitably moot because Appellants, with only a minor economic stake and questionable good faith, "seek[] nothing less than a complete unravelling of the confirmed Plan." It claims the court cannot "surgically excise[]" certain provisions, as the Funds request, because the Bankruptcy Code prohibits "modifications to confirmed plans after substantial consummation." *See* 11 U.S.C. § 1127(b). Not so.

"Although the Bankruptcy Code . . . restricts post-confirmation plan modifications, it does not expressly limit appellate review of plan confirmation orders." *Pacific Lumber*, 584 F.3d at 240 (footnote omitted) (citing 11 U.S.C. § 1127). This court may fashion "fractional relief" to minimize an appellate disturbance's effect on the rights of third parties. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (denying dismissal on equitable mootness grounds because the court "could grant partial relief . . . without disturbing the reorganization"); *cf. In re Cont'l Airlines*, 91 F.3d 553, 571–72 (3d Cir. 1996) (en banc) (Alito, J., dissenting)

000775

(observing "a remedy could be fashioned in the present case to ensure that the [debtor's] reorganization is not undermined"). In short, Highland Capital's speculations are farfetched, as the court may fashion the remedy it sees fit without upsetting the reorganization.

Second, Appellants contend that equitable mootness cannot apply—full-stop—because this appeal concerns a liquidation plan, not a reorganization plan. We reject that premise. *See infra* Part IV.A. Even if it were correct, however, this court has conducted the equitable-mootness inquiry for a Chapter 11 liquidation plan in the past. *See In re Superior Offshore Int'l, Inc.*, 591 F.3d 350, 353–54 (5th Cir. 2009). And other circuits have squarely rejected the categorical bar proposed by Appellants. *See In re Abengoa Bioenergy Biomass of Kan., LLC*, 958 F.3d 949, 956–57 (10th Cir. 2020); *In re BGI, Inc.*, 772 F.3d 102, 107–09 (2d Cir. 2014). We do the same.

Finally, Appellants assert that because Highland Capital and NexPoint Advisors, L.P. jointly moved to certify the appeal, it should be estopped from arguing the appeal is equitably moot. They cite no legal support for that approach. We decline to adopt it.

Instead, we proceed with a claim-by-claim analysis, as our precedent requires. Highland Capital suggests only two claims are equitably moot: (1) the protection-provisions challenge and (2) the absolute-priority-rule challenge. Neither provides a basis for equitable mootness.

For the protection provisions, Highland Capital anticipates that, without the provisions, its officers, employees, trustees, and Oversight Board members would all resign rather than be exposed to Dondero-initiated litigation. Those resignations would disrupt the Reorganized Debtor's operation, "significant[ly] deteriorat[ing] asset values due to uncertainty." Appellants disagree, offering several instances when this court has reviewed release, exculpation, and injunction provisions over calls for equitable

000776

mootness. *See, e.g.*, *In re Hilal*, 534 F.3d at 501; *Pacific Lumber*, 584 F.3d at 252; *In re Thru Inc.*, 782 F. App'x 339, 341 (5th Cir. 2019) (per curiam). In response, Highland Capital distinguishes this case because the provisions are "integral to the consummated plans." *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 486 (2d Cir. 2012). We again reject that premise. *See infra* Part IV.E.1. In any event, Appellants have the better argument.

We have before explained that "equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008). That is so because "the goal of finality sought in equitable mootness analysis does not outweigh a court's duty to protect the integrity of the process." *Pacific Lumber*, 584 F.3d at 252. As in *Pacific Lumber*, the legality of a reorganization plan's non-consensual non-debtor release is consequential to the Chapter 11 process and so should not escape appellate review in the name of equity. *Ibid.* The same is true here. Equitable mootness does not bar our review of the protection provisions.

For the absolute-priority-rule challenge,[10] Highland Capital contends our review requires us to "rejigger class recoveries." *Pacific Lumber* is again instructive. There, the court declined to apply equitable mootness to a secured creditor's absolute-priority-rule challenge, as no other panel had extended the doctrine so far. *Id.* at 243. Similarly, Highland Capital fails to identify a single case in which this court has declined review of the treatment of a class of creditor's claims resulting from a cramdown. *See id.* at 252. Regardless, Appellants challenge the distributions to classes 8, 10, and 11. According to Highland Capital's own declaration, "Class 8 General

---

[10] While the issue is nearly forfeited for inadequate briefing, it fails on the merits regardless. *See Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020).

000777

Unsecured Claims have received their Claimant Trust Interests." But there is no evidence that classes 10 or 11 have received any distributions. *Contra Pacific Lumber*, 584 F.3d at 251 (holding certain claims equitably moot where "the smaller unsecured creditors" had already "received payment for their claims"). As a result, the relief requested would not affect third parties or the success of the Plan. *See In re Manges*, 29 F.3d at 1039. The doctrine of equitable mootness does not bar our review of the cramdown and treatment of class-8 creditors.

We DENY Highland Capital's motion to dismiss the appeal as equitably moot.

## IV. Discussion

As to the merits, Appellants fire a bankruptcy-law blunderbuss. They contest the Plan's classification as a reorganization plan, the Plan's satisfaction of the absolute priority rule, the Plan's confirmation despite Highland Capital's noncompliance with Bankruptcy Rule 2015.3, and the sufficiency of the evidence supporting the court's factual finding that the Funds are "owned/controlled" by Dondero. For each, we disagree and affirm. We do, however, agree with Appellants that the bankruptcy court exceeded its statutory authority under § 524(e) by exculpating certain non-debtors, and so we reverse and vacate the Plan only to that extent.

### A. Discharge of Debt

We begin with the Plan's classification as a reorganization plan, allowing for automatic discharge of the debts. The confirmation of a Chapter 11 restructuring plan "discharges the debtor from any [pre-confirmation] debt" unless, under the plan, the debtor liquidates its assets, stops "engag[ing] in [its] business after consummation of the plan," and would be denied discharge in a Chapter 7 case. 11 U.S.C. § 1141(d)(1), (3); *see In re Sullivan*, No. 99-11107, 2000 WL 1597984, at *2 (5th Cir. Sept. 26, 2000)

000778

Case 19-34054-sgj11 Doc 3891-1 Filed 08/03/23 Entered 08/03/23 15:20:29 Desc
Case 3:23-cv-00573-E   Document 1-3   Exhibit A   Filed 05/02/23   Page 31 of 148   PageID 947

(per curiam). The bankruptcy court concluded Highland Capital continued to engage in business after plan consummation, so its debts are automatically discharged. The Trusts call foul because, in their view, Highland Capital's "wind down" of its portfolio management is not a continuation of its business. We disagree.

Whether a corporate debtor "engages in business" is "relatively straightforward." *Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018) (contrasting the more complex question for individual debtors); *see Grausz v. Sampson (In re Grausz)*, 63 F. App'x 647, 650 (4th Cir. 2003) (per curiam) (same). That is, "a business entity will not engage in business post-bankruptcy when its assets are liquidated and the entity is dissolved." *Um*, 904 F.3d at 819 (collecting cases).[11] But even a temporary continuation of business after a plan's confirmation is sufficient to discharge a Chapter 11 debtor's debt. *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 804 n.15 (5th Cir. 1997) (recognizing a debtor's "conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B)" (citation omitted)). That is the case here.

By the plain terms of the Plan, Highland Capital has and will continue its business as the Reorganized Debtor for several years. Indeed, much of this appeal concerns objections to Highland Capital's "continu[ing] to manage the assets of others." Because the Plan contemplates Highland Capital "engag[ing] in business after consummation," 11 U.S.C. § 1141(d)(1), the

---

[11] *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. 832, 853 (Bankr. N.D. Cal. 2003) (holding corporate debtor was not engaging in business by merely having directors and officers, rights under an insurance policy, and claims against it); *In re Wood Fam. Ints., Ltd.*, 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (holding corporate debtor was not engaging in business when the plan called for liquidation and discontinuation of its business upon confirmation).

000779

Case 3:23-cv-00573-E Document 1-1 Filed 05/02/23 Page 32 of 148 PageID 948

bankruptcy court correctly held Highland Capital was eligible for automatic discharge of its debts.[12]

### B. Absolute Priority Rule

Next, we consider the Plan's compliance with the absolute-priority rule. When assessing whether a plan is "fair and equitable" in a cramdown scenario, courts must invoke the absolute-priority rule. 11 U.S.C. § 1129(b)(1); *see* 7 COLLIER ON BANKRUPTCY ¶ 1129.04. Under that rule, if a class of unsecured claimants rejects a plan, the plan must provide that those claimants be paid in full on the effective date *or* any junior interest "will not receive or retain under the plan . . . any property." 11 U.S.C. § 1129(b)(2)(B).[13]

Because class-8 claimants voted against the Plan, the bankruptcy court proceeded by nonconsensual confirmation. The court concluded the Plan was fair and equitable to class 8 and its distributions were in line with the absolute-priority rule. 11 U.S.C. § 1129(b)(2)(B). The Advisors claim the Plan violates the absolute priority rule by giving class-10 and -11 claimants a "Contingent Claimant Trust Interest" without fully satisfying class-8 claimants. We agree the absolute-priority rule applies, and the Plan plainly satisfies it.

The Plan proposed to pay 71% of class-8 creditors' claims with *pro rata* distributions of interest generated by the Claimant Trust and then *pro rata*

---

[12] For the same reasons, we reject the Trusts' follow-on argument extending the same logic to the protection provisions.

[13] *See Pacific Lumber*, 584 F.3d at 244 (noting the rule "enforces a strict hierarchy of [creditor classes'] rights defined by state and federal law" to protect dissenting creditor classes); *see also In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002) ("[U]nsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." (citations omitted)).

000780

distributions from liquidated Claimant Trust assets. Classes 10 and 11 received a *pro rata* share of "Contingent Claimant Trust Interests," defined as a Claimant Trust Interest vesting only when the Claimant Trustee certifies that all class-8 claimants have been paid indefeasibly in full and all disputed claims in class 8 have been resolved. Voilà: no interest junior to class 8 will receive any property until class-8 claimants are paid.

But the Advisors point to Highland Capital's testimony and briefs to suggest the Contingent Claimant Trust Interests (received by classes 10 and 11) are property in some sense because they have value. That argument is specious. Of course, the Contingent Claimant Trust Interests have some small probability of vesting in the future and, thus, has some *de minimis* present value. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (holding a junior creditor's receipt of a presently valueless equity interest is receipt of property). But the absolute-priority rule has never required us to bar junior creditors from ever receiving property. By the Plan's terms, no trust property vests with class-10 or -11 claimants "unless and until" class-8 claims "have been paid indefeasibly in full." *See* 11 U.S.C. § 1129(b)(2)(B)(ii). That plainly comports with the absolute-priority rule.

## C. Bankruptcy Rule 2015.3

We turn to whether the failure to comply with Bankruptcy Rule of Procedure 2015.3 bars the Plan's confirmation. The Independent Directors failed to file periodic financial reports per Federal Rule of Bankruptcy Procedure 2015.3(a) about entities "in which the [Highland Capital] estate holds a substantial or controlling interest." The Advisors claim the failure dooms the Plan's confirmation because the Plan proponent failed to comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). We disagree.

000781

Rule 2015.3 cannot be an applicable provision of Title 11 because the Federal Rules of Bankruptcy Procedure are not provisions of the Bankruptcy Code. *See Bonner v. Adams (In re Adams)*, 734 F.2d 1094, 1101 (5th Cir. 1984) ("The Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075, provides that the Supreme Court may prescribe 'by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure' in bankruptcy courts."); *cf. In re Mandel*, No. 20-40026, 2021 WL 3642331, at *6 n.7 (5th Cir. Aug. 17, 2021) (per curiam) (noting "Rule 2015.3 implements section 419 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005," which amended 28 U.S.C. § 2073). The Advisors' attempt to tether the rule to the bankruptcy trustee's general duties lacks any legal basis. *See* 11 U.S.C. §§ 704(a)(8), 1106(a)(1), 1107(a). The bankruptcy court, therefore, correctly overruled the Advisors' objection.

## D. Factual Findings

One factual finding is in dispute, but we see no clear error. The bankruptcy court found that, despite their purported independence, the Funds are entities "owned and/or controlled by [Dondero]." The Funds ask the court to vacate the factual finding because it threatens the Funds' compliance with federal law and damages their reputations and values. According to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him. Highland Capital maintains Dondero has sole discretion over the Funds as their portfolio manager and through his control of the Advisors, so the finding is supported by the record.

"Clear error is a formidable standard: this court disturbs factual findings only if left with a firm and definite conviction that the bankruptcy court made a mistake." *In re Krueger*, 812 F.3d 365, 374 (5th Cir. 2016) (cleaned up). We defer to the bankruptcy court's credibility determinations.

000782

Case 19-34054-sgj11 Doc 3608-1 Filed 09/12/22 Entered 09/12/22 Page 2 Desc
Case 3:23-cv-00573-E Document 163-9 Filed 05/13/25 Page 35 of 148 PageID 951
Exhibit A Page 320 of 433

No. 21-10449

*See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587–88 (5th Cir. 1999).

 Here, the bankruptcy court drew its factual finding from the testimony of Jason Post, the Advisors' chief compliance officer, and Dustin Norris, an executive vice president for the Funds and the Advisors. Post testified that the Funds have independent board members that run them. But the bankruptcy court found Post not credible because "he abruptly resigned" from Highland Capital at the same time as Dondero and is currently employed by Dondero. Norris testified that Dondero "owned and/or controlled" the Funds and Advisors. The bankruptcy court found Norris credible and relied on his testimony. The bankruptcy court also observed that none of the Funds' board members testified in the bankruptcy case and all "engaged with the Highland complex for many years." Because nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are "owned and/or controlled by [Dondero]," we leave the bankruptcy court's factual finding undisturbed.

## E. The Protection Provisions

 Finally, we address the legality of the Plan's protection provisions. As discussed, the Plan exculpates certain non-debtor third parties supporting the Plan from post-petition lawsuits not arising from gross negligence, bad faith, or willful or criminal misconduct. It also enjoins certain parties "from taking any actions to interfere with the implementation or consummation of the Plan." The injunction requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as "colorable"—*i.e.*, the bankruptcy court acts as a gatekeeper. Together, the provisions screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness.

000783

Case 19-34054-sgj11 Doc 3601-1 Filed 09/14/22 Entered 09/14/22 Page 23 of 33 Desc
Case 3:23-cv-00573-E    Document 1-8    Exhibit A    Filed 03/20/23    Page 36 of 148    PageID 952

The bankruptcy court deemed the provisions legal, necessary under the circumstances, and in the best interest of all parties. We agree, but only in part. Though the injunction and gatekeeping provisions are sound, the exculpation of certain non-debtors exceeds the bankruptcy court's authority. We reverse and vacate that limited portion of the Plan.

### 1. *Non-Debtor Exculpation*

We start with the scope of the non-debtor exculpation. In a Chapter 11 bankruptcy proceeding, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Contrary to the bankruptcy court's holding, the exculpation here partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors. *See Pacific Lumber*, 584 F.3d 251–53. We must reverse and strike the few unlawful parts of the Plan's exculpation provision.

The parties agree that *Pacific Lumber* controls and also that the bankruptcy court had the power to exculpate both Highland Capital and the Committee members. Appellants, however, submit the bankruptcy court improperly stretched *Pacific Lumber* to shield other non-debtors from breach-of-contract and negligence claims, in violation of § 524(e). Highland Capital counters that the exculpation provision is a commonplace Chapter 11 term, is appropriate given Dondero's litigious nature, does not implicate § 524(e), and merely provides a heightened standard of care.

To support that argument, Highland Capital highlights the distinction between a concededly unlawful release of all non-debtor liability and the Plain's limited exculpation of non-debtor post-petition liability. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (describing releases as "eliminating" a covered party's liability "altogether" while exculpation provisions "set[] forth the applicable standard of liability" in

000784

future litigation). According to Highland Capital, the Third and Ninth Circuits have adopted that distinction when applying § 524(e). *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394 (2021); *In re PWS Holding*, 228 F.3d at 246–47. Under those cases, narrow exculpations of post-petition liability for certain critical third-party non-debtors are lawful "appropriate" or "necessary" actions for the bankruptcy court to carry out the proceeding through its statutory authority under § 1123(b)(6) and § 105(a). *See* 11 U.S.C. § 1123(b)(6) ("[A] plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title."); *id* § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Highland Capital reads *Pacific Lumber* as "in step with the law in [those] other circuits" by allowing a limited exculpation of post-petition liability. *Cf. Blixseth*, 961 F.3d at 1084. We disagree. As the Ninth Circuit acknowledged, our court in *Pacific Lumber* arrived at "a conclusion opposite [the Ninth Circuit's]." 961 F.3d at 1085 n.7. Moreover, the Ninth Circuit expressly disavowed *Pacific Lumber*'s rationale—that an exculpation provision provides a "fresh start" to a non-debtor in violation of § 524(e)—because, in the Ninth Circuit's view, the post-petition exculpation "affects only claims arising from the bankruptcy proceedings themselves." *Ibid.* We are not persuaded, as Highland Capital contends, that the Ninth Circuit was "sloppy" and simply "misread *Pacific Lumber*." *See* O.A. Rec. 19:45–21:38.

