Case No. 23-10534

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

In the Matter of: Highland Capital Management, L.P.,

     Debtor.

---

Highland Capital Management Fund Advisors, L.P., now known as NexPoint Asset Management, L.P.; NexPoint Advisors, L.P.,

     Appellants,

v.

Highland Capital Management, L.P.,

     Appellee.

---

## APPELLANTS' REPLY BRIEF

---

Direct Appeal from the United States Bankruptcy Court for
the Northern District of Texas, the Honorable Stacey G.C. Jernigan

Davor Rukavina, Esq.
**MUNSCH HARDT KOPF & HARR, P.C.**
500 North Akard St., Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR NEXPOINT ASSET
MANAGEMENT, L.P. and
NEXPOINT ADVISORS, L.P.**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... ii

I.     SUMMARY OF REPLY .................................................................1

II.    REPLY ..........................................................................................3

      A.    The Gatekeeper Injunction is an Injunction ...................................3

      B.    The Gatekeeper Injunction In Action ............................................5

      C.    Lessons from the Gatekeeper Opinion .........................................13

III.   CONCLUSION.............................................................................18

CERTIFICATE OF SERVICE ................................................................20

CERTIFICATE OF COMPLIANCE.......................................................21

# TABLE OF AUTHORITIES

## Cases

*Barton v. Barbour*, 104 U.S. 126, 137 (1881) ..........................................................15

*In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013)................................10

*In re Highland Capital Management, L.P.*, 2023 WL 5523949
(Bankr. N.D Tex. August 25, 2023)...................................................................*passim*

*In the Matter of The Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) ..........4

*In the Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995)..................................4

*Richardson v. United States*, 468 U.S. 317, 326 n. 6 (1984)..................................10

*Soley v. First Nat'l Bank of Commerce*, 923 F.2d 406, 409-10 (5th Cir. 1991)......17

## Statutes

28 U.S.C. § 959(a) ...................................................................................................16

### REPLY BRIEF OF APPELLANTS NEXPOINT  ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., now known as NexPoint Asset Management, L.P. (the "<u>Appellants</u>") hereby submit this their *Reply Brief*, in support of which they would respectfully state as follows:

### I.     <u>SUMMARY OF REPLY</u>

The Appellants acknowledge that *Highland I* can be read as affirming the Gatekeeper Injunction, and they have not suggested that the question is without some ambiguity.  Yet the fact remains that this Court issued a revised opinion on rehearing, deleting a critical sentence from its original opinion that the Gatekeeper Injunction was "perfectly lawful."  That must have some meaning, as must the fact of the rehearing being granted.  So too must the conclusion in *Highland I* that "the Plan violates § 524(e) but only insofar as it exculpates *and enjoins* certain non-debtors."[1] The Appellants can think of no injunction, other than the Gatekeeper Injunction, that *Highland I* could have been referring to.

But perhaps most revealing regarding the Gatekeeper Injunction—and something that ought to be of concern to this Court—is the Bankruptcy Court's recent ruling (after the Appellants' opening brief) denying a different party relief

---

[1] ROA.1040; Highland I, 48 F.4th at 439 (emphasis added).

from the Gatekeeper Injunction.[2]  In a 104 page opinion,[3] entered upon a summary proceeding, the Bankruptcy Court denied a party leave to file a breach of fiduciary duty claim and conspiracy claim related to a sale of $365 million of claims in the bankruptcy case by the members of the Committee themselves.  In the process, the Bankruptcy Court applied a standard higher than under Rule 12(b)(6) for whether the claims were "colorable" and it adjudicated questions of fact, seemingly undertaking a definitive adjudication denying the underlying claims themselves.

The Bankruptcy Court, acting after confirmation when there is no bankruptcy estate, and over state law claims, entered an opinion that disposed of the underlying claims.  That is not only far in excess of any reasonable gatekeeper provision that may be entered in aid of a Chapter 11 plan, but it is precisely the type of *de facto* exculpation that this Court squarely rejected in *Pacific Lumber* and in *Zale Corp.* Any ambiguity in *Highland I* aside, the Appellants do not believe that *Highland I* would have suggested that any Gatekeeper Injunction was proper had it known how the Gatekeeper Injunction would function in real life.