The simple fact of the matter is that there is a circuit split concerning the effect and reach of § 524(e).[14] Our court along with the Tenth Circuit

---

[14] Amicus's contention that failing to adopt the Ninth Circuit's holding "would generate a clear circuit split" is wrong. There already is one. *See* Petition for Writ of

000785

Case 3:24-cv-02473 Document 101 Filed 09/04/24 Page 2 of 2 Entered District Court 09/15/2022 Desc
Case 3:23-cv-00573-E Document-A Exhibit-A Filed 03/02/23 Page 38 of 148 PageID 954

hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code. *Pacific Lumber*, 584 F.3d at 252–53; *Landsing Diversified Props. v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600 (10th Cir. 1990) (per curiam). By contrast, the Ninth Circuit joins the Second, Third, Fourth, Sixth, Seventh, and Eleventh Circuits in reading § 524(e) to allow varying degrees of limited third-party exculpations. *Blixseth*, 961 F.3d at 1084; *accord In re PWS Holding*, 228 F.3d at 246–47 (allowing third-party releases for "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Airadigm Commc'ns., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2015).

Our *Pacific Lumber* decision was not blind to the countervailing view, as it twice cites the Third Circuit's contrary holding in other contexts. *See* 584 F.3d at 241, 253 (citing *In re PWS Holding*, 228 F.3d at 236–37, 246). But we rejected the parsing between limited exculpations and full releases that Highland Capital now requests. We are obviously bound to apply our own precedent. *See Hidalgo Cnty. Emergency Serv. Found. v. Carranza (In re Hidalgo Cnty. Emergency Serv. Found.)*, 962 F.3d 838, 841 (5th Cir. 2020) ("Under our well-recognized rule of orderliness, . . . a panel of this court is bound by circuit precedent." (citation omitted)).

Under *Pacific Lumber*, § 524(e) does not permit "absolv[ing] the [non-debtor] from any negligent conduct that occurred during the course of the

---

Certiorari, *Blixseth v. Credit Suisse*, 141 S. Ct. 1394 (No. 20-1028) (highlighting the circuits' divergent approaches to the non-debtor discharge bar under § 524(e)).

000786

bankruptcy" absent another source of authority. 584 F.3d at 252–53; *see also In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995). At oral argument, Highland Capital pointed only to § 1123(b)(6) and § 105(a) as footholds. *See* O.A. Rec. 16:45–17:28. But in this circuit, § 105(a) provides no statutory basis for a non-debtor exculpation. *In re Zale*, 62 F.3d at 760 (noting "[a] § 105 injunction cannot alter another provision of the code" (citing *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993))). And the same logic extends to § 1123(b)(6), which allows a plan to "include any other appropriate provision *not inconsistent with the applicable provisions of this title*." 11 U.S.C. § 1123(b)(6) (emphasis added).

*Pacific Lumber* identified two sources of authority to exculpate non-debtors. *See* 584 F.3d at 252–53. The first is to channel asbestos claims (not present here). *Id.* at 252 (citing 11 U.S.C. § 524(g)). The second is to provide a limited qualified immunity to creditors' committee members for actions within the scope of their statutory duties. *Pacific Lumber*, 584 F.3d at 253 (citing 11 U.S.C. § 1103(c)); *see In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012). And, though not before the court in *Pacific Lumber*, we have also recognized a limited qualified immunity to bankruptcy trustees unless they act with gross negligence. *In re Hilal*, 534 F.3d at 501 (citing *In re Smyth*, 207 F.3d 758, 762 (5th Cir. 2000)); *accord Baron v. Sherman (In re Ondova Ltd.)*, 914 F.3d 990, 993 (5th Cir. 2019) (per curiam). If other sources exist, Highland Capital failed to identify them. So we see no statutory authority for the full extent of the exculpation here.

The bankruptcy court read *Pacific Lumber* differently. In its view, *Pacific Lumber* created an additional ground to exculpate non-debtors: when the record demonstrates that "costs [a party] might incur defending against suits alleging such negligence are likely to swamp either [it] or the consummated reorganization." 584 F.3d at 252. We do not read the decision that way. The bankruptcy court's underlying factual findings do not alter

000787

whether it has statutory authority to exculpate a non-debtor. That is the holding of *Pacific Lumber*.

That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*. We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital. Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee. *See* 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01. It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence. *See In re Hilal*, 534 F.3d at 501. Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

In sum, our precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties, *see Baron*, 914 F.3d at 993. And so, excepting the Independent Directors and the Committee members, the exculpation of non-debtors here was unlawful. Accordingly, the other non-debtor exculpations must be struck from the Plan. *See Pacific Lumber*, 584 F.3d at 253.[15]

---

[15] Highland Capital, like the bankruptcy court, claims the *res judicata* effect of the January and July 2020 orders appointing the independent directors and appointing Seery as CEO binds the court to include the protection provisions here. We lack jurisdiction to consider collateral attacks on final bankruptcy orders even when it concerns whether the court properly exercised jurisdiction or authority at the time. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *In re Linn Energy, L.L.C.*, 927 F.3d 862, 866–67 (5th Cir. 2019) (quoting *Bailey*, 557 U.S. at 152). To the extent Appellants seek to roll back the protections

000788

No. 21-10449

As it stands, the Plan's exculpation provision extends to Highland Capital and its employees and CEO; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." Consistent with § 524(e), we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors.

### 2. *Injunction & Gatekeeper Provisions*

The injunction and gatekeeper provisions are, on the other hand, perfectly lawful. Appellants object to the bankruptcy court's injunction as vague and the gatekeeper provision as overbroad. We are unpersuaded.

First, Appellants' primary contention—that the Plan's injunction "is broad" by releasing non-debtors in violation of § 524(e)—is resolved by our striking the impermissibly exculpated parties. *See supra* Part IV.E.1.

Second, Appellants dispute the permanency of the injunction for the legally exculpated parties by enjoining conduct "on and after the Effective

---

in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded.

As a result, the bankruptcy court was correct insofar as *those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities, but it was incorrect that *res judicata* mandates their inclusion in the Plan's new exculpation provision. Despite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 orders, given the orders' ongoing *res judicata* effects and our lack of jurisdiction to review those orders. But that says nothing of the effect of the Plan's exculpation provision.

000789

No. 21-10449

Date." Even assuming the issue was preserved,[16] permanency alone is no reason to alter a bankruptcy court's otherwise-lawful injunction on appeal. *See In re Zale*, 62 F.3d at 759–60 (recognizing the bankruptcy court's jurisdiction to issue an injunction in the first place allowed it to issue a permanent injunction).

Third, the Advisors argue that the injunction is "overbroad and vague" because it does not define what it means to "interfere" with the "implementation or consummation of the Plan." That is unsupported by the record. As the bankruptcy court recognized, the Plan defined what constitutes interference: (i) filing a lawsuit, (ii) enforcing judgments, (iii) enforcing security interests, (iv) asserting setoff rights, or (v) acting "in any manner" not conforming with the Plan. The injunction is not unlawfully overbroad or vague.

Finally, Appellants maintain that the gatekeeper provision impermissibly extends to unrelated claims over which the bankruptcy court lacks subject-matter jurisdiction. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (noting a bankruptcy court retains jurisdiction post-confirmation only over "matters pertaining to the implementation or execution of the plan" (citations omitted)). While that may be the case, our precedent requires we leave that determination to the bankruptcy court in the first instance.

Courts have long recognized bankruptcy courts can perform a gatekeeping function. Under the "*Barton* doctrine," the bankruptcy court may require a party to "obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other

---

[16] *See Roy*, 950 F.3d at 251 ("Failure adequately to brief an issue on appeal constitutes waiver of that argument." (citation omitted)).

000790

bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added) (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)); *accord Barton v. Barbour*, 104 U.S. 126 (1881).[17] In *Villegas*, we held "that a party must continue to file with the relevant bankruptcy court for permission to proceed with a claim against the trustee." 788 F.3d at 158. Relevant here, we left to the bankruptcy court, faced with pre-approval of a claim, to determine whether it had subject matter jurisdiction over that claim in the first instance. *Id.* at 158–59; *see, e.g.*, *Carroll v. Abide*, 788 F.3d 502, 506–07 (5th Cir. 2015) (noting *Villegas* "rejected an argument that the *Barton* doctrine does not apply when the bankruptcy court lacked jurisdiction"). In other words, we need not evaluate whether the bankruptcy court would have jurisdiction under every conceivable claim falling under the widest interpretation of the gatekeeper provision. We leave that to the bankruptcy court in the first instance.[18]

*     *     *

In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. The exculpatory order is therefore vacated as to all parties *except* Highland Capital, the Committee and its members, and the

---

[17] The Advisors also maintain that Highland Capital is neither a receiver nor a trustee, so *Barton* has no application here. We disagree. Highland Capital, for all practical purposes, was a debtor in possession entitled to the rights of a trustee. *See* 7 Collier on Bankruptcy ¶ 1101.01 ("The debtor in possession is generally vested with all of the rights and powers of a trustee as set forth in section 1106 . . . ."); *see also Carter*, 220 F.3d at 1252 n.4. (finding no distinction between bankruptcy court "approved" and bankruptcy court "appointed" officers).

[18] For the same reasons, we also leave the applicability of *Barton*'s limited statutory exception to the bankruptcy and district courts in the first instance. *See* 28 U.S.C. § 959(a) (allowing suit, without leave of the appointing court, if the challenged acts relate to the trustee or debtor in possession "carrying on business connected with [their] property").

000791

No. 21-10449

Independent Directors for conduct within the scope of their duties. We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.[19]

## V. Conclusion

Highland Capital's motion to dismiss the appeal as equitably moot is DENIED. The bankruptcy court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

[19] Nothing in this opinion should be construed to hinder the bankruptcy court's power to enjoin and impose sanctions on Dondero and other entities by following the procedures to designate them vexatious litigants. *See In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (per curiam). But non-debtor exculpation within a reorganization plan is not a lawful means to impose vexatious litigant injunctions and sanctions.

30

000792
23-10454.265

# TAB 7

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 7, 2022

Lyle W. Cayce
Clerk

No. 21-10449

IN THE MATTER OF: HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Debtor*,

NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; HIGHLAND INCOME FUND; NEXPOINT STRATEGIC OPPORTUNITIES FUND; HIGHLAND GLOBAL ALLOCATION FUND; NEXPOINT CAPITAL, INCORPORATED; JAMES DONDERO; THE DUGABOY INVESTMENT TRUST; GET GOOD TRUST,

*Appellants*,

*versus*

HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Appellee*.

---

Appeal from the United States Bankruptcy Court
for the Northern District of Texas
USDC No. 19-34054
USDC No. 3:21-CV-538

---

Before WIENER, GRAVES, and DUNCAN, *Circuit Judges*.

ON PETITION FOR REHEARING

000838
PA0305401011

No. 21-10449

Sᴛᴜᴀʀᴛ Kʏʟᴇ Dᴜɴᴄᴀɴ, *Circuit Judge*:

The petition for panel rehearing is GRANTED. We withdraw our previous opinion, reported at 2022 WL 3571094, and substitute the following:

Highland Capital Management, L.P., a Dallas-based investment firm, managed billion-dollar, publicly traded investment portfolios for nearly three decades. By 2019, however, myriad unpaid judgments and liabilities forced Highland Capital to file for Chapter 11 bankruptcy. This provoked a nasty breakup between Highland Capital and its co-founder James Dondero. Under those trying circumstances, the bankruptcy court successfully mediated with the largest creditors and ultimately confirmed a reorganization plan amenable to most of the remaining creditors.

Dondero and other creditors unsuccessfully objected to the confirmation order and then sought review in this court. In turn, Highland Capital moved to dismiss their appeal as equitably moot. First, we hold that equitable mootness does not bar our review of any claim. Second, we affirm the confirmation order in large part. We reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds.

I. Bᴀᴄᴋɢʀᴏᴜɴᴅ

A. Parties

In 1993, Mark Okada and appellant James Dondero co-founded Highland Capital Management, L.P. ("Highland Capital") in Dallas. Highland Capital managed portfolios and assets for other investment advisers and funds through a complex of entities under the Highland umbrella. Highland Capital's ownership-interest holders included Hunter Mountain Investment Trust (99.5%); appellant The Dugaboy Investment

2

Trust, Dondero's family trust (0.1866%);[1] Okada, personally and through trusts (0.0627%); and Strand Advisors, Inc. (0.25%), the only general partner, which Dondero wholly owned.

Dondero also manages two of Highland Capital's clients—appellants Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Advisors"). Both the Advisors and Highland Capital serviced and advised billion-dollar, publicly traded investment funds for appellants Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. (collectively, the "Funds"), among others. For example, on behalf of the Funds, Highland Capital managed certain investment vehicles known as collateral loan obligations ("CLOs") under individualized servicing agreements.

### B. Bankruptcy Proceedings

Strapped with a series of unpaid judgments, Highland Capital filed for Chapter 11 bankruptcy in the District of Delaware in October 2019. The creditors included Highland Capital's interest holders, business affiliates, contractors, former partners, employees, defrauded investors, and unpaid law firms. Among those creditors, the Office of the United States Trustee appointed a four-member Unsecured Creditors' Committee (the "Committee").[2] *See* 11 U.S.C. § 1102(a)(1), (b)(1). Throughout the

---

[1] The Dugaboy Investment Trust appeals alongside Dondero's other family trust Get Good Trust (collectively, the "Trusts").

[2] First, Redeemer Committee of the Highland Crusader Fund had obtained a $191 million arbitration award after a decade of litigation against Highland Capital. Second, Acis Capital Management, L.P. and Acis Capital Management GP, LLC had sued Highland Capital after facing an adverse $8 million arbitration award, arising in part from its now-extinguished affiliation. Third, UBS Securities LLC and UBS AG London Branch had received a $1 billion judgment against Highland Capital following a 2019 bench trial in New

000840

No. 21-10449

bankruptcy proceedings, the Committee investigated Highland Capital's past and current operations, oversaw its continuing operations, and negotiated the reorganization plan. *See id.* § 1103(c). Upon the Committee's request, the court transferred the case to the Northern District of Texas in December 2019.

Highland Capital's reorganization did not proceed under the governance of a traditional Chapter 11 trustee. Instead, the Committee reached a corporate governance settlement agreement to displace Dondero, which the bankruptcy court approved in January 2020. Under the agreed order, Dondero stepped down as director and officer of Highland Capital and Strand to be an unpaid portfolio manager and "agreed not to cause any Related Entity . . . to terminate any agreements" with Highland Capital. The Committee selected a board of three independent directors to act as a quasi-trustee and to govern Strand and Highland Capital: James Seery Jr., John Dubel, and retired Bankruptcy Judge Russell Nelms (collectively, the "Independent Directors"). The order also barred any claim against the Independent Directors in their official roles without the bankruptcy court's authorizing the claim as a "colorable claim[] of willful misconduct or gross negligence." Six months later, at the behest of the creditors, the bankruptcy court appointed Seery as Highland Capital's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. The order contained an identical bar on claims against Seery acting in these roles. Neither order was appealed.

Throughout summer 2020, Dondero proposed several reorganization plans, each opposed by the Committee and the Independent Directors.

---

York. Fourth, discovery vendor Meta-E Discovery had $779,000 in unpaid invoices. The Committee members are not parties on appeal.

4

Case 19-34054-sgj11 Doc 3609-1 Filed 08/09/22 Entered 08/09/22 23:45 Desc
Case 3:23-cv-00573-E   Document 13-3 Filed 06/02/23   Page 94 of 148   PageID 1010

Exhibit C   Page 500 of 831

No. 21-10449

Unpersuaded by Dondero, the Committee and Independent Directors
negotiated their own plan. When Dondero's plans failed, he and other
creditors began to frustrate the proceedings by objecting to settlements,
appealing orders, seeking writs of mandamus, interfering with Highland
Capital's management, threatening employees, and canceling trades between
Highland Capital and its clients. *See Highland Cap. Mgmt., L.P. v. Dondero (In
re Highland Cap. Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No.
20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex. June 7,
2021) (holding Dondero in civil contempt, sanctioning him $100,000, and
comparing this case to a "nasty divorce"). In Seery's words, Dondero
wanted to "burn the place down" because he did not get his way. The
Independent Directors insisted Dondero resign from Highland Capital,
which he did in October 2020.

Highland Capital, meanwhile, proceeded toward confirmation of its
reorganization plan—the Fifth Amended Plan of Reorganization of Highland
Capital Management, L.P. (the "Plan"). In August 2020, the Independent
Directors filed the Plan and an accompanying disclosure statement with the
support of the Committee. *See* 11 U.S.C. §§ 1121, 1125. The bankruptcy court
approved the statement as well as proposed notice and voting procedures for
creditors, teeing up confirmation. Leading up to the confirmation hearing,
the Advisors and the Funds asked the court to bar Highland Capital from
trading or disposing of CLO assets pending confirmation. The bankruptcy
court denied the request, and Highland Capital declined to voluntarily
abstain and continued to manage the CLO assets.