Whereas the issues were hypothetical in *Highland I*, these recent developments demonstrate that the Gatekeeper Injunction is improper *per se* and support the conclusion that *Highland I* limited the Gatekeeper Injunction to only

---

[2] *See In re Highland Capital Management, L.P.*, 2023 WL 5523949 (Bankr. N.D Tex. August 25, 2023).

[3] The opinion is 48 pages on Westlaw, but it also contains 304 footnotes.

those parties that were properly exculpated by the confirmed Plan.  That does not mean that the Gatekeeper Injunction is superfluous, in that there would be little reason to enjoin that what is already exculpated.  On the contrary, exculpation extends only to simple negligence in the administration of the estate.  Other actionable wrongs are not exculpated, but the Gatekeeper Injunction ensures that such other actions are not brought without some advanced judicia oversight.  The two work in harmony, consistent with *Highland I*, but protecting the same universe of persons.  That is the most logical and equitable manner to harmonize the conflicting language in *Highland I* with its actual conclusions.

## II.   <u>REPLY</u>

### A.   <u>THE GATEKEEPER INJUNCTION IS AN INJUNCTION</u>

Highland repeatedly makes the remarkable argument that the Gatekeeper Injunction is not really an injunction, in that "[i]t requires only that a party seeking to assert claims first seek Bankruptcy Court approval before commencing litigation." Appellee Brief at p. 6.  The argument is a remarkable one in that the language of the Gatekeeper Injunction is that "no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that . . ." ROA.160.

'No party may' is the language of an injunction, and referring to the parties enjoined—including the Appellants—as the "Enjoined" parties demonstrates the obvious.  Indeed, the title of Article IX.F of the Plan, in which the Gatekeeper Injunction appears, is precisely "Injunction." *See id*.  Certainly the Debtor would

agree that if one violates the Gatekeeper Injunction, the remedy is not a breach of contract as breaches of a confirmed Chapter 11 plan usually are, but is contempt and sanctions. That is an injunction. If any further proof is needed, the Bankruptcy Court itself referred to the Gatekeeper Injunction as an "injunction." *In re Highland Capital Management, L.P.*, 2023 WL 5523949 at *2 n. 7 (Bankr. N.D Tex. August 25, 2023).

The reason why Highland seeks to argue against the obvious is because this Court has twice before addressed, and clearly disapproved, of permanent plan injunctions the effect of which is to grant a non-consensual release; *i.e.* a *de facto* exculpation. This Court so held in *Pacific Lumber*, where the Court read its precedent "broadly to foreclose non-consensual non-debtor releases <u>and permanent injunctions</u>." *In the Matter of The Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (emphasis added). This Court also so held in *Zale Corp.*, holding that it "must overturn a § 105 injunction if it effectively discharges a nondebtor." *In the Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995). There is no question that the Gatekeeper Injunction was entered by the Bankruptcy Court under section 105 of the Bankruptcy Code. ROA.809.

Similarly, Highland discusses at some length the general plan injunction set forth in Article IX.F of the Plan enforcing the Plan's discharge, which *Highland I* called "sound." *See* Appellee Brief at pp. 14-16. The Appellants have not challenged that conclusion and that particular injunction is not the subject of this

Appeal.  The Gatekeeper Injunction that *is* the subject of this Appeal is a wholly separate injunction from the anti-interference injunctions that appear immediately above the Gatekeeper Injunction in the Plan.  ROA.159-160.

## B.     THE GATEKEEPER INJUNCTION IN ACTION

Highland concludes its brief with the following: "[t]he only fair reading of the Gatekeeper Provision is that the Bankruptcy Court will authorize a party to pursue a claim if it determines the claim is colorable. It really is that simple."  Appellee Brief at pp. 28-29.  As a recent 104 page opinion (48 pages on Westlaw, but also containing 304 footnotes on many more unnumbered pages) from the Bankruptcy Court denying a different party relief from the Gatekeeper Injunction demonstrates, however, the reality is far different and that the issue is not "that simple" at all.

On August 25, 2023, the Bankruptcy Court had the opportunity to consider a motion for leave from the Gatekeeper Injunction, pursuant to the mechanism of the injunction itself, which the court denied.  *See In re Highland Capital Management, L.P.*, 2023 WL 5523949 (Bankr. N.D Tex. August 25, 2023) (the "Gatekeeper Opinion").  The Appellants believe that this development demonstrates the inappropriateness of the Gatekeeper Injunction from a jurisdictional and due process perspective, and also that the Gatekeeper Injunction is in reality and practice precisely the type of *de facto* exculpation prohibited by this Court's precedent discussed above.