Before confirmation, Dondero and other creditors (including several
non-appellants) filed over a dozen objections to the Plan. Like Dondero, the
United States Trustee primarily objected to the Plan's exculpation of certain
non-debtors as unlawful. Highland Capital voluntarily modified the Plan to
resolve six such objections. The Plan proposed to create eleven classes of

000842

DEBTORS_0002015

creditors and equity holders and three classes of administrative claimants. *See* <mark>11 U.S.C. § 1122</mark>. Of the voting-eligible classes, classes 2, 7, and 9 voted to accept the Plan while classes 8, 10, and 11 voted to reject it.

## C. Reorganization Plan

The Plan works like this: It dissolves the Committee, and creates four entities—the Claimant Trust, the Reorganized Debtor, HCMLP GP LLC,[3] and the Litigation Sub-Trust. Administered by its trustee Seery, the Claimant Trust "wind[s]-down" Highland Capital's estate over approximately three years by liquidating its assets and issuing distributions to class-8 and -9 claimants as trust beneficiaries. Highland Capital vests its ongoing servicing agreements with the Reorganized Debtor, which "among other things" continues to manage the CLOs and other investment portfolios. The Reorganized Debtor's only general partner is HCMLP GP LLC. And the Litigation Sub-Trust resolves pending claims against Highland Capital under the direction of its trustee Marc Kirschner.

The whole operation is overseen by a Claimant Trust Oversight Board (the "Oversight Board") comprised of four creditor representatives and one restructuring advisor. The Claimant Trust wholly owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust. The Claimant Trust (and its interests) will dissolve either at the soonest of three years after the effective date (August 2024) or (1) when it is unlikely to obtain additional proceeds to justify further action, (2) all claims and objections are resolved, (3) all distributions are made, and (4) the Reorganized Debtor is dissolved.

---

[3] The Plan calls this entity "New GP LLC," but according to the motion to dismiss as equitably moot, the new general partner was later named HCMLP GP LLC. For the sake of clarity, we use HCMLP GP LLC.

000843

23-10454.3016

No. 21-10449

Anticipating Dondero's continued litigiousness, the Plan shields
Highland Capital and bankruptcy participants from lawsuits through an
exculpation provision, which is enforced by an injunction and a gatekeeper
provision (collectively, "protection provisions"). The protection provisions
extend to nearly all bankruptcy participants: Highland Capital and its
employees and CEO; Strand; the Independent Directors; the Committee;
the successor entities and Oversight Board; professionals retained in this
case; and all "Related Persons"[4] (collectively, "protected parties").[5]

The Plan exculpates the protected parties from claims based on any
conduct "in connection with or arising out of" (1) the filing and
administration of the case, (2) the negotiation and solicitation of votes
preceding the Plan, (3) the consummation, implementation, and funding of
the Plan, (4) the offer, issuance, and distribution of securities under the Plan
before or after the filing of the bankruptcy, and (5) any related negotiations,
transactions, and documentation. But it excludes "acts or omissions that
constitute bad faith, fraud, gross negligence, criminal misconduct, or willful
misconduct" *and* actions by Strand and its employees predating the
appointment of the Independent Directors.

Under the Plan, bankruptcy participants are enjoined "from taking
any actions to interfere with the implementation or consummation of the

---

[4] The Plan generously defines "Related Persons" to include all former, present,
and future officers, directors, employees, managers, members, financial advisors,
attorneys, accountants, investment bankers, consultants, professionals, advisors,
shareholders, principals, partners, heirs, agents, other representatives, subsidiaries,
divisions, and managing companies.

[5] The Plan expressly excludes from the protections Dondero and Okada; NexPoint
Advisors, L.P.; Highland Capital Management Fund Advisors, L.P; their subsidiaries,
managed entities, managed entities, and members; and the Dugaboy Investment Trust and
its trustees, among others.

7

000844
APP-844-017

Plan" or filing any claim related to the Plan or proceeding. Should a party seek to bring a claim against any of the protected parties, it must go to the bankruptcy court to "first determin[e], after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind." Only then may the bankruptcy court "specifically authoriz[e]" the party to bring the claim. The Plan reserves for the bankruptcy court the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable" and then to adjudicate the claim if the court has jurisdiction over the merits.

## D. Confirmation Order

At a February 2021 hearing, the bankruptcy court confirmed the Plan from the bench over several remaining objections. *See* Fed R. Bankr. P. 3017–18; 11 U.S.C. §§ 1126, 1128, 1129. In its later-written decision, the bankruptcy court observed that Highland Capital's bankruptcy was "not a garden variety chapter 11 case." The type of debtor, the reason for the bankruptcy filing, the kinds of creditor claims, the corporate governance structure, the unusual success of the mediation efforts, and the small economic interests of the current objectors all make this case unique.

The confirmation order criticized Dondero's behavior before and during the bankruptcy proceedings. The court could not "help but wonder" if Highland Capital's deficit "was necessitated because of enormous litigation fees and expenses incurred" due to Highland Capital's "culture of litigation." Recounting Highland Capital's litigation history, it deduced that Dondero is a "serial litigator." It reasoned that, while "Dondero wants his company back," this "is not a good faith basis to lob objections to the Plan." It attributed Dondero's bad faith to the Advisors, the Trusts, and the Funds, given the "remoteness of their economic interests." For example, the bankruptcy court "was not convinced of the[] [Funds'] independence" from Dondero because the Funds' board members did not testify and had

000845

No. 21-10449

"engaged with the Highland complex for many years." And so the bankruptcy court "consider[ed] them all to be marching pursuant to the orders of Mr. Dondero." The court, meanwhile, applauded the members of the Committee for their "wills of steel" for fighting "hard before and during this Chapter 11 Case" and "represent[ing] their constituency . . . extremely well."

On the merits of the Plan, the bankruptcy court again approved the Plan's voting and confirmation procedures as well as the fairness of the Plan's classes. *See* 11 U.S.C. §§ 1122, 1125(a)–(c). The court held the Plan complied with the statutory requirements for confirmation. *See id.* §§ 1123(a)(1)–(7), 1129(a)(1)–(7), (9)–(13). Because classes 8, 10, and 11 had voted to reject the Plan, it was confirmable only by cramdown.[6] *See id.* § 1129(b). The bankruptcy court found that the Plan treated the dissenting classes fairly and equitably and satisfied the absolute-priority rule, so the Plan was confirmable. *See id.* § 1129(b)(2)(B)–(C). The court also concluded that the protection provisions were fair, equitable, and reasonable, as well as "integral elements" of the Plan under the circumstances, and were within both the court's jurisdiction and authority. The court confirmed the Plan as proposed and discharged Highland Capital's debts. *Id.* § 1141(d)(1). After confirmation and satisfaction of several conditions precedent, the Plan took effect August 11, 2021.

---

[6] The bankruptcy court must proceed by nonconsensual confirmation, or "cramdown," 11 U.S.C. § 1129(b), when a class of unsecured creditors rejects a Chapter 11 reorganization plan, *id.* § 1129(a)(8), but at least one impaired class accepts it, *id.* § 1129(a)(10). A cramdown requires that the plan be "fair and equitable" to dissenting classes and satisfy the absolute priority rule—that is, dissenting classes are paid in full before any junior class can retain any property. *Id.* § 1129(b)(2)(B); *see Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).

000846

No. 21-10449

## E. The Appeal

Dondero, the Advisors, the Funds, and the Trusts (collectively, "Appellants") timely appealed, objecting to the Plan's legality and some of the bankruptcy court's factual findings.[7] Together with Highland Capital, Appellants moved to directly appeal the confirmation order to this court, which the bankruptcy court granted. *See* 28 U.S.C. § 158(d). A motions panel certified and consolidated the direct appeals. *See ibid.* Both the bankruptcy court and the motions panel declined to stay the Plan's confirmation pending appeal. Given the Plan's substantial consummation since its confirmation, Highland Capital moved to dismiss the appeal as equitably moot, a motion the panel ordered carried with the case.

\* \* \*

We first consider equitable mootness and decline to invoke it here. We then turn to the merits, conclude the Plan exculpates certain non-debtors beyond the bankruptcy court's authority, and affirm in all other respects.

## II. Standard of Review

A confirmation order is an appealable final order, over which we have jurisdiction. *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015); *see* 28 U.S.C. §§ 158(d), 1291. This court reviews a bankruptcy court's factual findings for clear error and legal conclusions *de novo. Evolve Fed. Credit Union v. Barragan-Flores (In re Barragan-Flores)*, 984 F.3d 471, 473 (5th Cir. 2021) (citation omitted).

---

[7] The Trusts adopt the Funds' and the Advisors' briefs in full, and Dondero adopts the Funds' brief in full and the Advisors' brief in part. **Fed. R. App. P. 28(i).**

10

000847

## III. Equitable Mootness

Highland Capital moved to dismiss this appeal as equitably moot. It argues we should abstain from appellate review because clawing back the implemented Plan "would generate untold chaos." We disagree and deny the motion.

The judge-made doctrine of equitable mootness allows appellate courts to abstain from reviewing bankruptcy orders confirming "complex plans whose implementation has substantial secondary effects." *New Indus., Inc. v. Byman (In re Sneed Shipbuilding, Inc.)*, 916 F.3d 405, 409 (5th Cir. 2019) (citing *In re Trib. Media Co.*, 799 F.3d 272, 274, 281 (3d Cir. 2015)). It seeks to balance "the equitable considerations of finality and good faith reliance on a judgment" and "the right of a party to seek review of a bankruptcy order adversely affecting him." *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (quoting *First Union Real Estate Equity & Mortg. Inv. v. Club Assocs. (In re Club Assocs.)*, 956 F.3d 1065, 1069 (11th Cir. 1992)); *see In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008); *see also* 7 Collier on Bankruptcy ¶ 1129.09 (16th ed.), LexisNexis (database updated June 2022) (observing "the equitable mootness doctrine is embraced in every circuit").[8]

This court uses equitable mootness as a "scalpel rather than an axe," applying it claim-by-claim, instead of appeal-by-appeal. *In re Pac. Lumber*

---

[8] The doctrine's atextual balancing act has been criticized. *See In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) ("Despite its apparent virtues, equitable mootness is a judicial anomaly."); *In re One2One Commc'ns, LLC*, 805 F.3d 428, 438–54 (3rd Cir. 2015) (Krause, J., concurring); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (banishing the term "equitable mootness" as a misnomer); *In re Cont'l Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (en banc) (Alito, J., dissenting); *see also* Bruce A. Markell, *The Needs of the Many: Equitable Mootness' Pernicious Effects*, 93 Am. Bankr. L.J. 377, 393–96 (2019) (addressing the varying applications between circuits). *But see In re Trib. Media*, 799 F.3d at 287–88 (Ambro, J., concurring) (highlighting some benefits of the equitable mootness doctrine).

000848

No. 21-10449

*Co.(Pacific Lumber)*, 584 F.3d 229, 240–41 (5th Cir. 2009). For each claim, we analyze three factors: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re Manges*, 29 F.3d at 1039 (citing *In re Block Shim Dev. Co.*, 939 F.2d 289, 291 (5th Cir. 1991); and *Cleveland, Barrios, Kingsdorf & Casteix v. Thibaut*, 166 B.R. 281, 286 (E.D. La. 1994)); *see also, e.g.*, *In re Blast Energy Servs.*, 593 F.3d 418, 424–25 (5th Cir. 2010); *In re Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022). No one factor is dispositive. *See In re Manges*, 29 F.3d at 1039.

Here, the bankruptcy court and this court declined to stay the Plan pending appeal, and it took effect August 11, 2021. Given the months of progress, no party meaningfully argues the Plan has not been substantially consummated.[9] *See Pacific Lumber*, 584 F.3d at 242 (observing "consummation includes transferring all or substantially all of the property

---

[9] Since the Plan's effectuation, Highland Capital paid $2.2 million in claims to a committee member and $525,000 in "cure payments" to other counterparties. The independent directors resigned. The Reorganized Debtor, the Claimant Trust, HCMLP GP LLC, and the Litigation Sub-Trust were created and organized in accordance with the Plan. The bankruptcy court appointed the Oversight Board members, the Litigation Sub-Trust trustee, and the Claimant Trust trustee. Highland Capital assumed certain service contracts, including management of twenty CLOs with approximately $700 million in assets, and transferred its assets and estate claims to the successor entities. Highland Capital's pre-petition partnership interests were cancelled and cease to exist. A third party, Blue Torch Capital, infused $45 million in exit financing, fully guaranteed by the Reorganized Debtor, its operating subsidiaries, the Claimant Trust, and most of their assets. From the exit financing, an Indemnity Trust was created to indemnify claims that arise against the Reorganized Debtor, Claimant Trust, Ligation Sub-Trust, Claimant Trustee, Litigation Trustee, or Oversight Board members. The lone class-1 creditor withdrew its claim against Highland Capital. The lone class-2 creditor has been fully paid approximately $500,000 and issued a note of $5.2 million secured by $23 million of the Reorganized Debtor's assets. Classes 3 and 4 have been paid $165,412. Class 7 has received $5.1 million in distributions from the Claimant Trust, totaling 77% of class-7 claims filed.

000849

Case 3:21-cv-00534 Document 60-1 Filed 09/29/22 Page 342 of 433 Date Filed 07/15/2022 Desc
Case 3:23-cv-00573-E   Document 1-3   Filed 05/02/23   Page 102 of 148   PageID 1018

covered by the plan, the assumption of business by the debtors' successors, and the commencement of plan distributions" (citing 11 U.S.C. § 1141; and *In re Manges*, 29 F.3d at 1041 n.10)). But that alone does not trigger equitable mootness. *See In re SCOPAC*, 624 F.3d 274, 281–82 (5th Cir. 2010). Instead, for each claim, the inquiry turns on whether the court can craft relief for that claim that would not have significant adverse consequences to the reorganization. Highland Capital highlights four possible disruptions: (1) the unraveling of the Claimant Trust and its entities, (2) the expense of disgorging disbursements, (3) the threat of defaulting on exit-financing loans, and (4) the exposure to vexatious litigation.

Each party first suggests its own all-or-nothing equitable mootness applications. To Highland Capital, Appellants' broad requested remedy with only a minor economic stake demands mooting the entire appeal. To Appellants, the type of reorganization plan categorially bars equitable mootness, or, alternatively, Highland Capital's joining the motion to certify the appeal estops it from asserting equitable mootness. These arguments are unpersuasive and foreclosed by *Pacific Lumber*.

First, Highland Capital contends the entire appeal is equitably moot because Appellants, with only a minor economic stake and questionable good faith, "seek[] nothing less than a complete unravelling of the confirmed Plan." It claims the court cannot "surgically excise[]" certain provisions, as the Funds request, because the Bankruptcy Code prohibits "modifications to confirmed plans after substantial consummation." *See* 11 U.S.C. § 1127(b). Not so.

"Although the Bankruptcy Code . . . restricts post-confirmation plan modifications, it does not expressly limit appellate review of plan confirmation orders." *Pacific Lumber*, 584 F.3d at 240 (footnote omitted) (citing 11 U.S.C. § 1127). This court may fashion "fractional relief" to

000850

Case 19-34054-sgj11 Doc 3608-6 Filed 08/29/22 Entered 08/29/22 Page 343
Case 3:23-cv-00573-E   Document 11-3   Filed 05/02/23   Page 103 of 148   PageID 1019

minimize an appellate disturbance's effect on the rights of third parties. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (denying dismissal on equitable mootness grounds because the court "could grant partial relief . . . without disturbing the reorganization"); *cf. In re Cont'l Airlines*, 91 F.3d 553, 571–72 (3d Cir. 1996) (en banc) (Alito, J., dissenting) (observing "a remedy could be fashioned in the present case to ensure that the [debtor's] reorganization is not undermined"). In short, Highland Capital's speculations are farfetched, as the court may fashion the remedy it sees fit without upsetting the reorganization.

Second, Appellants contend that equitable mootness cannot apply—full-stop—because this appeal concerns a liquidation plan, not a reorganization plan. We reject that premise. *See infra* Part IV.A. Even if it were correct, however, this court has conducted the equitable-mootness inquiry for a Chapter 11 liquidation plan in the past. *See In re Superior Offshore Int'l, Inc.*, 591 F.3d 350, 353–54 (5th Cir. 2009). And other circuits have squarely rejected the categorical bar proposed by Appellants. *See In re Abengoa Bioenergy Biomass of Kan., LLC*, 958 F.3d 949, 956–57 (10th Cir. 2020); *In re BGI, Inc.*, 772 F.3d 102, 107–09 (2d Cir. 2014). We do the same.

Finally, Appellants assert that because Highland Capital and NexPoint Advisors, L.P. jointly moved to certify the appeal, it should be estopped from arguing the appeal is equitably moot. They cite no legal support for that approach. We decline to adopt it.