By way of brief background, something that any reasonable practitioner would agree is highly unusual happened during the confirmation process: three of the members of the Committee sold their claims worth $365 million to private equity funds. *See id*. at *13. This was after the plan was confirmed but before it became effective. *See id*. The members of the Committee owed fiduciary duties to the estate and were privy to highly confidential information. Of additional interest, the U.S. Department of Justice formally informs the members of committees that "they may not purchase, sell or otherwise trade in claims against the Debtor while they are committee members absent an order of the Court."[4] Ultimately, what happened was that Highland owned a substantial amount of MGM stock which, when purchased by Amazon, shot up in value. It was alleged that Highland's manager, Mr. James Seery, had advanced, material nonpublic information regarding this pending transaction, on which he traded for personal benefit. Whether anything untoward happened aside, that three Committee members, owing fiduciary duties and under the Department of Justice's prohibition against trading claims, sold their claims raises enough questions to merit some investigation and judicial oversight.

The Hunter Mountain Investment Trust ("HMIT"), which is separate from the Appellants,[5] sought leave from the Gatekeeper Injunction to file an action based on

---

[4] https://www.justice.gov/ust-regions-r11/file/ch11_creditor_cmte_infosheet_madison.pdf/download

[5] The Appellants and Hunter Mountain Investment Trust are both related to James Dondero so, while they are separate entities, they share an affiliation.

state law breaches of fiduciary duty and conspiracy claims against Mr. Seery and the purchasers of the subject claims. *See id.* at *2. HMIT owned equity in Highland and therefore held a contingent interest against Highland's postconfirmation trust estate. *See id.* HMIT alleged that Mr. Seery shared non-public information with the claims buyers such that they knew they would make large profits on the claims, in exchange for which they, as the largest claimants against the trust, would "rubber stamp" Mr. Seery's excessive compensation and authorize him to engage in unnecessary litigation against Mr. Dondero and his affiliates, even though the trust estate had enough funds to pay everyone in full with the successful sale of the MGM stock. *See id.* at *4.

The Bankruptcy Court heard evidence on the motion, but denied discovery, other than ordering a deposition of Mr. Seery and Mr. Dondero. *See id.* at *21. Suffice it to say that Mr. Seery, being accused of serious torts, was unlikely to be a cooperative witness or to offer much in the way of evidence, especially when documentary evidence to test his testimony was unavailable.[6]

Pausing for a moment, the Appellants are not arguing the merits of any of these allegations, they do not necessarily ratify any of these allegations, they are not necessarily arguing that the Bankruptcy Court's conclusion, rationale, or disposition

---

[6] As the Bankruptcy Court details in the Gatekeeper Opinion, two attempts were made to obtain prelitigation discovery in Texas state court employing the state law process, both of which were denied by the state courts. *See id.* at *12

of the evidence was wrong, and they are certainly not seeking any review of the Gatekeeper Opinion.  Rather, they discuss these proceedings to demonstrate what they would have to go through were they to seek similar relief, to demonstrate the *de facto* summary trial that the Bankruptcy Court engaged in, and to question whether this Court in *Highland I* would have contemplated that this would be how the Bankruptcy Court would apply the Gatekeeper Injunction.

The Bankruptcy Court began by pointing out what the Appellants pointed out to this Court before: that not only would the movant have to demonstrate that its claims were "colorable," but also that the Bankruptcy Court would have to grant "specific authorization" to pursue the claims.  *See id*. at 2.  As the Appellants pointed out in their opening brief, this latter element is wholly without any standard, seems to be wholly discretionary, and sounds more like the province of Caesar than that of a federal court.  Thus, even if the Bankruptcy Court found a claim to be "colorable," that by itself would not necessarily lead to leave from the Gatekeeper Injunction.

The Bankruptcy Court next weighed the evidence, making several evidentiary findings: "Seery credibly testified," *see id*. at *8; "it appears from the credible evidence . . . that the MGM Email did not disclose information to Seery that was not already made available to the public," *see id*.; "no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed 'material interest' in acquiring MGM," *see id*.; "he [Dondero] communicated information that Seery and any member of the

public who cared to look could have gleaned from publicly available information as of December 17, 2020," *see id*.; "Even if the MGM Email contained [material nonpublic information] on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed," *see id*. at * 9; "[c]redible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public)." *Id*. at *17 n. 113.