Instead, we proceed with a claim-by-claim analysis, as our precedent requires. Highland Capital suggests only two claims are equitably moot: (1) the protection-provisions challenge and (2) the absolute-priority-rule challenge. Neither provides a basis for equitable mootness.

For the protection provisions, Highland Capital anticipates that, without the provisions, its officers, employees, trustees, and Oversight Board

000851
3.23-cv-1024

members would all resign rather than be exposed to Dondero-initiated litigation. Those resignations would disrupt the Reorganized Debtor's operation, "significant[ly] deteriorat[ing] asset values due to uncertainty." Appellants disagree, offering several instances when this court has reviewed release, exculpation, and injunction provisions over calls for equitable mootness. *See, e.g.*, *In re Hilal*, 534 F.3d at 501; *Pacific Lumber*, 584 F.3d at 252; *In re Thru Inc.*, 782 F. App'x 339, 341 (5th Cir. 2019) (per curiam). In response, Highland Capital distinguishes this case because the provisions are "integral to the consummated plans." *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 486 (2d Cir. 2012). We again reject that premise. *See infra* Part IV.E.1. In any event, Appellants have the better argument.

We have before explained that "equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008). That is so because "the goal of finality sought in equitable mootness analysis does not outweigh a court's duty to protect the integrity of the process." *Pacific Lumber*, 584 F.3d at 252. As in *Pacific Lumber*, the legality of a reorganization plan's non-consensual non-debtor release is consequential to the Chapter 11 process and so should not escape appellate review in the name of equity. *Ibid.* The same is true here. Equitable mootness does not bar our review of the protection provisions.

For the absolute-priority-rule challenge,[10] Highland Capital contends our review requires us to "rejigger class recoveries." *Pacific Lumber* is again instructive. There, the court declined to apply equitable mootness to a secured creditor's absolute-priority-rule challenge, as no other panel had

---

[10] While the issue is nearly forfeited for inadequate briefing, it fails on the merits regardless. *See Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020).

000852

extended the doctrine so far. *Id.* at 243. Similarly, Highland Capital fails to identify a single case in which this court has declined review of the treatment of a class of creditor's claims resulting from a cramdown. *See id.* at 252. Regardless, Appellants challenge the distributions to classes 8, 10, and 11. According to Highland Capital's own declaration, "Class 8 General Unsecured Claims have received their Claimant Trust Interests." But there is no evidence that classes 10 or 11 have received any distributions. *Contra Pacific Lumber*, 584 F.3d at 251 (holding certain claims equitably moot where "the smaller unsecured creditors" had already "received payment for their claims"). As a result, the relief requested would not affect third parties or the success of the Plan. *See In re Manges*, 29 F.3d at 1039. The doctrine of equitable mootness does not bar our review of the cramdown and treatment of class-8 creditors.

We DENY Highland Capital's motion to dismiss the appeal as equitably moot.

## IV. Discussion

As to the merits, Appellants fire a bankruptcy-law blunderbuss. They contest the Plan's classification as a reorganization plan, the Plan's satisfaction of the absolute priority rule, the Plan's confirmation despite Highland Capital's noncompliance with Bankruptcy Rule 2015.3, and the sufficiency of the evidence supporting the court's factual finding that the Funds are "owned/controlled" by Dondero. For each, we disagree and affirm. We do, however, agree with Appellants that the bankruptcy court exceeded its statutory authority under § 524(e) by exculpating certain non-debtors, and so we reverse and vacate the Plan only to that extent.

### A. Discharge of Debt

We begin with the Plan's classification as a reorganization plan, allowing for automatic discharge of the debts. The confirmation of a Chapter

000853

No. 21-10449

11 restructuring plan "discharges the debtor from any [pre-confirmation] debt" unless, under the plan, the debtor liquidates its assets, stops "engag[ing] in [its] business after consummation of the plan," and would be denied discharge in a Chapter 7 case. 11 U.S.C. § 1141(d)(1), (3); *see In re Sullivan*, No. 99-11107, 2000 WL 1597984, at *2 (5th Cir. Sept. 26, 2000) (per curiam). The bankruptcy court concluded Highland Capital continued to engage in business after plan consummation, so its debts are automatically discharged. The Trusts call foul because, in their view, Highland Capital's "wind down" of its portfolio management is not a continuation of its business. We disagree.

Whether a corporate debtor "engages in business" is "relatively straightforward." *Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018) (contrasting the more complex question for individual debtors); *see Grausz v. Sampson (In re Grausz)*, 63 F. App'x 647, 650 (4th Cir. 2003) (per curiam) (same). That is, "a business entity will not engage in business post-bankruptcy when its assets are liquidated and the entity is dissolved." *Um*, 904 F.3d at 819 (collecting cases).[11] But even a temporary continuation of business after a plan's confirmation is sufficient to discharge a Chapter 11 debtor's debt. *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 804 n.15 (5th Cir. 1997) (recognizing a debtor's "conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B)" (citation omitted)). That is the case here.

---

[11] *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. 832, 853 (Bankr. N.D. Cal. 2003) (holding corporate debtor was not engaging in business by merely having directors and officers, rights under an insurance policy, and claims against it); *In re Wood Fam. Ints., Ltd.*, 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (holding corporate debtor was not engaging in business when the plan called for liquidation and discontinuation of its business upon confirmation).

000854

No. 21-10449

By the plain terms of the Plan, Highland Capital has and will continue its business as the Reorganized Debtor for several years. Indeed, much of this appeal concerns objections to Highland Capital's "continu[ing] to manage the assets of others." Because the Plan contemplates Highland Capital "engag[ing] in business after consummation," 11 U.S.C. § 1141(d)(1), the bankruptcy court correctly held Highland Capital was eligible for automatic discharge of its debts.[12]

## B. Absolute Priority Rule

Next, we consider the Plan's compliance with the absolute-priority rule. When assessing whether a plan is "fair and equitable" in a cramdown scenario, courts must invoke the absolute-priority rule. 11 U.S.C. § 1129(b)(1); *see* 7 Collier on Bankruptcy ¶ 1129.04. Under that rule, if a class of unsecured claimants rejects a plan, the plan must provide that those claimants be paid in full on the effective date *or* any junior interest "will not receive or retain under the plan . . . any property." 11 U.S.C. § 1129(b)(2)(B).[13]

Because class-8 claimants voted against the Plan, the bankruptcy court proceeded by nonconsensual confirmation. The court concluded the Plan was fair and equitable to class 8 and its distributions were in line with the absolute-priority rule. 11 U.S.C. § 1129(b)(2)(B). The Advisors claim the Plan violates the absolute priority rule by giving class-10 and -11 claimants a

---

[12] For the same reasons, we reject the Trusts' follow-on argument extending the same logic to the protection provisions.

[13] *See Pacific Lumber*, 584 F.3d at 244 (noting the rule "enforces a strict hierarchy of [creditor classes'] rights defined by state and federal law" to protect dissenting creditor classes); *see also In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002) ("[U]nsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." (citations omitted)).

18

000855
000028

"Contingent Claimant Trust Interest" without fully satisfying class-8 claimants. We agree the absolute-priority rule applies, and the Plan plainly satisfies it.

The Plan proposed to pay 71% of class-8 creditors' claims with *pro rata* distributions of interest generated by the Claimant Trust and then *pro rata* distributions from liquidated Claimant Trust assets. Classes 10 and 11 received a *pro rata* share of "Contingent Claimant Trust Interests," defined as a Claimant Trust Interest vesting only when the Claimant Trustee certifies that all class-8 claimants have been paid indefeasibly in full and all disputed claims in class 8 have been resolved. Voilà: no interest junior to class 8 will receive any property until class-8 claimants are paid.

But the Advisors point to Highland Capital's testimony and briefs to suggest the Contingent Claimant Trust Interests (received by classes 10 and 11) are property in some sense because they have value. That argument is specious. Of course, the Contingent Claimant Trust Interests have some small probability of vesting in the future and, thus, has some *de minimis* present value. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (holding a junior creditor's receipt of a presently valueless equity interest is receipt of property). But the absolute-priority rule has never required us to bar junior creditors from ever receiving property. By the Plan's terms, no trust property vests with class-10 or -11 claimants "unless and until" class-8 claims "have been paid indefeasibly in full." *See* 11 U.S.C. § 1129(b)(2)(B)(ii). That plainly comports with the absolute-priority rule.

## C. Bankruptcy Rule 2015.3

We turn to whether the failure to comply with Bankruptcy Rule of Procedure 2015.3 bars the Plan's confirmation. The Independent Directors failed to file periodic financial reports per Federal Rule of Bankruptcy Procedure 2015.3(a) about entities "in which the [Highland Capital] estate

000856

holds a substantial or controlling interest." The Advisors claim the failure dooms the Plan's confirmation because the Plan proponent failed to comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). We disagree.

Rule 2015.3 cannot be an applicable provision of Title 11 because the Federal Rules of Bankruptcy Procedure are not provisions of the Bankruptcy Code. *See Bonner v. Adams (In re Adams)*, 734 F.2d 1094, 1101 (5th Cir. 1984) ("The Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075, provides that the Supreme Court may prescribe 'by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure' in bankruptcy courts."); *cf. In re Mandel*, No. 20-40026, 2021 WL 3642331, at *6 n.7 (5th Cir. Aug. 17, 2021) (per curiam) (noting "Rule 2015.3 implements section 419 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005," which amended 28 U.S.C. § 2073). The Advisors' attempt to tether the rule to the bankruptcy trustee's general duties lacks any legal basis. *See* 11 U.S.C. §§ 704(a)(8), 1106(a)(1), 1107(a). The bankruptcy court, therefore, correctly overruled the Advisors' objection.

### D. Factual Findings

One factual finding is in dispute, but we see no clear error. The bankruptcy court found that, despite their purported independence, the Funds are entities "owned and/or controlled by [Dondero]." The Funds ask the court to vacate the factual finding because it threatens the Funds' compliance with federal law and damages their reputations and values. According to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him. Highland Capital maintains Dondero has sole discretion over the Funds as their portfolio manager and through his control of the Advisors, so the finding is supported by the record.

000857

No. 21-10449

"Clear error is a formidable standard: this court disturbs factual findings only if left with a firm and definite conviction that the bankruptcy court made a mistake." *In re Krueger*, 812 F.3d 365, 374 (5th Cir. 2016) (cleaned up). We defer to the bankruptcy court's credibility determinations. *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587–88 (5th Cir. 1999).

Here, the bankruptcy court drew its factual finding from the testimony of Jason Post, the Advisors' chief compliance officer, and Dustin Norris, an executive vice president for the Funds and the Advisors. Post testified that the Funds have independent board members that run them. But the bankruptcy court found Post not credible because "he abruptly resigned" from Highland Capital at the same time as Dondero and is currently employed by Dondero. Norris testified that Dondero "owned and/or controlled" the Funds and Advisors. The bankruptcy court found Norris credible and relied on his testimony. The bankruptcy court also observed that none of the Funds' board members testified in the bankruptcy case and all "engaged with the Highland complex for many years." Because nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are "owned and/or controlled by [Dondero]," we leave the bankruptcy court's factual finding undisturbed.

## E. The Protection Provisions

Finally, we address the legality of the Plan's protection provisions. As discussed, the Plan exculpates certain non-debtor third parties supporting the Plan from post-petition lawsuits not arising from gross negligence, bad faith, or willful or criminal misconduct. It also enjoins certain parties "from taking any actions to interfere with the implementation or consummation of the Plan." The injunction requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as

21

No. 21-10449

"colorable"—*i.e.*, the bankruptcy court acts as a gatekeeper. Together, the provisions screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness.

The bankruptcy court deemed the provisions legal, necessary under the circumstances, and in the best interest of all parties. We agree, but only in part. Though the injunction and gatekeeping provisions are sound, the exculpation of certain non-debtors exceeds the bankruptcy court's authority. We reverse and vacate that limited portion of the Plan.

### 1. *Non-Debtor Exculpation*

We start with the scope of the non-debtor exculpation. In a Chapter 11 bankruptcy proceeding, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Contrary to the bankruptcy court's holding, the exculpation here partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors. *See Pacific Lumber*, 584 F.3d 251–53. We must reverse and strike the few unlawful parts of the Plan's exculpation provision.

The parties agree that *Pacific Lumber* controls and also that the bankruptcy court had the power to exculpate both Highland Capital and the Committee members. Appellants, however, submit the bankruptcy court improperly stretched *Pacific Lumber* to shield other non-debtors from breach-of-contract and negligence claims, in violation of § 524(e). Highland Capital counters that the exculpation provision is a commonplace Chapter 11 term, is appropriate given Dondero's litigious nature, does not implicate § 524(e), and merely provides a heightened standard of care.

To support that argument, Highland Capital highlights the distinction between a concededly unlawful release of all non-debtor liability and the

000859

No. 21-10449

Plain's limited exculpation of non-debtor post-petition liability. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (describing releases as "eliminating" a covered party's liability "altogether" while exculpation provisions "set[] forth the applicable standard of liability" in future litigation). According to Highland Capital, the Third and Ninth Circuits have adopted that distinction when applying § 524(e). *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394 (2021); *In re PWS Holding*, 228 F.3d at 246–47. Under those cases, narrow exculpations of post-petition liability for certain critical third-party non-debtors are lawful "appropriate" or "necessary" actions for the bankruptcy court to carry out the proceeding through its statutory authority under § 1123(b)(6) and § 105(a). *See* 11 U.S.C. § 1123(b)(6) ("[A] plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title."); *id* § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Highland Capital reads *Pacific Lumber* as "in step with the law in [those] other circuits" by allowing a limited exculpation of post-petition liability. *Cf. Blixseth*, 961 F.3d at 1084. We disagree. As the Ninth Circuit acknowledged, our court in *Pacific Lumber* arrived at "a conclusion opposite [the Ninth Circuit's]." 961 F.3d at 1085 n.7. Moreover, the Ninth Circuit expressly disavowed *Pacific Lumber*'s rationale—that an exculpation provision provides a "fresh start" to a non-debtor in violation of § 524(e)— because, in the Ninth Circuit's view, the post-petition exculpation "affects only claims arising from the bankruptcy proceedings themselves." *Ibid.* We are not persuaded, as Highland Capital contends, that the Ninth Circuit was "sloppy" and simply "misread *Pacific Lumber*." *See* O.A. Rec. 19:45–21:38.

23

Case 3:23-cv-00573-E   Document 11-3   Filed 05/25/23   Page 113 of 148   PageID 1029

The simple fact of the matter is that there is a circuit split concerning the effect and reach of § 524(e).[14] Our court along with the Tenth Circuit hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code. *Pacific Lumber*, 584 F.3d at 252–53; *Landsing Diversified Props. v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600 (10th Cir. 1990) (per curiam). By contrast, the Ninth Circuit joins the Second, Third, Fourth, Sixth, Seventh, and Eleventh Circuits in reading § 524(e) to allow varying degrees of limited third-party exculpations. *Blixseth*, 961 F.3d at 1084; *accord In re PWS Holding*, 228 F.3d at 246–47 (allowing third-party releases for "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Airadigm Commc'ns., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2015).

Our *Pacific Lumber* decision was not blind to the countervailing view, as it twice cites the Third Circuit's contrary holding in other contexts. *See* 584 F.3d at 241, 253 (citing *In re PWS Holding*, 228 F.3d at 236–37, 246). But we rejected the parsing between limited exculpations and full releases that Highland Capital now requests. We are obviously bound to apply our own precedent. *See Hidalgo Cnty. Emergency Serv. Found. v. Carranza (In re Hidalgo Cnty. Emergency Serv. Found.)*, 962 F.3d 838, 841 (5th Cir. 2020)

---

[14] Amicus's contention that failing to adopt the Ninth Circuit's holding "would generate a clear circuit split" is wrong. There already is one. *See* Petition for Writ of Certiorari, *Blixseth v. Credit Suisse*, 141 S. Ct. 1394 (No. 20-1028) (highlighting the circuits' divergent approaches to the non-debtor discharge bar under § 524(e)).

000861

Case 3:23-cv-00573-E Document 11-3 Filed 05/26/23 Page 114 of 148 PageID 1030

("Under our well-recognized rule of orderliness, . . . a panel of this court is bound by circuit precedent." (citation omitted)).

Under *Pacific Lumber*, § 524(e) does not permit "absolv[ing] the [non-debtor] from any negligent conduct that occurred during the course of the bankruptcy" absent another source of authority. 584 F.3d at 252–53; *see also In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995). At oral argument, Highland Capital pointed only to § 1123(b)(6) and § 105(a) as footholds. *See* O.A. Rec. 16:45–17:28. But in this circuit, § 105(a) provides no statutory basis for a non-debtor exculpation. *In re Zale*, 62 F.3d 760 (noting "[a] § 105 injunction cannot alter another provision of the code" (citing *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993))). And the same logic extends to § 1123(b)(6), which allows a plan to "include any other appropriate provision *not inconsistent with the applicable provisions of this title.*" 11 U.S.C. § 1123(b)(6) (emphasis added).