By way of additional example, an important issue was whether the claims buyers made their decisions based on material nonpublic information, a disputed question of fact that the Bankruptcy Court seemed to adjudicate:

> HMIT insists that it 'made no sense' for the Claims Purchasers to buy the Purchased Claims because the publicly available information did not offer a sufficient potential profit to justify the publicly disclosed risk,' and 'their investment was projected to yield a small return with virtually no margin for error' . . .

> Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside. In this context, HMIT's and Dondero's assertions that it did not 'make any sense' for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan.

*Id*. at \*13-\*14.    And, on the ultimate issue of whether material, nonpublic

information was used, the Bankruptcy Court concluded as follows:

> contrary to the Proposed Complaint's statement that it would have been
> 'impossible for Stonehill and Farallon (in the absence of insider
> information) to forecast any significant profit at the time of their multi-
> million-dollar investments,' the evidence showed there were already
> reports in the financial press that MGM was engaging with Amazon,
> Apple, and others in selling its media portfolio, and thus the prospect
> of an MGM transaction increasing the value of, and return on, the
> Purchased Claims, 'at the time of their multi-million-dollar
> investments' was publicly available information.    HMIT's suggestion
> that the Claims Purchasers were in possession of inside information not
> publicly available when they acquired the Purchased Claims is simply
> not plausible.

*Id*. at \*.

Simply put, the Bankruptcy Court believed Mr. Seery and it did not believe

Mr. Dondero, including as Mr. Dondero recounted his conversations with the claims

buyers.    *See id*. at \*10-\*11.    While that is perfectly appropriate at trial, when the

Bankruptcy Court sits as the finder of fact, deciding questions of credibility and

deciding the evidence in the context of whether a claim is "colorable," in a summary

proceeding, is not.    While the Plan does not define what is "colorable" and while the

case law sets forth no precise definition, the general meaning of the term is

understood to mean "some possible validity."    *In re Deepwater Horizon*, 732 F.3d

326, 340 (5th Cir. 2013) (quoting and construing *Richardson v. United States*, 468

U.S. 317, 326 n. 6 (1984)).    Respectfully, no general understanding of the term

"colorable" includes weighing evidence of determining witness credibility.

Separate from adjudicating facts as part of the "colorable" standard, the Bankruptcy Court also decided questions of law. Namely, the Bankruptcy Court considered whether bankruptcy claims trading could be tortious or actionable. *See id*. at \*21. Surveying the law, the Bankruptcy Court concluded that there is nothing *per se* wrong with claims trading, *see id*. at \*22, and that "claims trading is a highly unregulated activity in the bankruptcy world. HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this." *Id*. at 27 (emphasis removed). In other words, the Bankruptcy Court concluded that, at last on the facts as it found them, there was nothing wrong with the members of the Committee selling their claims. Thus, there is also the potential of precedent being set in a summary proceeding over claims which, as will be discussed below, the Bankruptcy Court concluded it lacked subject matter jurisdiction.

The Bankruptcy Court also considered what it meant for a claim to be "colorable" within the meaning of the Gatekeeper Injunction—another problem *ab initio* because the Plan fails to define that requirement. Significantly, Highland offers this Court no analysis of what that term means, at least not in its brief, despite repeatedly referring to the Gatekeeper Injunction's requirement of a "colorable" claim. In the matter that *was* tried, Highland argued that this required HMIT to prove that the claim is "not without foundation," including on a factual basis. *See id*. at \*38. HMIT, on the other hand, argued that the standard should be the same as Rule

12(b)(6): "whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a plausible claim for relief." *Id*.

The Bankruptcy Court determined that the issue "was somewhat of a mixed question of fact and law," *see id*., and that the standard was broader than the "plausibility" standard under Rule 12(b)(6), "a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*." *Id*. at *41 (emphasis in original). The Bankruptcy Court also concluded that it was entitled to consider matters outside the record, to "take into consideration its knowledge of the bankruptcy proceedings and the parties." *Id*. (emphasis removed). The problem is that none of this was in the Plan or in *Highland I* and that it sets forth a highly subjective standard, as opposed to the standards specified by the Supreme Court in the form of Rule 11, Rule 12(b), Rule 56, and similar rules.