*Pacific Lumber* identified two sources of authority to exculpate non-debtors. *See* 584 F.3d at 252–53. The first is to channel asbestos claims (not present here). *Id.* at 252 (citing 11 U.S.C. § 524(g)). The second is to provide a limited qualified immunity to creditors' committee members for actions within the scope of their statutory duties. *Pacific Lumber*, 584 F.3d at 253 (citing 11 U.S.C. § 1103(c)); *see In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012). And, though not before the court in *Pacific Lumber*, we have also recognized a limited qualified immunity to bankruptcy trustees unless they act with gross negligence. *In re Hilal*, 534 F.3d at 501 (citing *In re Smyth*, 207 F.3d 758, 762 (5th Cir. 2000)); *accord Baron v. Sherman (In re Ondova Ltd.)*, 914 F.3d 990, 993 (5th Cir. 2019) (per curiam). If other sources exist, Highland Capital failed to identify them. So we see no statutory authority for the full extent of the exculpation here.

000862

The bankruptcy court read *Pacific Lumber* differently. In its view, *Pacific Lumber* created an additional ground to exculpate non-debtors: when the record demonstrates that "costs [a party] might incur defending against suits alleging such negligence are likely to swamp either [it] or the consummated reorganization." 584 F.3d at 252. We do not read the decision that way. The bankruptcy court's underlying factual findings do not alter whether it has statutory authority to exculpate a non-debtor. That is the holding of *Pacific Lumber*.

That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*. We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital. Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee. *See* 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01. It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence. *See In re Hilal*, 534 F.3d at 501. Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

In sum, our precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties, *see Baron*, 914 F.3d at 993. And so, excepting the Independent Directors and the Committee members, the exculpation of non-debtors here was unlawful.

000863

No. 21-10449

Accordingly, the other non-debtor exculpations must be struck from the Plan. *See Pacific Lumber*, 584 F.3d at 253.[15]

As it stands, the Plan's exculpation provision extends to Highland Capital and its employees and CEO; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." Consistent with § 524(e), we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors.

_____

[15] Highland Capital, like the bankruptcy court, claims the *res judicata* effect of the January and July 2020 orders appointing the independent directors and appointing Seery as CEO binds the court to include the protection provisions here. We lack jurisdiction to consider collateral attacks on final bankruptcy orders even when it concerns whether the court properly exercised jurisdiction or authority at the time. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *In re Linn Energy, L.L.C.*, 927 F.3d 862, 866–67 (5th Cir. 2019) (quoting *Bailey*, 557 U.S. at 152). To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded.

As a result, the bankruptcy court was correct insofar as *those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities, but it was incorrect that *res judicata* mandates their inclusion in the Plan's new exculpation provision. Despite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 orders, given the orders' ongoing *res judicata* effects and our lack of jurisdiction to review those orders. But that says nothing of the effect of the Plan's exculpation provision.

000864

No. 21-10449

### 2. *Injunction & Gatekeeper Provisions*

We now turn to the Plan's injunction and gatekeeper provisions. Appellants object to the bankruptcy court's injunction as vague and the gatekeeper provision as overbroad. We are unpersuaded.

First, Appellants' primary contention—that the Plan's injunction "is broad" by releasing non-debtors in violation of § 524(e)—is resolved by our striking the impermissibly exculpated parties. *See supra* Part IV.E.1.

Second, Appellants dispute the permanency of the injunction for the legally exculpated parties by enjoining conduct "on and after the Effective Date." Even assuming the issue was preserved,[16] permanency alone is no reason to alter a bankruptcy court's otherwise-lawful injunction on appeal. *See In re Zale*, 62 F.3d at 759–60 (recognizing the bankruptcy court's jurisdiction to issue an injunction in the first place allowed it to issue a permanent injunction).

Third, the Advisors argue that the injunction is "overbroad and vague" because it does not define what it means to "interfere" with the "implementation or consummation of the Plan." That is unsupported by the record. As the bankruptcy court recognized, the Plan defined what constitutes interference: (i) filing a lawsuit, (ii) enforcing judgments, (iii) enforcing security interests, (iv) asserting setoff rights, or (v) acting "in any manner" not conforming with the Plan. The injunction is not unlawfully overbroad or vague.

Finally, Appellants maintain that the gatekeeper provision impermissibly extends to unrelated claims over which the bankruptcy court

---

[16] *See Roy*, 950 F.3d at 251 ("Failure adequately to brief an issue on appeal constitutes waiver of that argument." (citation omitted)).

000865

No. 21-10449

lacks subject-matter jurisdiction. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (noting a bankruptcy court retains jurisdiction post-confirmation only over "matters pertaining to the implementation or execution of the plan" (citations omitted)). While that may be the case, our precedent requires we leave that determination to the bankruptcy court in the first instance.

Courts have long recognized bankruptcy courts can perform a gatekeeping function. Under the "*Barton* doctrine," the bankruptcy court may require a party to "obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added) (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)); *accord Barton v. Barbour*, 104 U.S. 126 (1881).[17] In *Villegas*, we held "that a party must continue to file with the relevant bankruptcy court for permission to proceed with a claim against the trustee." 788 F.3d at 158. Relevant here, we left to the bankruptcy court, faced with pre-approval of a claim, to determine whether it had subject matter jurisdiction over that claim in the first instance. *Id.* at 158–59; *see, e.g.*, *Carroll v. Abide*, 788 F.3d 502, 506–07 (5th Cir. 2015) (noting *Villegas* "rejected an argument that the *Barton* doctrine does not apply when the bankruptcy court lacked jurisdiction"). In other words, we need not evaluate whether the bankruptcy court would have

---

[17] The Advisors also maintain that Highland Capital is neither a receiver nor a trustee, so *Barton* has no application here. We disagree. Highland Capital, for all practical purposes, was a debtor in possession entitled to the rights of a trustee. *See* 7 COLLIER ON BANKRUPTCY ¶ 1101.01 ("The debtor in possession is generally vested with all of the rights and powers of a trustee as set forth in section 1106 . . . ."); *see also Carter*, 220 F.3d at 1252 n.4. (finding no distinction between bankruptcy court "approved" and bankruptcy court "appointed" officers).

29

000866

No. 21-10449

jurisdiction under every conceivable claim falling under the widest interpretation of the gatekeeper provision. We leave that to the bankruptcy court in the first instance.[18]

\*　　\*　　\*

In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. The exculpatory order is therefore vacated as to all parties *except* Highland Capital, the Committee and its members, and the Independent Directors for conduct within the scope of their duties. We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.[19]

## V. Conclusion

Highland Capital's motion to dismiss the appeal as equitably moot is DENIED. The bankruptcy court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

[18] For the same reasons, we also leave the applicability of *Barton*'s limited statutory exception to the bankruptcy and district courts in the first instance. *See* 28 U.S.C. § 959(a) (allowing suit, without leave of the appointing court, if the challenged acts relate to the trustee or debtor in possession "carrying on business connected with [their] property").

[19] Nothing in this opinion should be construed to hinder the bankruptcy court's power to enjoin and impose sanctions on Dondero and other entities by following the procedures to designate them vexatious litigants. *See In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (per curiam). But non-debtor exculpation within a reorganization plan is not a lawful means to impose vexatious litigant injunctions and sanctions.


000867

# TAB 8



# United States Court of Appeals
# for the Fifth Circuit

Certified as a true copy and issued
as the mandate on May 24, 2023

Attest: *Jyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

No. 23-90013

---

IN THE MATTER OF HIGHLAND CAPITAL MANAGEMENT, L.P.

*Debtor,*

NEXPOINT ADVISORS, ; HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P., *now known as* NEXPOINT ASSET
MANAGEMENT, L.P.,

*Petitioners,*

*versus*

HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Respondent.*

---

Motion for Leave to Appeal
Pursuant to 28 U.S.C. § 158(D)

---

## UNPUBLISHED ORDER

Before KING, JONES, and SMITH, *Circuit Judges.*

PER CURIAM:

 IT IS ORDERED that the motion for leave to appeal under
28 U.S.C. § 158(d) is GRANTED.



Exhibit

A

# TAB 9

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
for the Fifth Circuit

Fifth Circuit

## No. 21-10449

No. 21-10449
United
States Court
of Appeals

**FILED** August 19
September 7, 2022

Lyle W. Cayce
Clerk

IN THE MATTER OF: HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Debtor*,

NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P.; HIGHLAND INCOME FUND; NEXPOINT
STRATEGIC OPPORTUNITIES FUND; HIGHLAND GLOBAL
ALLOCATION FUND; NEXPOINT CAPITAL, INCORPORATED;
JAMES DONDERO; THE DUGABOY INVESTMENT TRUST; GET
GOOD TRUST,

*Appellants*,

*versus*

HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Appellee*.

Appeal from the United States Bankruptcy
Court for the Northern District of Texas
USDC No. 19-34054
USDC No. 3:21-CV-538

---

Before WIENER, GRAVES, and DUNCAN, *Circuit Judges*.

ON PETITION FOR REHEARING

No. 21-10449

Stuart Kyle Duncan, *Circuit Judge*:

No. 21-10449 The petition for panel rehearing is GRANTED. We withdraw our previous opinion, reported at 2022 WL 3571094, and substitute the following:

Highland Capital Management, L.P., a Dallas-based investment firm, managed billion-dollar, publicly traded investment portfolios for nearly three decades. By 2019, however, myriad unpaid judgments and liabilities forced Highland Capital to file for Chapter 11 bankruptcy. This provoked a nasty breakup between Highland Capital and its co-founder James Dondero. Under those trying circumstances, the bankruptcy court successfully mediated with the largest creditors and ultimately confirmed a reorganization plan amenable to most of the remaining creditors.

Dondero and other creditors unsuccessfully objected to the confirmation order and then sought review in this court. In turn, Highland Capital moved to dismiss their appeal as equitably moot. First, we hold that equitable mootness does not bar our review of any claim. Second, we affirm the confirmation order in large part. We reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds.

## I. Background

### A. Parties

In 1993, Mark Okada and appellant James Dondero co-founded Highland Capital Management, L.P. ("Highland Capital") in Dallas. Highland Capital managed portfolios and assets for other investment advisers and funds through a complex of entities under the Highland umbrella. Highland Capital's ownership-interest holders included Hunter Mountain Investment Trust (99.5%); appellant The Dugaboy Investment

Trust, Dondero's family trust (0.1866%);[1] Okada, personally and through

---

[1] The Dugaboy Investment Trust appeals alongside Dondero's other family trust Get Good Trust (collectively, the "Trusts").

~~No. 21-10449~~ trusts (0.0627%); and Strand Advisors, Inc. (0.25%), the only general partner, which Dondero wholly owned.

Dondero also manages two of Highland Capital's clients—appellants Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,
L.P. (the "Advisors"). Both the Advisors and Highland Capital serviced and advised billion-dollar, publicly traded investment funds for appellants Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. (collectively, the "Funds"), among others. For example, on behalf of the Funds, Highland Capital managed certain investment vehicles known as collateral loan obligations ("CLOs") under individualized servicing agreements.

### B. Bankruptcy Proceedings

Strapped with a series of unpaid judgments, Highland Capital filed for Chapter 11 bankruptcy in the District of Delaware in October 2019. The creditors included Highland Capital's interest holders, business affiliates, contractors, former partners, employees, defrauded investors, and unpaid law firms. Among those creditors, the Office of the United States Trustee appointed a four-member Unsecured Creditors' Committee (the "Committee").[2] *See* 11 U.S.C. § 1102(a)(1), (b)(1). Throughout the

---

[2] First, Redeemer Committee of the Highland Crusader Fund had obtained a $191 million arbitration award after a decade of litigation against Highland Capital. Second, Acis Capital Management, L.P. and Acis Capital Management GP, LLC had sued Highland Capital after facing an adverse $8 million arbitration award, arising in part from its now- extinguished affiliation. Third, UBS Securities LLC and UBS AG London Branch had received a $1 billion judgment against Highland Capital following a 2019 bench trial in New ~~York. Fourth, discovery vendor Meta-E Discovery had $779,000 in unpaid invoices. The Committee members are not parties on appeal.~~

bankruptcy proceedings, the Committee investigated Highland Capital's past and current operations, oversaw its continuing operations, and

No. 21-10449 negotiated the reorganization plan. *See id.* § 1103(c). Upon the Committee's request, the court transferred the case to the Northern District of Texas in December 2019.

Highland Capital's reorganization did not proceed under the governance of a traditional Chapter 11 trustee. Instead, the Committee reached a corporate governance settlement agreement to displace Dondero, which the bankruptcy court approved in January 2020. Under the agreed order, Dondero stepped down as director and officer of Highland Capital and Strand to be an unpaid portfolio manager and "agreed not to cause any Related Entity . . . to terminate any agreements" with Highland Capital. The Committee selected a board of three independent directors to act as a quasi- trustee and to govern Strand and Highland Capital: James Seery Jr., John Dubel, and retired Bankruptcy Judge Russell Nelms (collectively, the "Independent Directors"). The order also barred any claim against the Independent Directors in their official roles without the bankruptcy court's authorizing the claim as a "colorable claim[] of willful misconduct or gross negligence." Six months later, at the behest of the creditors, the bankruptcy court appointed Seery as Highland Capital's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. The order contained an identical bar on claims against Seery acting in these roles. Neither order was appealed.

Throughout summer 2020, Dondero proposed several reorganization plans, each opposed by the Committee and the Independent Directors.

---

York. Fourth, discovery vendor Meta-E Discovery had $779,000 in unpaid invoices. The Committee members are not parties on appeal.

No. 21-10449

Unpersuaded by Dondero, the Committee and Independent Directors negotiated their own plan. When Dondero's plans failed, he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients. *See Highland Cap. Mgmt., L.P. v. Dondero (In*

No. 21-10449 *re Highland Cap. Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex. June 7, 2021) (holding Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a "nasty divorce"). In Seery's words, Dondero wanted to "burn the place down" because he did not get his way. The Independent Directors insisted Dondero resign from Highland Capital, which he did in October 2020.

Highland Capital, meanwhile, proceeded toward confirmation of its reorganization plan—the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan"). In August 2020, the Independent Directors filed the Plan and an accompanying disclosure statement with the support of the Committee. *See* 11 U.S.C. §§ 1121, 1125. The bankruptcy court approved the statement as well as proposed notice and voting procedures for creditors, teeing up confirmation. Leading up to the confirmation hearing, the Advisors and the Funds asked the court to bar Highland Capital from trading or disposing of CLO assets pending confirmation. The bankruptcy court denied the request, and Highland Capital declined to voluntarily abstain and continued to manage the CLO assets.

Before confirmation, Dondero and other creditors (including several non-appellants) filed over a dozen objections to the Plan. Like Dondero, the United States Trustee primarily objected to the Plan's exculpation of certain non-debtors as unlawful. Highland Capital voluntarily modified the Plan to resolve six such objections. The Plan proposed to create eleven classes of

creditors and equity holders and three classes of administrative claimants. *See* 11 U.S.C. § 1122. Of the voting-eligible classes, classes 2, 7, and 9 voted to accept the Plan while classes 8, 10, and 11 voted to reject it.

No. 21-10449

## C. Reorganization Plan

The Plan works like this: It dissolves the Committee, and creates four entities—the Claimant Trust, the Reorganized Debtor, HCMLP GP LLC,[3] and the Litigation Sub-Trust. Administered by its trustee Seery, the Claimant Trust "wind[s]-down" Highland Capital's estate over approximately three years by liquidating its assets and issuing distributions to class-8 and -9 claimants as trust beneficiaries. Highland Capital vests its ongoing servicing agreements with the Reorganized Debtor, which "among other things" continues to manage the CLOs and other investment portfolios. The Reorganized Debtor's only general partner is HCMLP GP LLC. And the Litigation Sub-Trust resolves pending claims against Highland Capital under the direction of its trustee Marc Kirschner.

The whole operation is overseen by a Claimant Trust Oversight Board (the "Oversight Board") comprised of four creditor representatives and one restructuring advisor. The Claimant Trust wholly owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust. The Claimant Trust (and its interests) will dissolve either at the soonest of three years after the effective date (August 2024) or

(1) when it is unlikely to obtain additional proceeds to justify further action, (2) all claims and objections are resolved, (3) all distributions are made, and (4)      the Reorganized Debtor is dissolved.

---

[3] The Plan calls this entity "New GP LLC," but according to the motion to dismiss as equitably moot, the new general partner was later named HCMLP GP LLC. For the sake of clarity, we use HCMLP GP LLC.

No. 21-10449

Anticipating Dondero's continued litigiousness, the Plan shields Highland Capital and bankruptcy participants from lawsuits through an exculpation provision, which is enforced by an injunction and a gatekeeper

No. 21-10449 provision (collectively, "protection provisions"). The protection provisions extend to nearly all bankruptcy participants: Highland Capital and its employees and CEO; Strand; the Independent Directors; the Committee; the successor entities and Oversight Board; professionals retained in this case; and all "Related Persons"[4] (collectively, "protected parties").[5]

The Plan exculpates the protected parties from claims based on any conduct "in connection with or arising out of" (1) the filing and administration of the case, (2) the negotiation and solicitation of votes preceding the Plan, (3) the consummation, implementation, and funding of the Plan, (4) the offer, issuance, and distribution of securities under the Plan before or after the filing of the bankruptcy, and (5) any related negotiations, transactions, and documentation. But it excludes "acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct" *and* actions by Strand and its employees predating the appointment of the Independent Directors.