The Bankruptcy Court then proceeded to address the individual causes of action sought to be asserted, deciding that these causes of action had no merit on their substance. *See id*. at *46-*48. The Bankruptcy Court also found that "HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings." *Id*. at *48.

Finally, the Bankruptcy Court concluded that: (i) the movant lacked constitutional standing to bring its proposed claim "and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims"; (ii) the movant lacked prudential standing to bring its proposed claims; and (iii) that the claims were not "colorable," because HMIT failed to demonstrate that the claims "are not without foundation, not without merit, and not being pursued for an improper purpose." *Id*. at 48.

## C.   LESSONS FROM THE GATEKEEPER OPINION

As the Appellants have intimated throughout, the real problem with the Gatekeeper Injunction is not the existence of a gatekeeping process in the abstract to protect an estate and its professionals, but rather that an injunction such as this one is used to provide exculpation in an end-run around *Pacific Lumber*. The Gatekeeper Opinion demonstrates that the Appellants are correct and that the Gatekeeper Injunction is a *de facto* exculpation that exceeds the permissible scope of *Pacific Lumber*, and that the Bankruptcy Court was without jurisdiction to enter it (or to apply it after the bankruptcy estate ceased to exist, and hence the need to protect the estate and its professionals). In the Gatekeeper Opinion, the known facts raised at least some fair questions, evidence was presented in support of the claims, and recognized and established states law claims were sought to be asserted. Yet HMIT was not permitted to proceed. The Appellants do not know what more HMIT could have done without outright proving its underlying claims on the merits.

And, although they of course do not know, the Appellants respectfully and humbly submit that this Court in *Highland I* would have addressed the Gatekeeper Injunction in greater detail and with greater scrutiny, beyond the two (2) pages afforded to that discussion, were this Court to know that Highland would use the Gatekeeper Injunction to hold a mini-trial on the merits, without meaningful discovery, on a summary basis, the result of which would be complicated and extensive findings of fact and conclusions of law under the guise of whether a claim was "colorable."

The Bankruptcy Court, in its Gatekeeper Opinion, explained part of its reasoning for why the test for "colorable" should be higher than the plausibility test of Rule 12(b)(6): "if the standard of review presents no greater hurdle to the movant than the 12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put in place to prevent." *Id*. at 20. The Bankruptcy Court's point is a logical one, except that it would rewrite the application of Rule 12(b)(6) and that it ignores the many protections already provided by the law to protect against bad-faith litigation, including Rule 11.

But the same logic applies in reverse as well. The Plan's exculpation does not apply to "acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct." ROA.158. Thus, where these things are alleged, as they were in the Gatekeeper Opinion, the Gatekeeper Injunction turns

into a *de facto* exculpation of things that otherwise would not be capable of exculpation, because the Gatekeeper Injunction exists and is enforceable regardless of the scope of the exculpation provision, unless and until relief from the Gatekeeper Injunction is had.  In other words, if the standard of "colorable" is greater than plausibility, requires the showing of a *prima facie* case both factually and legally, and even permits the adjudication of conflicting evidence, then the Gatekeeper Injunction is exculpation unless and until this standard is proven.

Thus, where the Bankruptcy Court was logically concerned that the Gatekeeper Injunction would not have sufficient teeth, or could be rendered ineffective with too low a standard for a "colorable" claim, this Court should be logically concerned that having too high a standard converts the Gatekeeper Injunction into precisely the type of *de facto* exculpation by permanent injunction firmly disapproved of by *Pacific Lumber* and *Zale Corp.*  It is no answer to say, as Highland says, that all one need prove is that the claim is "colorable," if so proving is the effective equivalent of a trial.

Furthermore, in *Highland I*, this Court looked to the Barton Doctrine, as did the Bankruptcy Court, as partial support for the Gatekeeper Injunction.  But that doctrine applies only to "negligence." *Barton v. Barbour*, 104 U.S. 126, 137 (1881).  And the application of that doctrine directly conflicts with the statute expressly providing that a trustee, receiver, or debtor-in-possession may be sued "without leave of the court appointing them [] with respect to any of their acts or transactions

in carrying on business." 28 U.S.C. § 959(a). In the Gatekeeper Opinion, the issue was not negligence, and the issue was the transaction of business, as opposed to administering an estate. While *Highland I* generally held that bankruptcy courts may perform a gatekeeper function under the Barton Doctrine, the real world example discussed above demonstrates otherwise.