Under the Plan, bankruptcy participants are enjoined "from taking any actions to interfere with the implementation or consummation of the

---

[4] The Plan generously defines "Related Persons" to include all former, present, and future officers, directors, employees, managers, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, heirs, agents, other representatives, subsidiaries, divisions, and managing companies.

[5] The Plan expressly excludes from the protections Dondero and Okada; NexPoint Advisors, L.P.; Highland Capital Management Fund Advisors, L.P; their subsidiaries, managed entities, managed entities, and members; and the Dugaboy Investment Trust and its trustees, among others.

Plan" or filing any claim related to the Plan or proceeding. Should a party seek to bring a claim against any of the protected parties, it must go to the bankruptcy court to "first determin[e], after notice and a hearing, that such

claim or cause of action represents a colorable claim of any kind." Only then may the bankruptcy court "specifically authoriz[e]" the party to bring the claim. The Plan reserves for the bankruptcy court the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable" and then to adjudicate the claim if the court has jurisdiction over the merits.

### D.  Confirmation Order

At a February 2021 hearing, the bankruptcy court confirmed the Plan from the bench over several remaining objections. *See* Fed R. Bankr. P. 3017–18; 11 U.S.C. §§ 1126, 1128, 1129. In its later-written decision, the bankruptcy court observed that Highland Capital's bankruptcy was "not a garden variety chapter 11 case." The type of debtor, the reason for the bankruptcy filing, the kinds of creditor claims, the corporate governance structure, the unusual success of the mediation efforts, and the small economic interests of the current objectors all make this case unique.

The confirmation order criticized Dondero's behavior before and during the bankruptcy proceedings. The court could not "help but wonder" if Highland Capital's deficit "was necessitated because of enormous litigation fees and expenses incurred" due to Highland Capital's "culture of litigation." Recounting Highland Capital's litigation history, it deduced that Dondero is a "serial litigator." It reasoned that, while "Dondero wants his company back," this "is not a good faith basis to lob objections to the Plan." It attributed Dondero's bad faith to the Advisors, the Trusts, and the Funds, given the "remoteness of their economic interests." For example, the bankruptcy court "was not convinced of the[] [Funds'] independence" from Dondero because the Funds' board members did not testify and had

Case: 21-10449    Document: 00516346272    Page: 379    Date Filed: 06/16/2022

No. 21-10449

"engaged with the Highland complex for many years." And so the bankruptcy court "consider[ed] them all to be marching pursuant to the orders of Mr. Dondero." The court, meanwhile, applauded the members of

the Committee for their "wills of steel" for fighting "hard before and during this Chapter 11 Case" and "represent[ing] their constituency . . . extremely well."

On the merits of the Plan, the bankruptcy court again approved the Plan's voting and confirmation procedures as well as the fairness of the Plan's classes. *See* 11 U.S.C. §§ 1122, 1125(a)–(c). The court held the Plan complied with the statutory requirements for confirmation. *See id.* §§ 1123(a)(1)–(7), 1129(a)(1)–(7), (9)–(13). Because classes 8, 10, and 11 had voted to reject the Plan, it was confirmable only by cramdown.[6] *See id.* § 1129(b). The bankruptcy court found that the Plan treated the dissenting classes fairly and equitably and satisfied the absolute-priority rule, so the Plan was confirmable. *See id.* § 1129(b)(2)(B)–(C). The court also concluded that the protection provisions were fair, equitable, and reasonable, as well as "integral elements" of the Plan under the circumstances, and were within both the court's jurisdiction and authority. The court confirmed the Plan as proposed and discharged Highland Capital's debts. *Id.* § 1141(d)(1). After confirmation and satisfaction of several conditions precedent, the Plan took effect August 11, 2021.

---

[6] The bankruptcy court must proceed by nonconsensual confirmation, or "cramdown," 11 U.S.C. § 1129(b), when a class of unsecured creditors rejects a Chapter 11 reorganization plan, *id.* § 1129(a)(8), but at least one impaired class accepts it, *id.* § 1129(a)(10). A cramdown requires that the plan be "fair and equitable" to dissenting classes and satisfy the absolute priority rule—that is, dissenting classes are paid in full before any junior class can retain any property. *Id.* § 1129(b)(2)(B); *see Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).

No. 21-10449

### E. The Appeal

Dondero, the Advisors, the Funds, and the Trusts (collectively, "Appellants") timely appealed, objecting to the Plan's legality and some of

No. 21-10449 the bankruptcy court's factual findings.[7] Together with Highland Capital, Appellants moved to directly appeal the confirmation order to this court, which the bankruptcy court granted. *See* 28 U.S.C. § 158(d). A motions panel certified and consolidated the direct appeals. *See ibid.* Both the bankruptcy court and the motions panel declined to stay the Plan's confirmation pending appeal. Given the Plan's substantial consummation since its confirmation, Highland Capital moved to dismiss the appeal as equitably moot, a motion the panel ordered carried with the case.

*     *     *

We first consider equitable mootness and decline to invoke it here. We then turn to the merits, conclude the Plan exculpates certain non-debtors beyond the bankruptcy court's authority, and affirm in all other respects.

## II. Standard of Review

A confirmation order is an appealable final order, over which we have jurisdiction. *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015); *see* 28 U.S.C. §§ 158(d), 1291. This court reviews a bankruptcy court's factual findings for clear error and legal conclusions *de novo. Evolve Fed. Credit Union* v. *Barragan-Flores (In re Barragan-Flores)*, 984 F.3d 471, 473 (5th Cir. 2021) (citation omitted).

---

[7] The Trusts adopt the Funds' and the Advisors' briefs in full, and Dondero adopts the Funds' brief in full and the Advisors' brief in part. Fed. R. App. P. 28(i).

### III. Equitable Mootness

Highland Capital moved to dismiss this appeal as equitably moot. It argues we should abstain from appellate review because clawing back the implemented Plan "would generate untold chaos." We disagree and deny the motion.

The judge-made doctrine of equitable mootness allows appellate courts to abstain from reviewing bankruptcy orders confirming "complex plans whose implementation has substantial secondary effects." *New Indus., Inc. v. Byman (In re Sneed Shipbuilding, Inc.)*, 916 F.3d 405, 409 (5th Cir. 2019) (citing *In re Trib. Media Co.*, 799 F.3d 272, 274, 281 (3d Cir. 2015)). It seeks to balance "the equitable considerations of finality and good faith reliance on a judgment" and "the right of a party to seek review of a bankruptcy order adversely affecting him." *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (quoting *First Union Real Estate Equity & Mortg. Inv. v. Club Assocs. (In re Club Assocs.)*, 956 F.3d 1065, 1069 (11th Cir. 1992)); *see In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008); *see also* 7 Collier on Bankruptcy ¶ 1129.09 (16th ed.), LexisNexis (database updated June 2022) (observing "the equitable mootness doctrine is embraced in every circuit").[8]

This court uses equitable mootness as a "scalpel rather than an axe," applying it claim-by-claim, instead of appeal-by-appeal. *In re Pac. Lumber*

---

[8] The doctrine's atextual balancing act has been criticized. *See In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) ("Despite its apparent virtues, equitable mootness is a judicial anomaly."); *In re One2One Commc'ns, LLC*, 805 F.3d 428, 438–54 (3rd Cir. 2015) (Krause, J., concurring); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (banishing the term "equitable mootness" as a misnomer); *In re Cont'l Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (en banc) (Alito, J., dissenting); *see also* Bruce A. Markell, *The Needs of the Many: Equitable Mootness' Pernicious Effects*, 93 Am. Bankr. L.J. 377, 393–96 (2019) (addressing the varying applications between circuits). *But see In re Trib. Media*, 799 F.3d at 287–88 (Ambro, J., concurring) (highlighting some benefits of the equitable mootness doctrine).

*Co.(Pacific Lumber)*, 584 F.3d 229, 240–41 (5th Cir. 2009). For each claim, we analyze three factors: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re Manges*, 29 F.3d at 1039 (citing *In re Block Shim*

*Dev. Co.*, 939 F.2d 289, 291 (5th Cir. 1991); and *Cleveland, Barrios, Kingsdorf & Casteix v. Thibaut*, 166 B.R. 281, 286 (E.D. La. 1994)); *see also, e.g., In re Blast Energy Servs.*, 593 F.3d 418, 424–25 (5th Cir. 2010); *In re Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022). No one factor is dispositive. *See In re Manges*, 29 F.3d at 1039.

Here, the bankruptcy court and this court declined to stay the Plan pending appeal, and it took effect August 11, 2021. Given the months of progress, no party meaningfully argues the Plan has not been substantially consummated.[9] *See Pacific Lumber*, 584 F.3d at 242 (observing "consummation includes transferring all or substantially all of the property

---

[9] Since the Plan's effectuation, Highland Capital paid $2.2 million in claims to a committee member and $525,000 in "cure payments" to other counterparties. The independent directors resigned. The Reorganized Debtor, the Claimant Trust, HCMLP GP LLC, and the Litigation Sub-Trust were created and organized in accordance with the Plan. The bankruptcy court appointed the Oversight Board members, the Litigation Sub- Trust trustee, and the Claimant Trust trustee. Highland Capital assumed certain service contracts, including management of twenty CLOs with approximately $700 million in assets, and transferred its assets and estate claims to the successor entities. Highland Capital's pre-petition partnership interests were cancelled and cease to exist. A third party, Blue Torch Capital, infused $45 million in exit financing, fully guaranteed by the Reorganized Debtor, its operating subsidiaries, the Claimant Trust, and most of their assets. From the exit financing, an Indemnity Trust was created to indemnify claims that arise against the Reorganized Debtor, Claimant Trust, Ligation Sub-Trust, Claimant Trustee, Litigation Trustee, or Oversight Board members. The lone class-1 creditor withdrew its claim against Highland Capital. The lone class-2 creditor has been fully paid approximately $500,000 and issued a note of $5.2 million secured by $23 million of the Reorganized Debtor's assets. Classes 3 and 4 have been paid $165,412. Class 7 has received

$5.1 million in distributions from the Claimant Trust, totaling 77% of class-7 claims filed.

covered by the plan, the assumption of business by the debtors' successors, and the commencement of plan distributions" (citing 11 U.S.C. § 1141; and *In re Manges*, 29 F.3d at 1041 n.10)). But that alone does not trigger equitable mootness. *See In re SCOPAC*, 624 F.3d 274, 281–82 (5th Cir. 2010). Instead, for each claim, the inquiry turns on whether the court can craft relief for that

No. 21-10449 claim that would not have significant adverse consequences to the reorganization. Highland Capital highlights four possible disruptions: (1) the unraveling of the Claimant Trust and its entities, (2) the expense of disgorging disbursements, (3) the threat of defaulting on exit-financing loans, and (4) the exposure to vexatious litigation.

Each party first suggests its own all-or-nothing equitable mootness applications. To Highland Capital, Appellants' broad requested remedy with only a minor economic stake demands mooting the entire appeal. To Appellants, the type of reorganization plan categorically bars equitable mootness, or, alternatively, Highland Capital's joining the motion to certify the appeal estops it from asserting equitable mootness. These arguments are unpersuasive and foreclosed by *Pacific Lumber*.

First, Highland Capital contends the entire appeal is equitably moot because Appellants, with only a minor economic stake and questionable good faith, "seek[] nothing less than a complete unravelling of the confirmed Plan." It claims the court cannot "surgically excise[]" certain provisions, as the Funds request, because the Bankruptcy Code prohibits "modifications to confirmed plans after substantial consummation." *See* 11 U.S.C. § 1127(b). Not so.

"Although the Bankruptcy Code . . . restricts post-confirmation plan modifications, it does not expressly limit appellate review of plan confirmation orders." *Pacific Lumber*, 584 F.3d at 240 (footnote omitted) (citing 11 U.S.C. § 1127). This court may fashion "fractional relief" to

minimize an appellate disturbance's effect on the rights of third parties. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (denying dismissal on equitable mootness grounds because the court "could grant partial relief . . . without disturbing the reorganization"); *cf. In re Cont'l Airlines*, 91 F.3d 553, 571–72 (3d Cir. 1996) (en banc) (Alito, J., dissenting)

No. 21-10449 (observing "a remedy could be fashioned in the present case to ensure that the [debtor's] reorganization is not undermined"). In short, Highland Capital's speculations are farfetched, as the court may fashion the remedy it sees fit without upsetting the reorganization.

Second, Appellants contend that equitable mootness cannot apply—full-stop—because this appeal concerns a liquidation plan, not a reorganization plan. We reject that premise. *See infra* Part IV.A. Even if it were correct, however, this court has conducted the equitable-mootness inquiry for a Chapter 11 liquidation plan in the past. *See In re Superior Offshore Int'l, Inc.*, 591 F.3d 350, 353–54 (5th Cir. 2009). And other circuits have squarely rejected the categorical bar proposed by Appellants. *See In re Abengoa Bioenergy Biomass of Kan., LLC*, 958 F.3d 949, 956–57 (10th Cir. 2020); *In re BGI, Inc.*, 772 F.3d 102, 107–09 (2d Cir. 2014). We do the same.

Finally, Appellants assert that because Highland Capital and NexPoint Advisors, L.P. jointly moved to certify the appeal, it should be estopped from arguing the appeal is equitably moot. They cite no legal support for that approach. We decline to adopt it.

Instead, we proceed with a claim-by-claim analysis, as our precedent requires. Highland Capital suggests only two claims are equitably moot: (1) the protection-provisions challenge and (2) the absolute-priority-rule challenge. Neither provides a basis for equitable mootness.

For the protection provisions, Highland Capital anticipates that, without the provisions, its officers, employees, trustees, and Oversight Board

members would all resign rather than be exposed to Dondero-initiated litigation. Those resignations would disrupt the Reorganized Debtor's operation, "significant[ly] deteriorat[ing] asset values due to uncertainty." Appellants disagree, offering several instances when this court has reviewed release, exculpation, and injunction provisions over calls for equitable

Case: 21-30534   Document: 00516362923   Page: 392   Date Filed: 05/05/2023

No. 21-10449 mootness. *See, e.g.*, *In re Hilal*, 534 F.3d at 501; *Pacific Lumber*, 584 F.3d at 252; *In re Thru Inc.*, 782 F. App'x 339, 341 (5th Cir. 2019) (per curiam). In response, Highland Capital distinguishes this case because the provisions are "integral to the consummated plans." *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 486 (2d Cir. 2012). We again reject that premise. *See infra* Part IV.E.1.   In any event, Appellants have the better argument.

We have before explained that "equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008). That is so because "the goal of finality sought in equitable mootness analysis does not outweigh a court's duty to protect the integrity of the process." *Pacific Lumber*, 584 F.3d at 252. As in *Pacific Lumber*, the legality of a reorganization plan's non-consensual non-debtor release is consequential to the Chapter 11 process and so should not escape appellate review in the name of equity. *Ibid.* The same is true here. Equitable mootness does not bar our review of the protection provisions.

For the absolute-priority-rule challenge,[10] Highland Capital contends our review requires us to "rejigger class recoveries." *Pacific Lumber* is again instructive. There, the court declined to apply equitable mootness to a secured creditor's absolute-priority-rule challenge, as no other panel had

---

[10] While the issue is nearly forfeited for inadequate briefing, it fails on the merits regardless. *See Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020).

No. 21-10449

extended the doctrine so far. *Id.* at 243. Similarly, Highland Capital fails to identify a single case in which this court has declined review of the treatment of a class of creditor's claims resulting from a cramdown. *See id.* at 252. Regardless, Appellants challenge the distributions to classes 8, 10, and 11. According to Highland Capital's own declaration, "Class 8 General

No. 21-10449 Unsecured Claims have received their Claimant Trust Interests." But there is no evidence that classes 10 or 11 have received any distributions. *Contra Pacific Lumber*, 584 F.3d at 251 (holding certain claims equitably moot where "the smaller unsecured creditors" had already "received payment for their claims"). As a result, the relief requested would not affect third parties or the success of the Plan. *See In re Manges*, 29 F.3d at 1039. The doctrine of equitable mootness does not bar our review of the cramdown and treatment of class-8 creditors.

We DENY Highland Capital's motion to dismiss the appeal as equitably moot.

## IV. Discussion

As to the merits, Appellants fire a bankruptcy-law blunderbuss. They contest the Plan's classification as a reorganization plan, the Plan's satisfaction of the absolute priority rule, the Plan's confirmation despite Highland Capital's noncompliance with Bankruptcy Rule 2015.3, and the sufficiency of the evidence supporting the court's factual finding that the Funds are "owned/controlled" by Dondero. For each, we disagree and affirm. We do, however, agree with Appellants that the bankruptcy court exceeded its statutory authority under § 524(e) by exculpating certain non- debtors, and so we reverse and vacate the Plan only to that extent.