Finally, in its Gatekeeper Opinion, the Bankruptcy Court held that a federal court would lack subject matter jurisdiction over the claims sought to be brought. As discussed in the Appellants' opening brief, on the question of whether the Bankruptcy Court had jurisdiction to determine whether a claim was "colorable" when it would otherwise not have jurisdiction over the claim itself, *Highland I* concluded that "our precedent requires we leave that determination to the bankruptcy court in the first instance." ROA. 1039. Hence precisely the jurisdictional paradox that the Appellants addressed: even though the Bankruptcy Court expressly held that it would lack subject matter jurisdiction over the claims at issue, it proceeded to find and conclude that the claims were not "colorable," effectively and permanently adjudicating claims over which it had no jurisdiction. This is directly at odds with the belief expressed in *Highland I* that the Bankruptcy Court would effectively be able to ensure against misuse of the Gatekeeper Injunction on matters over which it lacked jurisdiction.

Nor is it any relief to conclude, as Highland does, that a "plaintiff can appeal the Bankruptcy Court's determination that the claim is not colorable." Appellee

Brief at p. 4.  By the same logic, legal error can be encouraged because an appellate court can remedy the error.  Respectfully, the proper administration of justice requires that legal error be avoided in the first instance.

The Appellants acknowledge that, normally, a court's adjudication of facts on a jurisdictional question is not binding or preclusive.  *See, e.g., Soley v. First Nat'l Bank of Commerce*, 923 F.2d 406, 409-10 (5th Cir. 1991).  Here, however, if the Appellants ever seek relief from the Gatekeeper Injunction, there is no other court for the Appellants to go to.  The matter is definitively concluded and adjudicated. There may be a right to appeal, as Highland points out, but one would be appealing determinations of fact without meaningful discovery and without a trial, which are the predicates of a finding of fact entitling it to deference on appeal.

This Court now has a real world example of the application of the Gatekeeper Injunction, at least under this Plan and in this Bankruptcy Case.  That application proves the Appellants' points regarding why the Gatekeeper Injunction is in reality a prohibited exculpation provision, and it should give this Court great concern that a court, having no subject matter jurisdiction, made findings of fact and conclusions of law the effect of which are to close the doors of *all* courts to a plaintiff that can otherwise satisfy Rule 12(b)(6) and is willing to live with the consequences of any shenanigans under Rule 11 and other protective powers of the court.

## III.    <u>CONCLUSION</u>

As the Appellants have stated, they recognize that this Court does not write on a clean slate and that the issue is the proper meaning and interpretation of *Highland I.*  As they have also made clear, this is not an appeal of the Gatekeeper Opinion.  For the reasons argued in their opening brief, they submit that *Highland I* has already decided that the Gatekeeper Injunction is lawful only as applied to the same persons otherwise protected by the exculpation provision.  There is no other meaningful way to harmonize *Highland I's* conclusion that "the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors," ROA.1040, and its rejection of the Appellants' challenge of the Gatekeeper Injunction as "resolved by our striking the impermissibly exculpated parties."  ROA.1038.

RESPECTFULLY SUBMITTED this 26th day of October, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
500 N. Akard St., Ste. 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**ATTORNEYS FOR APPELLANTS NEXPOINT ADVISORS, L.P. AND NEXPOINT ASSET MANAGEMENT, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 26th day of October, 2023, a true and a correct copy of the foregoing document was served on the counsel of record listed below via electronic service.

Melissa Sue Hayward, Esq.
Email: mhayward@haywardfirm.com
Hayward, P.L.L.C.
10501 N. Central Expressway, Ste. 106
Dallas, TX 75231-0000

Jeffrey N. Pomerantz
Email: jpomerantz@pszjlaw.com
Pachulski Stang Ziehl & Jones, L.L.P.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Zachery Z. Annable, Esq.
Email: zannable@haywardfirm.com
Hayward, P.L.L.C.
10501 N. Central Expressway, Ste. 106
Dallas, TX 75231-0000

By:  /s/ Davor Rukavina
      Davor Rukavina, Esq.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)'s TYPE-VOLUME LIMITATION, TYPEFACE LIMITATION, AND TYPE-STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,509 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman, 14 pt. font.

Dated:  July 29, 2022.

By:  /s/ Davor Rukavina
Davor Rukavina, Esq.

4860-0285-6843v.1 019717.00001