## A. Discharge of Debt

We begin with the Plan's classification as a reorganization plan, allowing for automatic discharge of the debts. The confirmation of a Chapter

No. 21-10449

11 restructuring plan "discharges the debtor from any [pre-confirmation] debt" unless, under the plan, the debtor liquidates its assets, stops "engag[ing] in [its] business after consummation of the plan," and would be denied discharge in a Chapter 7 case. 11 U.S.C. § 1141(d)(1), (3); *see In re Sullivan*, No. 99-11107, 2000 WL 1597984, at *2 (5th Cir. Sept. 26, 2000)

(per curiam). The bankruptcy court concluded Highland Capital continued to engage in business after plan consummation, so its debts are automatically discharged. The Trusts call foul because, in their view, Highland Capital's "wind down" of its portfolio management is not a continuation of its business. We disagree.

Whether a corporate debtor "engages in business" is "relatively straightforward." *Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018) (contrasting the more complex question for individual debtors); *see Grausz v. Sampson (In re Grausz)*, 63 F. App'x 647, 650 (4th Cir. 2003) (per curiam) (same). That is, "a business entity will not engage in business post- bankruptcy when its assets are liquidated and the entity is dissolved." *Um*, 904 F.3d at 819 (collecting cases).[11] But even a temporary continuation of business after a plan's confirmation is sufficient to discharge a Chapter 11 debtor's debt. *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 804 n.15 (5th Cir. 1997) (recognizing a debtor's "conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B)" (citation omitted)). That is the case here.

---

[11] *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. 832, 853 (Bankr. N.D. Cal. 2003) (holding corporate debtor was not engaging in business by merely having directors and officers, rights under an insurance policy, and claims against it); *In re Wood Fam. Ints., Ltd.*, 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (holding corporate debtor was not engaging in business when the plan called for liquidation and discontinuation of its business upon confirmation).

No. 21-10449

By the plain terms of the Plan, Highland Capital has and will continue its business as the Reorganized Debtor for several years. Indeed, much of this appeal concerns objections to Highland Capital's "continu[ing] to manage the assets of others." Because the Plan contemplates Highland Capital "engag[ing] in business after consummation," 11 U.S.C. § 1141(d)(1), the

bankruptcy court correctly held Highland Capital was eligible for automatic discharge of its debts.[12]

## B. Absolute Priority Rule

Next, we consider the Plan's compliance with the absolute-priority rule. When assessing whether a plan is "fair and equitable" in a cramdown scenario, courts must invoke the absolute-priority rule. 11 U.S.C. § 1129(b)(1); *see* 7 COLLIER ON BANKRUPTCY ¶ 1129.04. Under that rule, if a class of unsecured claimants rejects a plan, the plan must provide that those claimants be paid in full on the effective date *or* any junior interest "will not receive or retain under the plan . . . any property." 11 U.S.C. § 1129(b)(2)(B).[13]

Because class-8 claimants voted against the Plan, the bankruptcy court proceeded by nonconsensual confirmation. The court concluded the Plan was fair and equitable to class 8 and its distributions were in line with the absolute-priority rule. 11 U.S.C. § 1129(b)(2)(B). The Advisors claim the Plan violates the absolute priority rule by giving class-10 and -11 claimants a

---

[12] For the same reasons, we reject the Trusts' follow-on argument extending the same logic to the protection provisions.

[13] *See Pacific Lumber*, 584 F.3d at 244 (noting the rule "enforces a strict hierarchy of [creditor classes'] rights defined by state and federal law" to protect dissenting creditor classes); *see also In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002) ("[U]nsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." (citations omitted)).

"Contingent Claimant Trust Interest" without fully satisfying class-8 claimants. We agree the absolute-priority rule applies, and the Plan plainly satisfies it.

The Plan proposed to pay 71% of class-8 creditors' claims with *pro rata* distributions of interest generated by the Claimant Trust and then *pro rata*

No. 21-10449 distributions from liquidated Claimant Trust assets. Classes 10 and 11 received a *pro rata* share of "Contingent Claimant Trust Interests," defined as a Claimant Trust Interest vesting only when the Claimant Trustee certifies that all class-8 claimants have been paid indefeasibly in full and all disputed claims in class 8 have been resolved. Voilà: no interest junior to class 8 will receive any property until class-8 claimants are paid.

But the Advisors point to Highland Capital's testimony and briefs to suggest the Contingent Claimant Trust Interests (received by classes 10 and

11)      are property in some sense because they have value. That argument is specious. Of course, the Contingent Claimant Trust Interests have some small probability of vesting in the future and, thus, has some *de minimis* present value. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (holding a junior creditor's receipt of a presently valueless equity interest is receipt of property). But the absolute-priority rule has never required us to bar junior creditors from ever receiving property. By the Plan's terms, no trust property vests with class-10 or -11 claimants "unless and until" class-8 claims "have been paid indefeasibly in full." *See* 11 U.S.C. § 1129(b)(2)(B)(ii). That plainly comports with the absolute-priority rule.

## C.  Bankruptcy Rule 2015.3

We turn to whether the failure to comply with Bankruptcy Rule of Procedure 2015.3 bars the Plan's confirmation. The Independent Directors failed to file periodic financial reports per Federal Rule of Bankruptcy Procedure 2015.3(a) about entities "in which the [Highland Capital] estate

holds a substantial or controlling interest." The Advisors claim the failure dooms the Plan's confirmation because the Plan proponent failed to comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). We disagree.

Rule 2015.3 cannot be an applicable provision of Title 11 because the Federal Rules of Bankruptcy Procedure are not provisions of the Bankruptcy Code. *See Bonner v. Adams (In re Adams)*, 734 F.2d 1094, 1101 (5th Cir. 1984) ("The Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075, provides that the Supreme Court may prescribe 'by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure' in bankruptcy courts."); *cf. In re Mandel*, No. 20-40026, 2021 WL 3642331, at *6 n.7 (5th Cir. Aug. 17, 2021) (per curiam) (noting "Rule 2015.3 implements section 419 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005," which amended 28 U.S.C. § 2073). The Advisors' attempt to tether the rule to the bankruptcy trustee's general duties lacks any legal basis. *See* 11 U.S.C. §§ 704(a)(8), 1106(a)(1), 1107(a). The bankruptcy court, therefore, correctly overruled the Advisors' objection.

## D. Factual Findings

One factual finding is in dispute, but we see no clear error. The bankruptcy court found that, despite their purported independence, the Funds are entities "owned and/or controlled by [Dondero]." The Funds ask the court to vacate the factual finding because it threatens the Funds' compliance with federal law and damages their reputations and values. According to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him. Highland Capital maintains Dondero has sole discretion over the Funds as their portfolio manager and through his control of the Advisors, so the finding is supported by the record.

"Clear error is a formidable standard: this court disturbs factual findings only if left with a firm and definite conviction that the bankruptcy court made a mistake." *In re Krueger*, 812 F.3d 365, 374 (5th Cir. 2016) (cleaned up). We defer to the bankruptcy court's credibility determinations.

*See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587–88 (5th Cir. 1999).

Here, the bankruptcy court drew its factual finding from the testimony of Jason Post, the Advisors' chief compliance officer, and Dustin Norris, an executive vice president for the Funds and the Advisors. Post testified that the Funds have independent board members that run them. But the bankruptcy court found Post not credible because "he abruptly resigned" from Highland Capital at the same time as Dondero and is currently employed by Dondero. Norris testified that Dondero "owned and/or controlled" the Funds and Advisors. The bankruptcy court found Norris credible and relied on his testimony. The bankruptcy court also observed that none of the Funds' board members testified in the bankruptcy case and all "engaged with the Highland complex for many years." Because nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are "owned and/or controlled by [Dondero]," we leave the bankruptcy court's factual finding undisturbed.

### E. The Protection Provisions

Finally, we address the legality of the Plan's protection provisions. As discussed, the Plan exculpates certain non-debtor third parties supporting the Plan from post-petition lawsuits not arising from gross negligence, bad faith, or willful or criminal misconduct. It also enjoins certain parties "from taking any actions to interfere with the implementation or consummation of the Plan." The injunction requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as

"colorable"—*i.e.*, the bankruptcy court acts as a gatekeeper. Together, the provisions screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness.

The bankruptcy court deemed the provisions legal, necessary under the circumstances, and in the best interest of all parties. We agree, but only in part. Though the injunction and gatekeeping provisions are sound, the exculpation of certain non-debtors exceeds the bankruptcy court's authority. We reverse and vacate that limited portion of the Plan.

### 1. Non-Debtor Exculpation

We start with the scope of the non-debtor exculpation. In a Chapter 11 bankruptcy proceeding, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Contrary to the bankruptcy court's holding, the exculpation here partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors. *See Pacific Lumber*, 584 F.3d 251–53. We must reverse and strike the few unlawful parts of the Plan's exculpation provision.

The parties agree that *Pacific Lumber* controls and also that the bankruptcy court had the power to exculpate both Highland Capital and the Committee members. Appellants, however, submit the bankruptcy court improperly stretched *Pacific Lumber* to shield other non-debtors from breach- of-contract and negligence claims, in violation of § 524(e). Highland Capital counters that the exculpation provision is a commonplace Chapter 11 term, is appropriate given Dondero's litigious nature, does not implicate § 524(e), and merely provides a heightened standard of care.

To support that argument, Highland Capital highlights the distinction between a concededly unlawful release of all non-debtor liability and the

Plain's limited exculpation of non-debtor post-petition liability. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (describing releases as "eliminating" a covered party's liability "altogether" while exculpation provisions "set[] forth the applicable standard of liability" in

future litigation). According to Highland Capital, the Third and Ninth Circuits have adopted that distinction when applying § 524(e). *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394 (2021); *In re PWS Holding*, 228 F.3d at 246–47. Under those cases, narrow exculpations of post-petition liability for certain critical third-party non- debtors are lawful "appropriate" or "necessary" actions for the bankruptcy court to carry out the proceeding through its statutory authority under

§ 1123(b)(6) and § 105(a). *See* 11 U.S.C. § 1123(b)(6) ("[A] plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title."); *id* § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Highland Capital reads *Pacific Lumber* as "in step with the law in [those] other circuits" by allowing a limited exculpation of post-petition liability. *Cf. Blixseth*, 961 F.3d at 1084. We disagree. As the Ninth Circuit acknowledged, our court in *Pacific Lumber* arrived at "a conclusion opposite [the Ninth Circuit's]." 961 F.3d at 1085 n.7. Moreover, the Ninth Circuit expressly disavowed *Pacific Lumber*'s rationale—that an exculpation provision provides a "fresh start" to a non-debtor in violation of § 524(e)— because, in the Ninth Circuit's view, the post-petition exculpation "affects only claims arising from the bankruptcy proceedings themselves." *Ibid.* We are not persuaded, as Highland Capital contends, that the Ninth Circuit was "sloppy" and simply "misread *Pacific Lumber*." *See* O.A. Rec. 19:45–21:38.

The simple fact of the matter is that there is a circuit split concerning the effect and reach of § 524(e).[14] Our court along with the Tenth Circuit

---

[14] Amicus's contention that failing to adopt the Ninth Circuit's holding "would generate a clear circuit split" is wrong. There already is one. *See* Petition for Writ of Certiorari, *Blixseth v. Credit Suisse*, 141 S. Ct. 1394 (No. 20-1028) (highlighting the circuits' divergent approaches to the non-debtor discharge bar under § 524(e)).

No. 21-10449 hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code. *Pacific Lumber*, 584 F.3d at 252–53; *Landsing Diversified Props. v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600 (10th Cir. 1990) (per curiam). By contrast, the Ninth Circuit joins the Second, Third, Fourth, Sixth, Seventh, and Eleventh Circuits in reading § 524(e) to allow varying degrees of limited third-party exculpations. *Blixseth*, 961 F.3d at 1084; *accord In re PWS Holding*, 228 F.3d at 246–47 (allowing third-party releases for "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Airadigm Commc'ns., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2015).

Our *Pacific Lumber* decision was not blind to the countervailing view, as it twice cites the Third Circuit's contrary holding in other contexts. *See* 584 F.3d at 241, 253 (citing *In re PWS Holding*, 228 F.3d at 236–37, 246). But we rejected the parsing between limited exculpations and full releases that Highland Capital now requests. We are obviously bound to apply our own precedent. *See Hidalgo Cnty. Emergency Serv. Found. v. Carranza (In re Hidalgo Cnty. Emergency Serv. Found.)*, 962 F.3d 838, 841 (5th Cir. 2020)

--------------------

("Under our well-recognized rule of orderliness, . . . a panel of this court is bound by circuit precedent." (citation omitted)).

Under *Pacific Lumber*, § 524(e) does not permit "absolv[ing] the [non- debtor] from any negligent conduct that occurred during the course of the

Certiorari, *Blixseth v. Credit Suisse*, 141 S. Ct. 1394 (No. 20-1028) (highlighting the circuits' divergent approaches to the non- debtor discharge bar under § 524(e)).

bankruptcy" absent another source of authority. 584 F.3d at 252–53; *see also In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995). At oral argument, Highland Capital pointed only to § 1123(b)(6) and § 105(a) as footholds. *See* O.A. Rec. 16:45–17:28. But in this circuit, § 105(a) provides no statutory basis for a non-debtor exculpation. *In re Zale*, 62 F.3d at 760 (noting "[a] § 105 injunction cannot alter another provision of the code" (citing *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993))). And the same logic extends to § 1123(b)(6), which allows a plan to "include any other appropriate provision *not inconsistent with the applicable provisions of this title*." 11 U.S.C. § 1123(b)(6) (emphasis added).

*Pacific Lumber* identified two sources of authority to exculpate non-debtors. *See* 584 F.3d at 252–53. The first is to channel asbestos claims (not present here). *Id.* at 252 (citing 11 U.S.C. § 524(g)). The second is to provide a limited qualified immunity to creditors' committee members for actions within the scope of their statutory duties. *Pacific Lumber*, 584 F.3d at 253 (citing 11 U.S.C. § 1103(c)); *see In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012). And, though not before the court in *Pacific Lumber*, we have also recognized a limited qualified immunity to bankruptcy trustees unless they act with gross negligence. *In re Hilal*, 534 F.3d at 501 (citing *In re Smyth*, 207 F.3d 758, 762 (5th Cir. 2000)); *accord Baron v. Sherman (In re Ondova Ltd.)*, 914 F.3d 990, 993 (5th Cir. 2019) (per curiam). If other sources exist, Highland Capital failed to identify them. So we see no statutory authority for the full extent of the exculpation here.

The bankruptcy court read *Pacific Lumber* differently. In its view, *Pacific Lumber* created an additional ground to exculpate non-debtors: when the record demonstrates that "costs [a party] might incur defending against suits alleging such negligence are likely to swamp either [it] or the consummated reorganization." 584 F.3d at 252. We do not read the decision that way. The bankruptcy court's underlying factual findings do not alter

whether it has statutory authority to exculpate a non-debtor. That is the holding of *Pacific Lumber*.

That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*. We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital. Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee. *See* 11 U.S.C. § 1107(a); 7 COLLIER ON BANKRUPTCY ¶ 1101.01. It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence. *See In re Hilal*, 534 F.3d at 501. Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

In sum, our precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties, *see Baron*, 914 F.3d at 993. And so, excepting the Independent Directors and the Committee members, the exculpation of non-debtors here was unlawful.

No. 21-10449

Accordingly, the other non-debtor exculpations must be struck from the Plan. *See Pacific Lumber*, 584 F.3d at 253.[15]

---

[15] Highland Capital, like the bankruptcy court, claims the *res judicata* effect of the January and July 2020 orders appointing the independent directors and appointing Seery as CEO binds the court to include the protection provisions here. We lack jurisdiction to consider collateral attacks on final bankruptcy orders even when it concerns whether the court properly exercised jurisdiction or authority at the time. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *In re Linn Energy, L.L.C.*, 927 F.3d 862, 866–67 (5th Cir. 2019)

(quoting *Bailey*, 557 U.S. at 152). To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded.

As a result, the bankruptcy court was correct insofar as *those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities, but it was incorrect that *res judicata* mandates their inclusion in the Plan's new exculpation provision. Despite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 orders, given the orders' ongoing *res judicata* effects and our lack of jurisdiction to review those orders. But that says nothing of the effect of the Plan's exculpation provision.

As it stands, the Plan's exculpation provision extends to Highland Capital and its employees and CEO; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." Consistent with § 524(e), we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors.

## 2. Injunction & Gatekeeper Provisions

~~The~~We now turn to the Plan's injunction and gatekeeper provisions ~~are, on the other hand, perfectly lawful~~. Appellants object to the bankruptcy court's injunction as vague and the gatekeeper provision as overbroad. We are unpersuaded.

First, Appellants' primary contention—that the Plan's injunction "is broad" by releasing non-debtors in violation of § 524(e)—is resolved by our striking the impermissibly exculpated parties. *See supra* Part IV.E.1.

Second, Appellants dispute the permanency of the injunction for the legally exculpated parties by enjoining conduct "on and after the Effective

~~in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded.~~

~~As a result, the bankruptcy court was correct insofar as *those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities, but it was incorrect that *res judicata* mandates their inclusion in the Plan's new exculpation provision. Despite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 orders, given the orders' ongoing *res judicata* effects and our lack of jurisdiction to review those orders. But that says nothing of the effect of the Plan's exculpation provision.~~

No. 21-10449 Date." Even assuming the issue was preserved,[16] permanency alone is no reason to alter a bankruptcy court's otherwise-lawful injunction on appeal. *See In re Zale*, 62 F.3d at 759–60 (recognizing the bankruptcy court's jurisdiction to issue an injunction in the first place allowed it to issue a permanent injunction).

Third, the Advisors argue that the injunction is "overbroad and vague" because it does not define what it means to "interfere" with the "implementation or consummation of the Plan." That is unsupported by the record. As the bankruptcy court recognized, the Plan defined what constitutes interference: (i) filing a lawsuit, (ii) enforcing judgments, (iii)  enforcing security interests, (iv) asserting setoff rights, or (v) acting "in any manner" not conforming with the Plan. The injunction is not unlawfully overbroad or vague.

Finally, Appellants maintain that the gatekeeper provision impermissibly extends to unrelated claims over which the bankruptcy court

---

[16] *See Roy*, 950 F.3d at 251 ("Failure adequately to brief an issue on appeal constitutes waiver of that argument." (citation omitted)).

lacks subject-matter jurisdiction. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (noting a bankruptcy court retains jurisdiction post- confirmation only over "matters pertaining to the implementation or execution of the plan" (citations omitted)). While that may be the case, our precedent requires we leave that determination to the bankruptcy court in the first instance.

Courts have long recognized bankruptcy courts can perform a gatekeeping function. Under the "*Barton* doctrine," the bankruptcy court may require a party to "obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other

No. 21-10449 bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added) (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)); *accord Barton v. Barbour*, 104 U.S. 126 (1881).[17] In *Villegas*, we held "that a party must continue to file with the relevant bankruptcy court for permission to proceed with a claim against the trustee." 788 F.3d at 158. Relevant here, we left to the bankruptcy court, faced with pre-approval of a claim, to determine whether it had subject matter jurisdiction over that claim in the first instance. *Id.* at 158–59; *see, e.g.*, *Carroll v. Abide*, 788 F.3d 502, 506–07 (5th Cir. 2015) (noting *Villegas* "rejected an argument that the *Barton* doctrine does not apply when the bankruptcy court lacked jurisdiction"). In other words, we need not evaluate whether the bankruptcy court would have

---

[17] The Advisors also maintain that Highland Capital is neither a receiver nor a trustee, so *Barton* has no application here. We disagree. Highland Capital, for all practical purposes, was a debtor in possession entitled to the rights of a trustee. *See* 7 COLLIER ON BANKRUPTCY ¶ 1101.01 ("The debtor in possession is generally vested with all of the rights and powers of a trustee as set forth in section 1106 "); *see also Carter*, 220 F.3d

    at 1252 n.4. (finding no distinction between bankruptcy court "approved" and bankruptcy court "appointed" officers).

jurisdiction under every conceivable claim falling under the widest interpretation of the gatekeeper provision. We leave that to the bankruptcy court in the first instance.[18]

\*   \*   \*

In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. The exculpatory order is therefore vacated as to all parties *except* Highland Capital, the Committee and its members, and the

---

[18] For the same reasons, we also leave the applicability of *Barton*'s limited statutory exception to the bankruptcy and district courts in the first instance. *See* 28 U.S.C. § 959(a) (allowing suit, without leave of the appointing court, if the challenged acts relate to the trustee or debtor in possession "carrying on business connected with [their] property").

Independent Directors for conduct within the scope of their duties. We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.[19]

## V. Conclusion

Highland Capital's motion to dismiss the appeal as equitably moot is DENIED. The bankruptcy court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

------

[19] Nothing in this opinion should be construed to hinder the bankruptcy court's power to enjoin and impose sanctions on Dondero and other entities by following the procedures to designate them vexatious litigants. *See In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (per curiam). But non-debtor exculpation within a reorganization plan is not a lawful means to impose vexatious litigant injunctions and sanctions.

Document comparison by Workshare Compare on Monday, August 14, 2023 2:42:05 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\lbaldridge\Desktop\WIP\Opinion.pdf |
| Description | Opinion |
| Document 2 ID | file://C:\Users\lbaldridge\Desktop\WIP\Opinion on Rehearing.pdf |
| Description | Opinion on Rehearing |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Redline Summary: | | |
|---|---|---|
| No. | Change | Text |
| 1-2 | Change | Document: ~~0051643934~~00516462923 |
| 3-4 | Change | Date Filed: ~~08/19/2022~~09/07/2022 |
| 5 | Moved to | United States Court of Appeals |
| 6 | Insertion | Case: 21-10449 |
| 7 | Insertion | Document: 00516462923 |
| 8-9 | Insertion | Page: |

| 10 | Insertion | Date Filed: 09/07/2022 |
| 11 | Insertion | for the Fifth Circuit |
| 12 | Insertion | No. 21-10449 |
| 13 | Insertion | United States Court of Appeals |
| 14 | Deletion | United States Court of Appeals ~~for the~~ Fifth Circuit |
| 15 | Deletion | |
| 16 | Deletion | ~~Fifth Circuit~~ |
| 17 | Deletion | ~~No. 21-10449~~ |
| 18 | Deletion | |
| 19 | Moved from | ~~United States Court of Appeals~~ |
| 20 | Deletion | FILED ~~August 19~~ |
| 21 | Insertion | September 7, 2022 |
| 22-23 | Change | Document: ~~0051643934~~1100516462923 |
| 24-25 | Change | Date Filed: ~~08/19/2022~~09/07/2022 |
| 26 | Insertion | Graves, and Duncan, Circuit Judges. ON PETITION FOR REHEARING |
| 27 | Insertion | Case: 21-10449 |
| 28 | Insertion | Document: 00516462923 |
| 29-30 | Insertion | Page: |
| 31 | Insertion | Date Filed: 09/07/2022 |
| 32 | Insertion | 2 |
| 33 | Insertion | No. 21-10449 |
| 34-35 | Change | ~~No. 21-10449~~The petition for panel...the following: |
| 36 | Insertion | Case: 21-10449 |
| 37 | Insertion | Document: 00516462923 |

| 38-39 | Insertion | Page: |
|-------|-----------|-------|
| 40 | Insertion | Date Filed: 09/07/2022 |
| 41 | Insertion | 3 |
| 42 | Insertion | No. 21-10449 |
| 43 | Deletion | No. 21-10449 |
| 44 | Deletion | following a 2019 bench trial in New York. Fourth, discovery...not parties on appeal. |
| 45 | Insertion | Case: 21-10449 |
| 46 | Insertion | Document: 00516462923 |
| 47-48 | Insertion | Page: |
| 49 | Insertion | Date Filed: 09/07/2022 |
| 50 | Insertion | 4 |
| 51 | Insertion | No. 21-10449 |
| 52 | Deletion | No. 21-10449 |
| 53 | Insertion | York. Fourth, discovery...not parties on appeal. |
| 54 | Insertion | Case: 21-10449 |
| 55 | Insertion | Document: 00516462923 |
| 56-57 | Insertion | Page: |
| 58 | Insertion | Date Filed: 09/07/2022 |
| 59 | Insertion | 5 |
| 60 | Insertion | No. 21-10449 |
| 61 | Deletion | No. 21-10449 |
| 62 | Insertion | Case: 21-10449 |
| 63 | Insertion | Document: 00516462923 |
| 64-65 | Insertion | Page: |
| 66 | Insertion | Date Filed: 09/07/2022 |

| 67 | Insertion | 6 |
| 68 | Insertion | No. 21-10449 |
| 69 | Deletion | No. 21-10449 |
| 70 | Insertion | Case: 21-10449 |
| 71 | Insertion | Document: 00516462923 |
| 72-73 | Insertion | Page: |
| 74 | Insertion | Date Filed: 09/07/2022 |
| 75 | Insertion | 7 |
| 76 | Insertion | No. 21-10449 |
| 77 | Deletion | No. 21-10449 |
| 78 | Insertion | Case: 21-10449 |
| 79 | Insertion | Document: 00516462923 |
| 80-81 | Insertion | Page: |
| 82 | Insertion | Date Filed: 09/07/2022 |
| 83 | Insertion | 8 |
| 84 | Insertion | No. 21-10449 |
| 85 | Deletion | No. 21-10449 |
| 86 | Insertion | Case: 21-10449 |
| 87 | Insertion | Document: 00516462923 |
| 88-89 | Insertion | Page: |
| 90 | Insertion | Date Filed: 09/07/2022 |
| 91 | Insertion | 9 |
| 92 | Insertion | No. 21-10449 |
| 93 | Deletion | No. 21-10449 |
| 94 | Insertion | Case: 21-10449 |

| 95 | Insertion | Document: 00516462923 |
| 96-97 | Insertion | Page: |
| 98 | Insertion | Date Filed: 09/07/2022 |
| 99 | Insertion | 10 |
| 100 | Insertion | No. 21-10449 |
| 101 | Deletion | No. 21-10449 |
| 102 | Insertion | Case: 21-10449 |
| 103 | Insertion | Document: 00516462923 |
| 104-105 | Insertion | Page: |
| 106 | Insertion | Date Filed: 09/07/2022 |
| 107 | Insertion | 11 |
| 108 | Insertion | No. 21-10449 |
| 109 | Deletion | No. 21-10449 |
| 110 | Insertion | Case: 21-10449 |
| 111 | Insertion | Document: 00516462923 |
| 112-113 | Insertion | Page: |
| 114 | Insertion | Date Filed: 09/07/2022 |
| 115 | Insertion | 12 |
| 116 | Insertion | No. 21-10449 |
| 117 | Deletion | No. 21-10449 |
| 118 | Insertion | Case: 21-10449 |
| 119 | Insertion | Document: 00516462923 |
| 120-121 | Insertion | Page: |
| 122 | Insertion | Date Filed: 09/07/2022 |
| 123 | Insertion | 13 |

| 124 | Insertion | No. 21-10449 |
| 125 | Deletion | No. 21-10449 |
| 126 | Insertion | Case: 21-10449 |
| 127 | Insertion | Document: 00516462923 |
| 128-129 | Insertion | Page: |
| 130 | Insertion | Date Filed: 09/07/2022 |
| 131 | Insertion | 14 |
| 132 | Insertion | No. 21-10449 |
| 133 | Deletion | No. 21-10449 |
| 134 | Insertion | Case: 21-10449 |
| 135 | Insertion | Document: 00516462923 |
| 136-137 | Insertion | Page: |
| 138 | Insertion | Date Filed: 09/07/2022 |
| 139 | Insertion | 15 |
| 140 | Insertion | No. 21-10449 |
| 141 | Deletion | No. 21-10449 |
| 142 | Insertion | Case: 21-10449 |
| 143 | Insertion | Document: 00516462923 |
| 144-145 | Insertion | Page: |
| 146 | Insertion | Date Filed: 09/07/2022 |
| 147 | Insertion | 16 |
| 148 | Insertion | No. 21-10449 |
| 149 | Deletion | No. 21-10449 |
| 150 | Insertion | Case: 21-10449 |
| 151 | Insertion | Document: 00516462923 |

| 152-153 | Insertion | Page: |
| 154 | Insertion | Date Filed: 09/07/2022 |
| 155 | Insertion | 17 |
| 156 | Insertion | No. 21-10449 |
| 157 | Deletion | No. 21-10449 |
| 158 | Insertion | Case: 21-10449 |
| 159 | Insertion | Document: 00516462923 |
| 160-161 | Insertion | Page: |
| 162 | Insertion | Date Filed: 09/07/2022 |
| 163 | Insertion | 18 |
| 164 | Insertion | No. 21-10449 |
| 165 | Deletion | No. 21-10449 |
| 166 | Insertion | Case: 21-10449 |
| 167 | Insertion | Document: 00516462923 |
| 168-169 | Insertion | Page: |
| 170 | Insertion | Date Filed: 09/07/2022 |
| 171 | Insertion | 19 |
| 172 | Insertion | No. 21-10449 |
| 173 | Deletion | No. 21-10449 |
| 174 | Insertion | Case: 21-10449 |
| 175 | Insertion | Document: 00516462923 |
| 176-177 | Insertion | Page: |
| 178 | Insertion | Date Filed: 09/07/2022 |
| 179 | Insertion | 20 |
| 180 | Insertion | No. 21-10449 |

| 181 | Deletion | No. 21-10449 |
| 182 | Insertion | Case: 21-10449 |
| 183 | Insertion | Document: 00516462923 |
| 184-185 | Insertion | Page: |
| 186 | Insertion | Date Filed: 09/07/2022 |
| 187 | Insertion | 21 |
| 188 | Insertion | No. 21-10449 |
| 189 | Deletion | No. 21-10449 |
| 190 | Insertion | Case: 21-10449 |
| 191 | Insertion | Document: 00516462923 |
| 192-193 | Insertion | Page: |
| 194 | Insertion | Date Filed: 09/07/2022 |
| 195 | Insertion | 22 |
| 196 | Insertion | No. 21-10449 |
| 197 | Deletion | No. 21-10449 |
| 198 | Insertion | Case: 21-10449 |
| 199 | Insertion | Document: 00516462923 |
| 200-201 | Insertion | Page: |
| 202 | Insertion | Date Filed: 09/07/2022 |
| 203 | Insertion | 23 |
| 204 | Insertion | No. 21-10449 |
| 205 | Deletion | No. 21-10449 |
| 206 | Insertion | Case: 21-10449 |
| 207 | Insertion | Document: 00516462923 |
| 208-209 | Insertion | Page: |

| 210 | Insertion | Date Filed: 09/07/2022 |
|---|---|---|
| 211 | Insertion | 24 |
| 212 | Insertion | No. 21-10449 |
| 213 | Insertion | is one. See Petition for Writ of Certiorari, Blixseth v....bar under § 524(e)). |
| 214 | Deletion | No. 21-10449 |
| 215 | Insertion | Case: 21-10449 |
| 216 | Insertion | Document: 00516462923 |
| 217-218 | Insertion | Page: |
| 219 | Insertion | Date Filed: 09/07/2022 |
| 220 | Insertion | 25 |
| 221 | Insertion | No. 21-10449 |
| 222 | Deletion | Certiorari, Blixseth v....bar under § 524(e)). |
| 223 | Deletion | No. 21-10449 |
| 224 | Insertion | Case: 21-10449 |
| 225 | Insertion | Document: 00516462923 |
| 226-227 | Insertion | Page: |
| 228 | Insertion | Date Filed: 09/07/2022 |
| 229 | Insertion | 26 |
| 230 | Insertion | No. 21-10449 |
| 231 | Deletion | No. 21-10449 |
| 232 | Insertion | Case: 21-10449 |
| 233 | Insertion | Document: 00516462923 |
| 234-235 | Insertion | Page: |
| 236 | Insertion | Date Filed: 09/07/2022 |
| 237 | Insertion | 27 |

| 238 | Insertion | No. 21-10449 |
| 239 | Insertion | seek to roll back the protections in the bankruptcy...attack is precluded. |
| 240 | Insertion | As a result, the...exculpation provision. |
| 241 | Deletion | No. 21-10449 |
| 242 | Insertion | Case: 21-10449 |
| 243 | Insertion | Document: 00516462923 |
| 244-245 | Insertion | Page: |
| 246 | Insertion | Date Filed: 09/07/2022 |
| 247 | Insertion | 28 |
| 248 | Insertion | No. 21-10449 |
| 249-250 | Change | The We now turn to the Plan's injunction and gatekeeper provisions |
| 251 | Deletion | injunction and gatekeeper provisions are, on the other hand, perfectly lawful. Appellants object to the bankruptcy |
| 252 | Deletion | in the bankruptcy court's...attack is precluded. |
| 253 | Deletion | As a result, the...exculpation provision. |
| 254 | Deletion | No. 21-10449 |
| 255 | Insertion | Case: 21-10449 |
| 256 | Insertion | Document: 00516462923 |
| 257-258 | Insertion | Page: |
| 259 | Insertion | Date Filed: 09/07/2022 |
| 260 | Insertion | 29 |
| 261 | Insertion | No. 21-10449 |
| 262 | Deletion | No. 21-10449 |
| 263 | Insertion | Case: 21-10449 |

| 264 | Insertion | Document: 00516462923 |
| 265-266 | Insertion | Page: |
| 267 | Insertion | Date Filed: 09/07/2022 |
| 268 | Insertion | 30 |
| 269 | Insertion | No. 21-10449 |
| 270 | Deletion | No. 21-10449 |

| Statistics: | |
| --- | --- |
| | Count |
| Insertions | 223 |
| Deletions | 45 |
| Moved from | 1 |
| Moved to | 1 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 270 |